STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
*sbasser@barrack.com*
*sward@barrack.com*

MARK R. ROSEN (139506)
JEFFREY A. BARRACK (admitted *pro hac vice*)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
*mrosen@barrack.com*
*jbarrack@barrack.com*

*Counsel for Lead Plaintiff, Public
Employees Retirement Association of
New Mexico, and Lead Counsel for the
Proposed Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re PriceSmart, Inc. Securities Litigation | CASE NO. 19-CV-0958-JM-LL |
| | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | Jury Trial Demanded |

# TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION ....................................... 1

II.   JURISDICTION AND VENUE ........................................................... 17

III.  PARTIES ...................................................................................... 18

IV.   SUBSTANTIVE ALLEGATIONS ...................................................... 20

  A.  PriceSmart's Background, Business Model and Formula for Success ............... 20

  B.  The New E-Commerce Environment Confronting PriceSmart ....................... 22

  C.  PriceSmart Strives to Achieve Necessary Online Connectivity In-House ........ 23

  D.  PriceSmart Announces an Innovation Committee and Plan to Launch a "New Online Business" During the Summer of 2018 ........................................ 28

  E.  Defendants Deceive Investors with False and Misleading Financial Reporting Regarding the Adequacy of Related Internal Controls and False SOX Certifications ............................................................................. 32

  F.  Developing an Omni-Channel Experience In-House – But Without Solving the Basic "How" to do so in Accordance with PriceSmart's Business Model ......................................................................... 33

  G.  Misclassification of Assets: Distorting PriceSmart's Liquidity Profile ............ 36

  H.  False and Misleading Statements of March 19, 2018, April 5, 2018, and April 6, 2018 Respecting the Acquisition of Aeropost ..................................... 37

  I.  Continuing Falsity and Deception in Statements of July 5, 2018 and July 6, 2018 ..................................................................................... 49

  J.  The Entire Truth Finally Emerges ..................................................... 55

V.    ADDITIONAL ALLEGATIONS SUPPORTING *SCIENTER* ................ 68

  A.  An Inference of *Scienter* Arising from Required Acquisition Due Diligence Relating to Aeropost ......................................................... 69

  B.  Inference of Knowledge: The Aeropost Acquisition Was a Critically Important Transaction that Involved a Key Issue Vital to PriceSmart's Success and Competitiveness ............................................................. 73

i

C.   The Departure of Laparte in Close Proximity to the Aeropost Acquisition Supports an Inference that He Knowingly Entered into a Damaging Transaction that did not Provide the Solution that was the Keystone to Building or Accelerating the Seamless Omni-Channel Experience .................73

D.   The Proximity, Magnitude, and Ongoing Duration of the Adverse EPS Impact from Aeropost Supports *Scienter* ...........................................74

E.   Admissions that PriceSmart had not Figured out Connecting Brick-and-Mortar to Online in a way that Really Works Support a Strong Inference of *Scienter* ...................................................................................75

F.   False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls..............................................76

   ➢   *General Principles of Financial Reporting*........................................76

   ➢   *Material Weakness of Internal Controls and False and Misleading SOX Certifications* ...............................................................78

   ➢   *Misclassification of Assets: Short Term Investments* .........................80

   ➢   *Lack of Transparency, Obscuring Losses from Aeropost Legacy Operations Versus Losses from Its Omni-Channel Development*.....................83

VI.   CLASS ACTION ALLEGATIONS ..........................................................84

VII.   LOSS CAUSATION ...............................................................................85

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE .....................................86
      (FRAUD-ON-THE-MARKET DOCTRINE)

IX.   NO SAFE HARBOR ...............................................................................88

FIRST CLAIM FOR RELIEF (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) Against All Defendants .........................90

SECOND CLAIM FOR RELIEF (Violation of Section 20(a) of the Exchange Act) Against the Individual Defendants...................................................................93

PRAYER FOR RELIEF ……………………………………………………..........94

JURY TRIAL DEMANDED ………………………………………………………93

ii

Lead Plaintiff, Public Employees Retirement Association of New Mexico ("PERA"), asserts claims against PriceSmart, Inc. ("PriceSmart" or "Company"), its former chief executive officer ("CEO"), defendant Jose Luis Laparte ("Laparte"), its former chief financial officer, ("CFO") defendant John M. Heffner ("Heffner"), and its current chief financial officer, defendant Maarten O. Jager ("Jager") (collectively "Defendants"), for violations of the Securities Exchange Act of 1934. Except as to the allegations in paragraph 51 respecting PERA itself, Lead Plaintiff's allegations are based on information and belief, including an investigation of counsel, and a review of the United States Securities and Exchange Commission ("SEC") filings, and reports, advisors, press releases, and other public statements issued or rendered by the Company or the defendants named herein, media reports about the Company, and a discussion with a confidential witness. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a class action on behalf of all persons and entities that purchased or otherwise acquired PriceSmart publicly traded common stock between October 26, 2017 and October 25, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and recover damages caused by the Defendants' materially false, deceptive and misleading statements and omissions.

2.    The Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), was enacted to promote the dissemination of truthful information to the investment community and thereby strengthen the integrity of our capital markets, which are vital to the nation's economic well-being. PriceSmart, its former CEO Laparte, its former CFO Heffner, and its current CFO Jager, violated this basic principle and tenet of the federal securities laws.

3.     During the Class Period, Defendants issued or made several materially false and misleading statements to, and/or material omissions from, the investment community in violation of their duty to tell the whole truth when they spoke to the market, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and SEC Rule 10(b)-5, 17 C.F.R. § 240.10(b)(5), promulgated thereunder, consequently artificially buoying and inflating the price of PriceSmart's publicly traded common stock and causing investors to suffer economic harm once the truth began to be revealed and the Company's stock price tumbled as a result.

4.     PriceSmart owns and operates membership warehouse clubs that, according to its SEC filings, "offer high quality brand name and private label consumer goods at low prices to individuals and businesses." The Company and its subsidiaries have been principally engaged, at all times material, in the international operation of membership shopping and warehouse clubs located in 13 countries and territories in Central America, the Caribbean, and Columbia. Additionally, the Company operates distribution centers in Miami, Florida, and, more recently, Costa Rica, and maintains its corporate offices in San Diego, California.

5.     The Company has consistently portrayed itself as operating in accordance with the "Six Rights of Merchandising," with its mantra of low pricing of goods aided by a constant focus on achieving cost efficiencies – PriceSmart's long- standing business model. At all times material, PriceSmart touted as a "competitive strength" its "low operating cost," moving merchandise to its club members at a "lower expense ratio" than its competitors, its "focus on achieving efficiencies in product distribution" and its business strategy of always being able to offer for sale to businesses and families a limited number of "stock keeping units" covering a wide range of products in high volumes at the lowest possible prices. Many customers do not buy single items when shopping at PriceSmart clubs. Instead, customers load their shopping carts with bulk purchases of different items, thereby taking greater advantage of PriceSmart's low-priced merchandise that its business model enabled it to offer to cost-conscious consumers. Such low-price offerings relied on "logistics and

CONSOLIDATED CLASS ACTION COMPLAINT

distribution efficiencies," and the "ability to efficiently receive, handle and distribute merchandise," while continuously exploring ways to "improve efficiency, reduce cost and ensure a good flow of merchandise" to its warehouse clubs, as PriceSmart emphasized in its ongoing dialogue with the market.

6.     Beginning at least prior to, and by no later than, 2016, retail merchandisers, including wholesalers of consumer products and merchant entities operating through brick and mortar stores like PriceSmart, were confronted with operating in a new, "e-commerce" environment. Consumers were increasingly turning to online shopping, as opposed to shopping within brick-and-mortar stores and physical establishments. This created significant adverse business repercussions for brick-and-mortar retailers, including PriceSmart.

7.     As a consequence, retailers recognized that a "seamless" shopping experience across all channels was not simply nice to have, but "an imperative." Retailers the world over were heavily investing in developing a seamless omni-channel experience connecting digital with brick-and-mortar retail. And achieving this omni-channel experience in a manner consistent with PriceSmart's business model (sometimes hereinafter referred to herein as "Omni-Channel Experience") was a constant, important goal and focus of PriceSmart's C-Suite executives. To that end, PriceSmart had several strategic options: (1) develop and build the Omni-Channel Experience in-house; (2) secure such ability by contracting with a third party – known as an "outsource solution;" or, (3) acquire a company providing such a solution and upon which it could build a robust digital platform.

8.     Establishing a robust, seamless e-commerce presence and connectivity to its brick-and-mortar retail clubs or stores, consistent with PriceSmart's time-honored business model, was critically important to the Defendants. The failure to do so posed a threat to PriceSmart's ongoing profitability and success. But, whatever option it chose, the basic fundamentals important to PriceSmart's success needed to remain the same.

9.     PriceSmart initially attempted to develop the necessary Omni-Channel Experience in-house. It invested in websites and systems with the long-term objective of

CONSOLIDATED CLASS ACTION COMPLAINT

offering its customers a "seamless multi-channel experience" consistent with its business model. It endeavored to expand its online offerings, recognizing that it was "an important and growing way to serve our current members and attract new members."

10.     In April 2017, defendant and then-CEO Laparte gave notice that the Company was going to "replace" its online platform and was going to "relaunch our platform very soon", noting that it would be a "more robust platform" and would "launch, hopefully, by the end of Q3, in all our countries," while adding "we do recognize that retail is changing and we've got to be ready" and that "we are getting there."

11.     In July 2017, during the Company's Third Quarter 2017 Earnings Conference Call, Laparte noted the realization that "this is an important trend in meeting future consumer needs" and that "we at PriceSmart are developing a strategic plan and investing in technology," which, if done well, "can integrate the best of our traditional brick-and-mortar warehouse clubs with the new trends of online shopping and **create the right omnichannel experience** for our members[,]" adding that it should be "fully integrated with the other activities we have right now" and that "we also have a well-developed and extensive distribution network," with a "deep understanding of our markets."[1] Laparte reiterated that there is "a need to invest in technology, to invest in things that will make that online experience better for our members" and "that's where we are heading right now. We don't want to wait … we don't know if it's going to be 2, 5 years, 10 years, but its – I think all retail is moving on that direction and we just want to be ready."

12.     Investors waited for the in-house development, build-out, and launch of PriceSmart's Omni-Channel Experience. Meanwhile, the trading price of PriceSmart common stock continued to see-saw in the $80-$90 range throughout 2017 due, in part, to slower store expansion, which had been disappointing the investment community and causing analysts to cut target multiples and estimates. PriceSmart common stock had traded as high as $93.15 in March 2017, but far below its historic trading price of $125.36 in

---

[1]     Unless otherwise noted, all emphases in the Complaint are added.

CONSOLIDATED CLASS ACTION COMPLAINT

November 2013. It was no longer being viewed by *Fortune Magazine* as one of the Nation's fastest growing companies, as it had been listed in the past.

13.    However, PriceSmart's in-house development and build-out of an Omni-Channel Experience, consistent with its business model, was not working. By October 2017, PriceSmart notably terminated its online shopping service via its so-called online international catalog. The Company desperately needed to timely develop and monetize a digital platform that could connect to its brick-and-mortar sales and merchandizing capabilities, consistent with its business model. CEO Laparte was under pressure to deliver and to do so within the core values of maintaining efficiency and controlling costs, vital to PriceSmart's profitability. Pressure mounted on PriceSmart and its highest-level executive officers to take action and demonstrate that the Company was positioning itself to survive and profit in the rapidly developing e-commerce retail environment by finding an appropriate solution toward a realistic, robust build-out and imminent launch of its long-awaited Omni-Channel Experience.

14.    Amid its ongoing failure to successfully find such a solution and build-out of an Omni-Channel Experience in-house, the Company's financial reporting from the beginning of the Class Period, commencing with the issuance, on October 26, 2017, of PriceSmart's Annual Report on Form 10-K for Fiscal Year 2017, ending August 31, 2017 ("2017 Form 10-K"), did not accurately reflect the effectiveness of its internal controls over financial reporting. Its internal controls over "asset classification" were materially weak and ineffective. Defendants would later exploit this material weakness to make the Company's asset liquidity profile and related risk appear to be better than it actually was.

15.    On October 27, 2017, PriceSmart, CEO Laparte, and CFO Heffner stoked investor enthusiasm that progress was being made toward an imminent launch of an Omni-Channel Experience by announcing that the Company had created an "Innovation Committee," and that the board of directors "designated an incremental $3.0 to $5.0 million of technology-related spending for this fiscal year 2018" to, among other things, "fund a newly established team to direct our technology investment and pre-opening spending to

develop a new online business we hope to launch during the Summer of 2018," adding that PriceSmart "will likely require further investments beyond the current fiscal year." The launch date – the Summer of 2018 – was neither far off, nor years away.

16.     During a conference call with analysts that same day, CEO Laparte emphasized that "we *realize* the *importance* of the online activity…and realized that it is an *important* trend in meeting future consumer needs." He assured investors stating, "we, at PriceSmart, are developing a strategy plan and investing in technology to better satisfy our business and retail members." Laparte noted that the "goal" was "to *integrate the best of our traditional brick-and-mortar warehouse clubs* with the new trends of *online shopping* and *create* the *right omni-channel experience* for our members,["] adding that "[t]he returns of these efforts will be *important* to create a seamless omni-channel experience for our members." Defendant CFO Heffner stated during the call that developing "technologies and capabilities" was "*essential* for our future[,]" adding that PriceSmart had "some very exciting plans" including the "wider use of technology to better serve our…members." Laparte disclosed that PriceSmart had discontinued "the efforts that we have before with the electronic international catalog[,]" and reconfirmed the Company's critically important goal and effort to "better integrate our traditional brick-and-mortar warehouse club with the new trends of online shopping" and "create this omni-channel experience for our members[.]" He noted that included within the $3-5 million number were different components so they could "*make it the right way*" – a reference that created a clear impression in the market that it would do so consistent with PriceSmart's successful business model.

17.     However, the in-house development of PriceSmart's Omni-Channel Experience was spinning its wheels. PriceSmart had *not yet even figured out how* to connect digital with brick-and-mortar in a way that adhered to PriceSmart's business model. Without such a basic foundation being laid, it could not progress to meet the hoped for Summer 2018 launch date, let alone a launch timeframe within the context of the allocated $3-5 million – a serious dilemma.

18.     During the Company's First Quarter Fiscal Year 2018 Earnings Conference Call on January 5, 2018, and after commenting that PriceSmart's online strategy was focused on "Costa Rica, Panama, and Columbia, some of the bigger markets, obviously, to start" – CEO Laparte stated that the plan was for "launching something…towards the end of the year[,]" instead of "the Summer of 2018," and disclosed that the Company would keep investing "until we *figure out how* to get on that space *and create* that *omni-channel experience*."

19.     The in-house development still had not produced a solution consistent with PriceSmart's business model. PriceSmart was falling behind the curve. A new approach to figuring out **how** to achieve seamless Omni-Channel connectivity in a way that met PriceSmart's business model – in "the right way," as Laparte had promised – was needed, sooner, rather than later. The news put additional downward pressure on the trading price of the Company's common stock, which fell from a closing price of $87.85 on January 4, 2018 to close at $81.25 per share on January 5, 2018. The pressure on CEO Laparte and CFO Heffner to find a solution increased.

20.     Meanwhile, unbeknown to the market, PriceSmart's Report on Form 10-Q for the First Quarter Fiscal Year 2018, ending November 30, 2018, ("First Quarter 2018 Form 10-Q"), contained false representations about internal controls and false SOX certifications executed by its CEO and CFO respecting the reliability of its financial reporting. And, the Company's financial reporting contained a material misclassification of its short-term assets, thereby making its liquidity profile look better than it actually was, as more fully discussed herein in Part V, subpart F, entitled "False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls."

21.     Then, months later, it appeared that PriceSmart had found the answer. A significantly important new event occurred that appeared to represent a sea change in PriceSmart's foundation for successfully developing and building out a robust, seamless, Omni-Channel Experience. On March 19, 2018, PriceSmart issued a press release announcing the "Acquisition of *Aeropost*, Inc.," one of "the largest and most visible

7

crossborder logistics and *e-commerce providers* in Latin America and the Caribbean" offering "*convenient local pick-up points*, and an *innovative local payments platform* that *allows* buyers to purchase US-source merchandised *online*." The acquisition was portrayed as taking Aeropost and PriceSmart "to the forefront of retail innovation" and exclaimed *"we can't think of a better match,"* while noting the "*technology* behind Aeropost.com coupled with its strong team, will *allow* PriceSmart to offer new online shopping options for its members, *strengthening its commitment* to *provide* an *exceptional member experience* with high quality merchandise at *low prices*." CEO Laparte added that "the acquisition of Aeropost provides an opportunity to *accelerate the development* of an *omni-channel shopping experience* for our members."

22.     The statements represented to, and created the false impression in, the market that Aeropost's operational business model fit with PriceSmart's well-known, cost-efficient, and competitive low pricing business model, which was the foundation of its success. The statement that "the technology behind Aeropost.com coupled with its strong team, will allow PriceSmart to offer new online shopping options" with "high quality merchandise at low prices," also gave the false and misleading impression and was understood and constituted a representation to the market that Aeropost possessed the digital platform technology piece PriceSmart needed to figure out and build its robust, seamless, Omni-Channel Experience – consistent with its business model – and which it had been trying to achieve on its own. And the foregoing statements represented to, and created the false impression in, the market that pursuing the strategic acquisition of Aeropost favorably positioned the Company to achieve the Omni-Channel Experience. Laparte's representation that "the acquisition of Aeropost provides an opportunity to *accelerate* the development of an omni-channel shopping experience for our members" reinforced these favorable impressions created by the announcement and gave false comfort to investors that the goal of achieving the Omni-Channel Experience was accelerated by reason of the acquisition.

23.     The March 19, 2018 announcement of the Aeropost acquisition was viewed favorably by investors as an effective strategic solution securing and achieving an Omni-

Channel Experience consistent with PriceSmart's legacy business model upon which its success was founded, without the unbridled costs and delays associated with having to build a system and develop such capability from scratch. Although the market still awaited further detail about the acquisition, the news caused the trading price of PriceSmart's stock to rise, from a close of $81.15 per share on March 19, 2008 to $83.55 per share by March 29, 2018, and higher still to $83.85 per share at the close of trading on April 4, 2018.

24.    The favorable news was more deeply emphasized when, on April 5, 2018, the Company aggressively stated that "we are in the process of expanding our strategy to include online shopping and the strategic placement of regional distribution centers to support both our traditional warehouse club business and our new online shopping initiative…" adding "[w]e believe our business strategy needs to be broadened to respond to changes in shopping habits so our members will have the shopping experience they desire." It was announced that PriceSmart had acquired Aeropost, Inc., a "cross-border logistics and e-commerce provider," for a total consideration of $30 million, and that "*Aeropost brings* to PriceSmart a *technology* and *development* team, which the Company can *leverage* to offer new online shopping options for our members." Benefits of the Aeropost acquisition were stated to include "*efficient and low cost border delivery services*" and a "more user friendly operating system and delivery services for PriceSmart members."

25.    The impression that the $30 million Aeropost acquisition was the *panacea* was further reinforced by the disclosure that the Company recorded an impairment charge of approximately $1.9 million for the three and six months ended February 28, 2018, "related to the write-off of internally developed software for e-commerce due to the Company's acquisition of Aeropost … and its digital e-commerce platform." Laparte boldly stated during PriceSmart's Second Quarter 2018 Earnings Conference Call of April 6, 2018, that PriceSmart took "$2.6 million in charges for e-commerce development activities that are *no longer needed because* of that technology purchase as part of the *acquisition of Aeropost, Inc*." This representation sent a message to investors that Aeropost's digital e-

9

CONSOLIDATED CLASS ACTION COMPLAINT

commerce platform was mature enough to enable the Company to effectively abandon whatever it had previously done internally to develop software for its own in-house e-commerce platform. The announcement reinforced the false impression in the market that PriceSmart's own internally developed software for e-commerce was no longer needed owing to the fact that it had acquired an Omni-Channel Experience solution, afforded by the acquisition of Aeropost and its digital e-commerce platform technology and "know-how," which would integrate into PriceSmart and become its foundation to build expansive online connectivity "in the right way" – in other words, consistent with PriceSmart's long-standing business model.

26.     Laparte again reinforced the impression in the marketplace that the Company had accelerated its rate of progress toward achieving connectivity of a digital platform with its brick-and-mortar retail business – the Omni-Channel Experience – consistent with PriceSmart's business model. He represented and assured investors that "the combination of our two companies brings together PriceSmart brick-and-mortar excellence, buying power and distribution and operation expertise, with Aeropost's exceptional cross-border logistics, delivery option and *e-commerce know-how*." Then, Laparte said what the investment community was also longing to hear: "Aeropost business *accelerates* PriceSmart's ability to offer online shopping, test and measure new digital strategies and offer delivery options for our members, *all while maintaining* our *commitment to excellent members experience* with high quality merchandise at *low prices* …."

27.     Importantly, Laparte reassured investors about the economics of the deal explaining that, "[b]eyond the charges we took in the current quarter, we *do not anticipate any further dilution to our earnings through the end of this fiscal year with this acquisition[,]*" and that "[s]ome of the activities and investments we were planning to do as part of our innovation initiatives, which we have previously indicated would be up to $5 million in this fiscal year, are *now being addressed by Aeropost capability*" and that, as a result, "any incremental costs of integrating Aeropost will largely fall within that previously planned investment amount[,]" adding that PriceSmart had now added "exciting new

10

CONSOLIDATED CLASS ACTION COMPLAINT

*capabilities* with Aeropost[.]" CEO Heffner reinforced the foregoing representations and the impressions that they created, stating that "***the acquisition of Aeropost will allow us to utilize Aeropost online technology, along with their in-house digital capability in place of an outsource solution***.*"* The words "***in place of an outsource solution***," and especially the careful use of the word "***solution,***" alone and in combination with the many related statements by the Defendants on March 19, 2018, April 5, 2018, and April 6, 2018, was understood in the market as a representation that acquiring Aeropost solved the "how" regarding figuring out how to achieve the Omni-Channel Experience consistent with PriceSmart's business model. With this acquisition solution, PriceSmart was now given a jump-start toward an expansive robust build-out of its Omni-Channel Experience.

28.    The announcement of the Aeropost acquisition was met with considerable market enthusiasm. With further details of the $30 million acquisition now being disclosed, the closing price of PriceSmart's common stock rose from $83.65 on April 5, 2018 to $88.23 on April 6, 2018, on trading volume of 711,600 shares – significantly higher than the average daily trading volume of the Company's stock. With this price increase, the market capitalization of the Company increased over $292 million since March 19, 2018, immediately before the acquisition was first announced that day. Defendants' market deception continued to fuel a rise of the trading price of PriceSmart's common stock, which reached $93.40 per share on July 5, 2018, representing a market capitalization increase of over $373 million from its closing price just before the Aeropost acquisition was announced.

29.    But in truth, the Company's acquisition of Aeropost did not strengthen or otherwise provide a viable Omni-Channel Experience. Aeropost's own online platform and technology was immature, requiring far more than the balance of the $3 to $5 million that had been previously allocated. Aeropost did not have or provide the solution to achieve an Omni-Channel Experience consistent with PriceSmart's business model. It was not the *panacea*. Nor was the acquisition non-dilutive to PriceSmart's earnings beyond the charges taken in the quarter. The two entities possessed very different business models. Aeropost

CONSOLIDATED CLASS ACTION COMPLAINT

did not provide adequate logistics and distribution efficiencies, nor did Aeropost focus on efficiency. Its shipping templates, which impacted pricing, were not consistent with PriceSmart's and its efficient, low operating cost, lower expense ratio business format. Defendants had painted a picture that was materially misleading.

30.     On July 5, 2018, after the close of the market, the Company disclosed that Aeropost had had a negative impact of ($0.08) per share with respect to the Company's earnings per share ("EPS") in the Third Quarter of Fiscal Year 2018, ending May 31, 2018, despite having previously stated, as recently as three months earlier on April 5, 2018, that the acquisition of Aeropost for a gross purchase price of $30 million would not be dilutive to PriceSmart's earnings through the end of Fiscal Year 2018 (ending August 31, 2018), beyond any acquisition charges required to be taken in the quarter in which Aeropost was acquired. The Aeropost acquisition saddled PriceSmart with an ongoing drag on earnings that ultimately adversely impacted the Company's Fiscal Year 2018 EPS in the amount of ($0.31) per share in just six months, and an even greater negative impact of ($0.47) per share in Fiscal Year 2019, which was an enormous adverse impact, going far beyond the amortization expenses or acquisition charges incurred in the quarter of Aeropost's acquisition.

31.     On the news of July 5, 2018, that the acquisition of Aeropost was actually having an adverse impact on the Company's EPS, the closing price of the Company's shares fell from $93.40 on July 5, 2018, to $83.40 on July 6, 2018, representing a one-day drop of more than 10%, and fell further still to as low as $77.90 on July 10, 2018.

32.     The disclosures of July 5 and 6, 2018 still did not reveal the whole truth, nor did they serve to fully correct for and remove the artificial inflation embedded in the trading price of PriceSmart common stock as a result of Defendants' materially false and misleading statements and omissions. Investors were not told of Aeropost's systemic legacy operational deficiencies, that represented a significant drain on PriceSmart's EPS and financial results nor were investors told of its nascent online presence that did not accelerate the achievement of an Omni-Channel Experience. Nor had the acquisition of Aeropost provided the solution

to how to seamlessly integrate online consumer shopping with PriceSmart's brick-and-mortar retail, upon which it could build a robust platform to provide the Omni-Channel Experience consistent with its business model. And investors were not informed at that time that the Company's internal controls over financial reporting were materially weak, ineffective and deficient, or that it had been misclassifying its assets, thereby making its cash and cash equivalents reporting, and its liquidity profile, appear better than it actually was.

33.     On October 25, 2018, PriceSmart's new interim CEO, accompanied by its co-founder, had to reveal the whole truth about PriceSmart's e-commerce dilemma and positioning, and the yoke of a continuing drag on EPS that PriceSmart had incurred under Laparte and Heffner's leadership. Previously, CEO Heffner left the Company effective April 24, 2018, at which time he was replaced by CFO Jager. Now, while disclosing poor operating results for its fiscal Fourth Quarter and year ended August 31, 2018, the Company also announced that its chief executive officer, Laparte, had submitted his resignation on October 24, 2018, which the board of directors accepted the same day. The resignation of Laparte further demonstrated the failure of the Company's professed development of an Omni-Channel Experience consistent with PriceSmart's business model "in the right way," and further disclosed Laparte's lack of candor about that important topic and the Aeropost acquisition. PriceSmart's new interim CEO acknowledged the need for a "fresh perspective" and a CEO that brings a "different set of skills … to help expedite our growth."

34.     During a follow-on conference call with market analysts, PriceSmart disclosed that the Company was still "struggling with the issue of *how* to connect brick-and-mortar to online *in a way that really works[,]*" while further acknowledging that *nobody had "figured it out[.]"* Co-founder Robert Price confirmed the complete lack of direction of the Company, while posing the conundrum with reference to PriceSmart's business "what is that sweet spot … *how* do you make sure that you can *integrate properly the technology*, the benefits of technology *with the traditional ways* in which people have been shopping."

35.   On that same day, the Company, under new leadership, disclosed for the first time that it had been misclassifying its short-term assets on its first, second and third quarter fiscal year 2018 reported financial results, thereby requiring a restatement, and that, despite prior representations and SOX certifications signed by CEO Laparte, CFO Heffner, or CFO Jager, the Company's ***internal controls*** over financial reporting, relating in particular to asset classifications, were ***materially weak*** and ***deficient***.

36.   On this news, the Company share price fell $12.41 a share, or more than 15% from $81.57 at the close of trading on October 25, 2018, to close at $69.16 per share on October 26, 2018, on unusually heavy trading volume.

37.   One analyst remarked that the "resignation of the CEO … Laparte" "captured most of our attention" while noting that Aeropost had an operating loss and a negative impact on EPS, with higher losses in its core facilitator business and significant online developmental expenses.

38.   The October 25-26, 2018 disclosures effectively acknowledged that (1) the Company's Omni-Channel business strategy had failed to reach key operating goals and, most especially, the Company never had figured out the "how" – the solution – to achieve the Omni-Channel Experience "in the right way" – consistent with PriceSmart's time-honored business model; (2) the acquisition of Aeropost's nascent technology capability and the contradictory business model and shipping templates of its legacy operation encumbered PriceSmart with an ongoing drag on its earnings that was dilutive, despite prior representations to the contrary; (3) the Company's short-term investments had been improperly classified and accounted for, creating a deception regarding its liquidity that had to be corrected through an accounting reclassification and restatement; (4) there was a material weakness in the Company's internal controls over financial reporting, particularly with regard to asset classification; and (5), as a result of the foregoing, the Defendants' positive statements during the Class Period regarding the Company's business, operations, and prospects, particularly with regard to its development of the Omni-Channel Experience, had been and were materially misleading and lacked a reasonable basis.

39.    On January 9, 2019, while reporting on the results for the First Quarter of Fiscal Year 2019, ending November 30, 2019, PriceSmart disclosed a net loss from Aeropost operations and Omni-Channel development of $2.678 million, with an adverse impact of negative ($.13) per share on PriceSmart's EPS in that quarter.

40.    When one analyst wanted to know if the Company had "seen any traction yet … in terms of your online activities" PriceSmart's interim CEO confessed that they were "trying to understand where the greatest value is to be unlocked from this acquisition" of Aeropost and "how to best apply it and integrate those technological capabilities and the talent into the very core of our business at PriceSmart."

41.    Importantly, and perhaps more surprisingly given the Company's positive statements about the Aeropost acquisition on April 5 and 6, 2018, the interim CEO revealed and admitted that Aeropost was **not "*just a plug-and-play that was going to be the answer to all of our e-commerce and omni-channel needs*,**" while further disclosing that there would ***have to be additional investments*** which "at this point it is difficult for me to quantify[.]"

42.    On April 10, 2019, following the announcement of Second Quarter Fiscal Year 2019 results, PriceSmart acknowledged $4.2 million in Aeropost costs, including expansion of Omni-Channel capability, amounting to an adverse drag on earnings totaling ($.14) per share. On April 11, 2019, an analyst correctly observed that the "Aeropost acquisition continues to be a drag on earnings" and that PriceSmart's ***Omni-channel retail strategy continued to be a "work in progress*,**" noting that "[t]he Aeropost ***acquisition was used to jumpstart [PriceSmart's] omni-channel capabilities, but it all remains in development*.**" Thereafter, PriceSmart disclosed that its results for the Third Quarter of Fiscal Year 2019, ending May 31, 2019, absorbed a ($0.09) per share negative impact from operating Aeropost and its ongoing Omni-Channel investment and acquisition cost, while the Company, now more than 15 months from the acquisition, was continuing to focus on the development and eventual launch of PriceSmart's Omni-Channel Experience.

CONSOLIDATED CLASS ACTION COMPLAINT

43.     Finally, on October 29, 2019, upon reporting the Company's results for Fiscal Year 2019, ending August 31, 2019, PriceSmart admitted that the negative impact of Aeropost related activities in Fiscal Year 2019 amounted to (0.47) per share for the entire year, versus (0.31) per share for the approximate six-month period since its acquisition in Fiscal Year 2018. The impact of Aeropost's acquisition constituted a significant cause of PriceSmart's year-over-year decline in operating income. Rather than rolling out an Omni-Channel Experience in markets in Central and South America, investors were disappointed to learn that the Company was only *testing* its online connectivity capabilities in the Dominican Republic – little progress.

44.     During PriceSmart's Fiscal Year 2019 Earnings Conference Call on October 30, 2019, investors were assured that PriceSmart was operating with a ***renewed focus*** on its founding "***Six Rights of Merchandising***," with the effort to "expedite our growth strategies in a manner consistent with our ***core values***." At bottom, PriceSmart never had a viable Omni-Channel Experience solution regarding the "how" to harmonize with PriceSmart low-cost, efficient business model upon which it had for so long relied to achieve success. Thus, it was never poised to launch an Omni-channel Experience for PriceSmart's customers in 2018, nor did the Aeropost acquisition accelerate any such launch date, or provide a "solution," when the acquisition was announced, or for a substantial time thereafter.

45.     As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when corrective information was disclosed, Lead Plaintiff and other Class Members have suffered significant losses and damages.

46.     The following chart illustrates the artificial inflation of PriceSmart's stock price caused by the initial announcement of the Aeropost acquisition on March 19, 2018, and the fuller April 5-6, 2018 announcements and representations, and the massive losses and damages class members have suffered arising from the corrective disclosures thereafter, including the October 25, 2018 disclosures ending the Class Period:

CONSOLIDATED CLASS ACTION COMPLAINT



## II.   JURISDICTION AND VENUE

47.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

48.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act,15 U.S.C. § 78aa.

49.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged, including the dissemination of materially false and/or misleading information,

17

occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

50.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

51.     Lead Plaintiff PERA purchased 104,740 shares of PriceSmart common stock during the Class Period, and suffered damages as a result of the Defendants' federal securities law violations arising from their false and/or misleading statements and/or material omissions alleged herein. Established in 1947, PERA now manages 31 retirement plans for New Mexico's state, county, and municipal employees, including police, professional and volunteer firefighters, judges, magistrates, and legislators.

52.     Defendant PriceSmart is a corporation organized under the laws of Delaware with its principal executive offices located in San Diego, California. PriceSmart common stock trades on the NASDAQ exchange under the symbol "PSMT."

53.     Defendant Laparte was the president, chief executive officer, and a director of the Company at all relevant times. Until his departure from the Company effective November 16, 2018, Mr. Laparte had been a director since February 2008, CEO since July 2010, and president since October 2004. Mr. Laparte initially served as a consultant for the Company from December 2003 to October 2004. Prior to joining the Company as a consultant, Mr. Laparte worked for more than 14 years at Wal-Mart Stores, Inc. in Mexico and the United States in progressively responsible positions. From October 2002 through September 2003, he served as vice president of Sam's International, where he directed and managed its operations, finance, sales, marketing, product development, and merchandising. From May 2000 to October 2002, he served as vice president of Wal-Mart de Mexico, responsible for sales and the expansion of the Sam's Club format in Mexico.

Mr. Laparte's background and experience as an executive overseeing numerous operational aspects of the international merchandising business, including sales, product development, merchandising, marketing, finance and information technology, contributed to his being placed on the PriceSmart board of directors.

54. Defendant Heffner was the chief financial officer of the Company from 2004 to April 24, 2018. Until his retirement from the Company effective April 23, 2018, Mr. Heffner had been executive vice president and chief financial officer of PriceSmart since January 2004, after having served as its consultant on financial matters from September 2003 through December 2003. From February 2000 until August 2003, Mr. Heffner was vice president of finance and chief financial officer of Kyocera Wireless Corp. Mr. Heffner's previous professional experience was with Digital Equipment Corporation, where he held a variety of financial management roles over a 20-year period, and with QUALCOMM Incorporated, where he was a vice president of finance from July 1998 until February 2000.

55. Defendant Jager was the chief financial officer of the Company beginning April 24, 2018. On October 29, 2019, it was announced that he would leave the Company effective January 10, 2020.

56. Defendants Laparte, Heffner, and Jager (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. During their respective tenures, the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew at the time they served in their respective offices that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive

19

representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for their false statements and the false statements they approved or adopted, as alleged herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   PriceSmart's Background, Business Model and Formula for Success

57.   PriceSmart owns and operates membership warehouse clubs that, according to the Company, "offer high quality brand name and private label consumer goods at low prices to individuals and businesses." PriceSmart Annual Report on Form 10-K SEC for the Fiscal Year ending August 31, 2016, ("2016 Form 10-K"). The Company and its subsidiaries have been principally engaged, at all times material, in the international operation of membership shopping in warehouse clubs located in thirteen countries and territories located in Central America, the Caribbean, and Columbia. Additionally, the Company operates distribution centers in Miami, Florida, and, more recently, Costa Rica.

58.   From the time of its initial public offering in 1997 and through 2013, PriceSmart grew rapidly. It was ranked No. 55 on Fortune Magazine's 2009 list of the "100 Fastest Growing Companies" in America. The following year, Fortune Magazine's 2010 list of the "100 Fastest Growing Companies in America" ranked PriceSmart No. 94. Its growth was reflected in the ascending trading price of its common stock. By November 27, 2013, the trading price of PriceSmart common stock closed at $125.36 per share – its all-time high – and a significant escalation from its initial closing price of $77.25 on or about September 2, 1997.

59.   PriceSmart consistently portrayed itself as innovative. Noting that the world of merchandising has changed greatly - particularly related to technology - PriceSmart informed investors in October 27, 2016, "[w]e believe that fundamental to our future

CONSOLIDATED CLASS ACTION COMPLAINT

success is our capacity to continue to adapt and innovate to meet the needs of our current and future members." 2016 Form 10-K.

60.    PriceSmart consistently portrayed itself as operating on a business model that co-founder Robert Price has proudly referred to as the "Six Rights of Merchandising." It was this model that was credited for building the Company with its mantra of low pricing of goods aided by a constant focus on achieving cost efficiency.

61.    PriceSmart's 2016 Form 10-K touted as a "Competitive Strength" its "Low Operating Costs," while noting that its "format is designed to move merchandise from our suppliers to our members at a lower expense ratio than our competitors. We focus on achieving efficiencies in product distribution, minimizing the labor required to stock and display merchandise, limiting non-payroll operating expenses and maintaining low occupancy costs." The 2016 Form 10-K also represented that PriceSmart's "focus on driving down operating costs," relative to net warehouse club sales, "allows us to offer lower prices to our members, which we believe helps generate member loyalty and increased sales."

62.    PriceSmart's business strategy has always been to offer for sale to businesses and families a limited number of "stock keeping units" covering a wide range of products in high volumes and at the lowest possible prices. According to the Company's Second Quarter 2017 Form 10-Q filed April 6, 2017 ("Second Quarter 2017 Form 10-Q") and Third Quarter 2017 Form 10-Q, filed July 5, 2017 ("Third Quarter 2017 Form 10-Q"):

> Logistics and distribution efficiencies are an important part of what allows us to deliver high quality merchandise at low prices to our members…. Our ability to efficiently receive, handle and distribute merchandise to the point where our members put that merchandise into their shopping carts has a significant impact on our level of operating expenses and ultimately how low we can price our merchandise. We continue to explore ways to improve efficiency, reduce costs and ensure a good flow of merchandise to our warehouse clubs.

CONSOLIDATED CLASS ACTION COMPLAINT

63.     The Company charges an annual membership fee to its customers. Membership fees, ostensibly combined with warehouse and distribution operating efficiencies and volume purchasing, enable PriceSmart to operate its business on lower merchandise margins than conventional retail stores and wholesale suppliers, and offer members what PriceSmart advertises and markets as high quality merchandise at "very competitive prices" which, in turn, are designed to enhance its "membership proposition."

64.     According to PriceSmart, operating efficiencies, earnings, and cash flow generally improve as sales increase. PriceSmart represents that "[h]igher sales, coupled with continuous efforts to improve efficiencies through our distribution network and within our warehouse clubs, also give us the opportunity to leverage our operating cost and reduce prices for our members." PriceSmart Form 10-Q for the quarter ending November 30, 2016, filed January 5, 2017 ("First Quarter 2017 Form 10-Q"). Hence, PriceSmart's success, and the unwavering attention and focus of its management, is dependent on efficiency and controlling costs in order to offer the best prices.

### B.     The New E-Commerce Environment Confronting PriceSmart

65.     By 2016, retail merchandisers, including wholesalers of consumer products and merchant entities operating through brick and mortar stores like PriceSmart, were confronted with operating in a new, so-called "e-commerce," environment. Consumers were increasingly turning to online shopping as opposed to shopping in brick and mortar stores. The movement to online shopping was having significant negative repercussions for brick and mortar retailers, including PriceSmart.

66.     According to a report issued by Deloitte entitled "*Global Powers of Retailing 2018*: *Transformative change, Reinvigorated Commerce*," (the "2018 Deloitte Report"):

> Stores are closing as retail spending moves online .... In fact, the US saw a record number of store closings in 2017, with 6,885 stores already having shut their doors by 1 December .... Stores across the globe face a similar fate as

22

CONSOLIDATED CLASS ACTION COMPLAINT

retailers close unprofitable stores to instead focus on their most productive and promising locations.

67.     Under the topic heading "Building World-Class Digital Capabilities," the 2018 Deloitte Report stated "from the consumer perspective, shopping is not about bricks versus clicks or one channel versus another. Instead, consumers are channel-agnostic. The shopping journey and pre-shopping research is a fluid process with consumers bouncing between online and offline along the path to purchase."

68.     As observed in the 2018 Deloitte Report, "retailers must adequately and holistically plan, strategize, and execute across all channels.… A seamless shopping experience is no longer nice to have, but an imperative" adding "it is a key reason why retailers worldwide are heavily investing in online and digital."

69.     The 2018 Deloitte Report cited *Wal-Mart* – the "world's largest retailer" – as an example, noting that "Wal-Mart has made it clear that e-commerce is one of the Company's strategic pillars .... "pumping billions in capital investment" and "leverag[ing] its vast network of stores to marry online and offline assets and gain an edge over Amazon[,]" adding that the "retail behemoth also has been on an *acquisition spree* of late…*to quickly attain e-commerce capabilities in lieu of building from the ground up*."

## C.     PriceSmart Strives to Achieve Necessary Online Connectivity In-House

70.     Establishing a robust and seamless e-commerce experience, with connectivity to its brick and mortar locations (sometimes referred to herein as "Omni-Channel"), that remained consistent with its efficient, low-cost pricing business model (sometimes referred to herein as "Omni-Channel Experience"), was critically important to PriceSmart's success. The Company had already been obsessing about it. Still, the basic fundamentals central to PriceSmart's success, as noted above, needed to remain the same, especially since, as the Company repeated in its public filings, "logistics and distribution efficiencies are an important part of what allow us to deliver high quality merchandise at low prices to our

23

members." To that end, and mindful of the need to provide an Omni-Channel Experience to effectively compete in the new e-commerce retail environment and comfort investors that it was timely pursuing and moving to achieve that goal, instead of falling behind the e-commerce curve, PriceSmart's 2016 Form 10-K reported that "[a]s part of the expansion of our e-commerce program, we began direct home delivery of products not carried in our warehouse clubs to members in Colombia in August 2015."

71.    The Company's 2016 Form 10-K informed investors that "**we have begun to offer limited online shopping to our members**," (emphasis in original) while noting that "[o]nline sales currently represent a small fraction of the total sales in our markets of the types of merchandise we offer, but online shopping may become more prevalent in our markets as we and our competitors begin to offer more opportunities for online shopping and as delivery systems in our markets improve." In discussing its online offering, PriceSmart advised investors that "[i]n most markets, our members can order products from our website that are shipped from the U.S. to the members' local warehouse clubs for pickup." PriceSmart affirmatively assured investors that "We continue to invest in our websites and systems with the long-term objective of offering our members a seamless multichannel experience."

72.    PriceSmart explained that it offered "our members alternatives to in-club shopping through our e-commerce platform which enables on-line access to purchase merchandise in different ways." The Company assured investors that "[w]e have been expanding our online offerings, and while the percentage of sales through these channels relative to our overall sales is small, we believe it is an important and growing way to serve our current members and attract new members."

73.    The new e-commerce environment in which PriceSmart operated was of considerable concern to the investment community. On April 7, 2017, during PriceSmart's Second Quarter 2017 earnings conference call, defendant Laparte engaged in the following exchange with a securities market analyst:

**ANALYST**: … in the U.S., everybody has been talking about the shift to e-commerce. You guys have an e-commerce program for Colombia, but what are your plans looking long term as moving further into e-commerce?

**LAPARTE**: Well, we have a couple of things on the works. The first one is we are going to replace our platform; we are going to relaunch our platform very soon. It's been taking a little longer than we expected because it's a more robust platform that will help to support the operation that we are doing in Colombia, which actually members come by, merchants that will sell in the clubs, that's something we are going to launch, hopefully, by the end of Q3, in all our countries. And that's the first step of having a better platform that can support that. And in addition, we're reviewing our strategy in our whole e-commerce. We do believe there is opportunity to do it a lot better.… we do recognize that retail is changing and we've got to be ready for, I guess, attacking that and competing with other players. We don't have, right now, big players, I guess, in this e-commerce arena. But I mean things are changing, and I want to (sic) ready. We will try to do our best on getting that business also. I'm learning now, as everybody's learning in this environment, but we are getting there…

74.   On July 6, 2017, defendant Laparte further demonstrated PriceSmart's recognition of, and focus on, the critical importance of the new e-commerce environment in which it needed to profitably operate and compete, comforting investors with the following statement during the Company's Third Quarter Earnings Conference call:

**LAPARTE** … I would like to address an important topic for all retailers related to the online channel given recent activity, particularly in the United States, where retail companies have taken action to strengthen their online presence or even companies looking at combining their online activity with more traditional brick-and-mortar businesses via acquisition. We realize that this is an important trend in meeting future consumer needs. And although the online channel is less developed in our markets, we at PriceSmart are developing a strategic plan and investing in technology to satisfy the shopping needs of our business and retail members. We believe that if done well, we can integrate the best of our traditional brick-and-mortar warehouse clubs with the new trends of online shopping and create the right omnichannel experience for our members.

CONSOLIDATED CLASS ACTION COMPLAINT

We don't look at this online business in isolation but instead, we believe it should be fully integrated with the other activities we have right now that allow us to serve more than 1.5 million members accounts in the 13 countries where we do business. We also believe we have a privileged condition given the fact that through our membership base, we know who our members are and what they buy. We also have a well-developed and extensive distribution network within the region along with a deep understanding of our markets. If done well again, we see an opportunity for PriceSmart to take full advantage of the trends toward increasing online shopping capabilities and integrate them with our existing clubs and distribution infrastructure…

75.    During that same July 6, 2017 earnings conference call, CEO Laparte gave the following response to a market analyst:

**ANALYST**: Just curious about the online strategy and obviously, being in the States here, there's lots of concern over Amazon and other online players, they being the largest. Just wonder how you view that threat and just wonder if you could elaborate a little more on what your plans are to stem that, if you will. And how big of an issue is it in countries you serve versus what we see in the U.S.?

**LAPARTE**: Well, as I mentioned at the beginning, in our countries, it is still -- obviously, the -- there's no presence per se of, I guess, a competitor like Amazon, although people can shop -- currently, anybody in a country can shop, obviously, not only Amazon, I guess, any site in the States. And for the most part, they choose postal offices and they can get some goods. Usually, it's smaller goods. If you want to buy bigger stuff, it's just a challenge because the price and the delivery will kill you, no? So it's a little bit harder right now for our markets. But they have the ability to do some of that shopping. Now with that said, obviously, the level of online activity is not as big as it is, not even close to what it is in the States, but we see that trend changing. And that's why we, I mentioned at the beginning, the strategy that we're not giving up on having a good strategy to serve the needs of the online shopping. And obviously, we believe we have the strength obviously given that we have the distribution network.

We know the market. We have this base of members. We know what they shop. So it's a matter of organizing all those things that we know about our market and try to get the online experience mixed with our brick-and-mortar that is still a successful part of the business, as it is in the markets in the States where we see the component of brick-and-mortar being important. So I don't

CONSOLIDATED CLASS ACTION COMPLAINT

know if I can give you more details on the strategy. We are working and investing on doing something. We believe there is a need to invest in technology, to invest in things that will make that online experience better for the members. And that's where we are heading right now. We don't want to wait to see if this becomes more important in our countries. It is going to be probably may take a little longer. We don't know if it's going to be 2, 5 years, 10 years, but it's -- I think all retail is moving on that direction and we just want to be ready.

76.     PriceSmart's in-house e-commerce operations and development were still nascent. The Company had not yet figured out how to achieve digital and brick-and-mortar connectivity in a way that was consistent with PriceSmart's business model.

77.     Meanwhile, PriceSmart's shares continued to see-saw in the $80-$90 range throughout 2017, due in part to its slower expansion which had been disappointing the investment community and causing analysts to cut target multiples and estimates. While PriceSmart's common stock had traded as high as $93.15 on March 17, 2017, this was still far below its historic trading high of $125.36 in November 2013.

78.     On April 7, 2017 an analyst at ScotiaBank commented that "[o]ur biggest concern remains the slowdown in store openings." The trading price of PriceSmart stock fell from a close of $92.85 on April 6, 2017 to close at $87.00 per share on April 7, 2017. The pace of new stores openings was not accelerating. On August 17, 2017, PriceSmart common stock had fallen to as low as $80.50 per share.

79.     By the start of the Class Period, the ability to take advantage of the e-commerce environment was vital to PriceSmart's growth, profitability, and competitiveness, but its online presence was too small. PriceSmart had fallen behind the curve with respect to the development of a viable e-commerce platform.

80.     CEO Laparte was under pressure to deliver the Omni-Channel Experience investors longed for. There was significant pressure on PriceSmart and its highest-level executive officers, especially CEO Laparte, to take action and comfort the investment community that it was positioning itself to survive and profit in the rapidly developing e-

CONSOLIDATED CLASS ACTION COMPLAINT

commerce retail environment by finding an appropriate solution and progressing toward a build-out and launch of a robust digital platform providing e-commerce connectivity with its brick-and-mortar retail, consistent with its fundamental core values, and low-cost, competitive business model so vital to its profitability.

### D. PriceSmart Announces an Innovation Committee and Plan to Launch a "New Online Business" During the Summer of 2018

81.     On October 26, 2017, PriceSmart issued its 2017 Form 10-K. The Company disclosed that net income fell 11% year over year, and reported gross margins and expense ratios that disappointed the market. The Company reported EPS of $0.64, down from $0.74 the prior year and missing one analyst's estimate of $0.75. Operating margins also fell year over year, coming in at 4.2%, compared to 4.6% the year prior. In addition, the Company was unable to announce any new store openings, meaning that PriceSmart added just one store in Fiscal Year 2017, and anticipated just two store openings in Fiscal Year 2018, significantly limiting its growth potential. The financial results were disappointing.

82.     The topic of "online shopping" and its development of a "relevant multichannel experience" to grow its "e-commerce business," remained a major point of discussion with the market. Under the topic heading "On-line Shopping and Other Services," the 2017 Form 10-K noted the "significant opportunity to increase sales and profits" with PriceSmart's current and future members "through increasing online shopping opportunities; providing home and business product delivery; and offering additional products and services not currently available to our members," and represented that "these capabilities" were at the time "currently under development."

83.     PriceSmart's 2017 Form 10-K also stated:

… We are increasing our investments in e-commerce, technology and other customer initiatives. The success of our ecommerce initiative will depend in large measure on our ability to build and deliver a seamless shopping experience across the physical and digital retail channels. If we fail to

28

successfully implement our ecommerce initiative, our market position, net sales and financial performance could be adversely affected.

\*\*\*

In addition, the cost of certain ecommerce and technology investments will adversely impact our financial performance in the short-term and may adversely impact our financial performance over the longer term.

84.     Amid market concern that PriceSmart was not keeping pace with the new e-commerce era, especially after terminating its online international catalog, slowed retail brick-and-mortar growth, and disappointing financial results, it was imperative that the Company make an announcement indicating to the market that it was progressing and developing a new online platform and capability, seriously advancing toward an Omni-Channel Experience, and doing it "the right way." The market needed to know that PriceSmart was addressing the important topic of growing PriceSmart's e-commerce business through the integration of physical and digital retail. This focus and attention was demonstrated by the discussion in PriceSmart's 2017 Form 10-K of the creation of a sub-committee of its board entitled the "Innovation Committee," that included board chairman and co-founder Robert Price and CEO Laparte. Upon announcing the creation of such an Innovation Committee, the 2017 Form 10-K further disclosed:

> The Board of Directors has designated an incremental *$3.0 to $5.0 million* of technology-related spending for fiscal year 2018 for evaluation and selection of the ERP vendor and to fund a newly established team to direct our technology investment and preopening spending to develop a new online business that we hope to launch during the Summer of 2018. Substantially all of this spending for fiscal year 2018 will be recorded as expenses on the statement of income that will impact earnings during the upcoming fiscal year as we pursue these long-term initiatives, which will likely require further investments beyond the current fiscal year.

85.     Defendants' defined planned launch date – the Summer of 2018 – was not far off. In the follow-on earnings conference call on October 27, 2017, defendant Laparte

CONSOLIDATED CLASS ACTION COMPLAINT

continued to focus on the development of PriceSmart's e-commerce capabilities. Laparte stated "…we realize the importance of the online activity occurring in the United States and we realized that it is an important trend in meeting future consumer needs." In an effort to assure investors that PriceSmart was taking the necessary steps to successfully compete in a burgeoning e-commerce world, Laparte assured investors that "[w]e at PriceSmart are developing a strategy plan and investing in technology to better satisfy our business and retail members."

86. Laparte spoke about the "goal" of the Innovation Team "to integrate the best of our traditional brick and mortar warehouse clubs with the new trends of online shopping and create the right omni-channel experience for our members." Laparte stated that the "board has designated $3 million to $5 million of technology-related spending for this fiscal year 2018 and we believe that the returns of these efforts will be important to create a seamless omni-channel experience for our members," while disclosing that PriceSmart had begun the effort and spending early in the fourth quarter of 2018.

87. Defendant Heffner followed up on Laparte's positive statements, noting that these "technologies and capabilities" were "essential for our future[.]" Heffner added "[i]t is also time when the company has some very exciting plans for the future, including the wider use of technology to better serve our current and future members …." Heffner reiterated that the Company had allocated $3 to $5 million incrementally for Fiscal Year 2018, which he noted would be over four quarters "a little more than" $800,000 in any individual quarter.

88. During the call on October 27, 2017, after affirming that the Company would spend "between $3 million to $5 million" with the idea to "invest more and to learn more" about "what we can do in this omni-channel and online market," Laparte reiterated that the Company had discontinued "the efforts that we have before with the electronic international catalog," acknowledging that "[w]e used to have an operation online where we were only serving international catalog…." While reinforcing the Company's effort to "better integrate our traditional brick-and-mortar warehouse clubs with the new trends of online shopping"

CONSOLIDATED CLASS ACTION COMPLAINT

and "create this omni-channel experience for our members" and "see that we can come up with new ideas ...." he acknowledged that included within the $3 to $5 million number were different components so PriceSmart could "**make it the right way**." This was a reference to adhering to PriceSmart's business model of efficiency, controlling costs, and providing competitive low cost pricing to consumers. One analyst positively reacted to Laparte's statements and representations exclaiming "fantastic," while inquiring as to whether the "$3 million to $5 million is … onetime … or is this yearly $3million to $5 million." Defendant Heffner responded that "it's always sort of looked at for this year … but the plans we've brought to the board for this fiscal year," adding that it was "not beyond reasonable to think that this … would continue to some level," and adding that "I don't think we would be sort of done if you will, with this evolving market and how to best serve our members going forward. So I wouldn't cap it as a onetime expense."

89.     In a report dated October 26, 2017, an analyst at ScotiaBank commented that PriceSmart "announced the launch of a new ERP system in order to develop a robust online platform, which will require US$3-US$5 million in incremental IT spending in FY2018."[2] On October 30, 2017, an analyst with Kansas City Capital, after observing that "[r]esults for the quarter came in well below expectations" with an "increase in SG&A expense ratio," found the silver lining in the conference call reporting that PriceSmart "is ramping up spending on the development of a new online business that is expected to be launched in 2018," and observing that "[l]ike all retailers, PSMT must deal with the changing industry dynamics and proactively develop a robust online platform." Digesting the news that was imparted during the conference call and in the Company's 2017 Form 10-K, the Kansas City Capital analyst further reported that "the company anticipates and [sic] additional $3-$5 million (or about $0.05-$0.10 per share) in incremental spending in 2018 associated with those items" adding that it "will likely require further investments beyond the current year." ScotiaBank then issued a report dated November 6, 2017, in which it reported that "the

---

[2]     Enterprise resource planning ("ERP") is the software platform that manages supply chain logistics, including the logistics to support e-commerce.

CONSOLIDATED CLASS ACTION COMPLAINT

board has designated $3-$5 mm of incremental investments and technology in fiscal year 2018 to develop a robust omni-channel strategy."

90.     The investment community was comforted that PriceSmart was striving to, and taking steps toward, introducing e-commerce connectivity and meeting its goal of creating a seamless Omni-Channel Experience through the integration of its physical and digital retail channels. The Company emphasized and repeatedly spoke about its efforts in achieving that goal. Convincing investors that the Company was actually making progress toward meeting that goal – and that it would be met in the Summer of 2018 – was especially critical given that the Company had decided to discontinue its online international catalog.

E.     **Defendants Deceive Investors with False and Misleading Financial Reporting Regarding the Adequacy of Related Internal Controls and False SOX Certifications**

91.     Starting October 26, 2017, PriceSmart's financial reporting was false and deceptive with regard to an issue of considerable importance to the investment community – the adequacy of internal controls over financial reporting, including with regard to asset valuation and asset classification. The Company's 2017 Form 10-K falsely represented and certified that internal controls were adequate and effective.

92.     PriceSmart's 2017 Form 10-K reported and represented that based upon their evaluation, the principal executive officer (CEO Laparte) and principal financial officer (CFO Heffner) concluded that the Company's disclosure controls and procedures were "effective at the reasonable assurance" level as of the end of the period covered by this Annual Report on Form 10-K.

93.     In addition, Laparte, as the CEO, and Heffner as CFO, executed SOX certifications that were appended and filed with the 2017 Form 10-K. Their SOX certifications supported the portrayal of adequate and effective internal controls over PriceSmart's financial reporting and the accuracy and reliability of the Company's reported financial statements.

32

94.     In truth, the Company's internal controls over financial reporting were deficient and inadequate, as has been admitted by PriceSmart, and its financial reporting was unreliable and deficient, as more fully discussed below in Part V, subpart F, entitled "False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls.

95.     It was not until the end of the Class Period, on October 25, 2018, that PriceSmart revealed and admitted that it had a "**material weakness**" in its internal control over financial reporting due to the fact that "**adequate controls did not exist** over the classification of certain financial instruments as cash equivalents or short-term investments."[3] This was a significant weakness given its relevance to the issue of liquidity associated with PriceSmart's ability to convert foreign currency into U.S. dollars.

**F.     Developing an Omni-Channel Experience In-House – But Without Solving the Basic "How" to do so in Accordance with PriceSmart's Business Model**

96.     On January 4, 2018, PriceSmart issued its First Quarter 2018 Form 10-Q. Beyond repeating the same false representations regarding the effectiveness and adequacy of internal controls over financial reporting, and the false Sarbanes-Oxley certifications executed by Laparte and Heffner, under the topic heading "Business Strategy," the First Quarter 2018 Form 10-Q reinforced its e-commerce connectivity goal stating:

> Our longer range strategic objective is to combine the traditional membership warehouse club "brick and mortar" business with online shopping to provide the best shopping experience possible for our members.

---

[3]     A material weakness in internal control over financial reporting is a deficiency, or a combination of deficiencies, such that there is a reasonable possibility that a material misstatement of any entity's annual or interim financial statements will not be prevented or detected on a timely basis.

CONSOLIDATED CLASS ACTION COMPLAINT

97.     Under the topic heading "Current and Future Management Actions," and specifically with regard to the progress of e-commerce connectivity, the First Quarter 2018 Form 10-Q stated:

> To oversee our efforts to identify and adopt new technologies that can help us better serve our members, our Board of Directors has approved a new committee of the Board, the Innovation Committee. "[m]embers include … Price ... Laparte and two other members of our Board … designated an incremental $3.0 to $5.0 million of technology-related spending for fiscal year 2018 for evaluation and selection of the ERP vendor and to fund a newly established team to direct our technology investment and preopening spending to develop a new online business that we hope to launch during the Summer of 2018. Substantially all of this spending for fiscal year 2018 would be recorded as expenses on the statement of income that will impact earnings during the fiscal year as we pursue these long-term initiatives … will likely require further investments beyond the current fiscal year.…
>
> The Company continues to … increasingly investing in efforts to evaluate and develop technologies to create a seamless omni-channel experience for our members in the future with expected $3.0 million to $5.0 million spending for the current fiscal year, of which $735,000 were spent in the first quarter …

98.     The Company's pronouncement that it had already spent $735,000 in the First Quarter of Fiscal Year 2018 on the in-house development of a "new online" Omni-Channel Experience was consistent with meeting the low-end of the $3-$5 million range for the entire fiscal year. But the amounts being expended were not achieving PriceSmart's stated goal of a "seamless omni-channel experience." The Company had been spinning its wheels.

99.     On January 5, 2018, during the follow-on First Quarter 2018 earnings conference call, Laparte noted that "I believe we're doing the right investments in different areas … definitely on ERP" and reiterated that the Company's online strategy was focused on Costa Rica, Panama and Columbia – "some of the bigger markets, obviously to start." But Laparte stated that the plan was for the Company to be "launching something … towards the end of the year," instead of "during the Summer of 2018," as stated previously.

100.    When asked whether there would be incremental additional expenses in the following Fiscal Year 2019, ending August 31, 2019, Laparte responded "we haven't

CONSOLIDATED CLASS ACTION COMPLAINT

figured out how much in the next upcoming year," while adding "we will continue investing ***until we figure out how to get on that space and create that omnichannel experience*** … [b]ut yes, this year is $3 million to $5 million in the fiscal year 2018." PriceSmart had not figured out how to achieve an Omni-Channel Experience in the right way: consistent with its core business model, designed to control costs through cost efficiencies and offer the lowest competitive pricing to consumers. Without such a basic foundation, PriceSmart had not progressed enough and could not meet any reasonable launch date in 2018, let alone achieve any such launch timeframe within the designated technology-related spending of $3 million-$5 million. Continuing to go down the path of trying to develop its own "new online shopping" capability connecting physical retail and e-commerce and achieve a "seamless" experience for its members – the Omni-Channel Experience – was not taking root. This presented a serious dilemma.

101.   Meanwhile, pressure mounted on CEO Laparte and CFO Heffner to do something to get PriceSmart to the next level. PriceSmart had fallen behind the curve in Omni-Channel capabilities prior to the advent of the Class Period, and remained well behind the curve, despite the allocation of additional monies.

102.   At that juncture, PriceSmart had three basic strategic choices with respect to achieving an Omni-Channel Experience in a way that worked with its time-honored business model. One option was to continue to try to achieve an Omni-Channel Experience by developing it "in-house." The Company had adopted this approach without success. The second option was to outsource it by paying a third party to provide an Omni-Channel Experience. But this could prove cost prohibitive, uncontrollable, or be hobbled by the lack of suitable contractors able to achieve the desired goal for the geographical space in which PriceSmart operated. A third option was to purchase and acquire the very Omni-Channel solution and capability PriceSmart had been struggling to achieve, preferably by a business acquisition or merger.

103.   Faced with this reality and continued market expectation that the Company would progress toward a robust e-commerce solution, PriceSmart, Laparte, and Heffner

elected to pursue the last option – an acquisition strategy, thereby creating the impression that the Company secured a solution that enabled and accelerated the building-out of a seamless Omni-Channel Experience, and expanded its e-commerce footprint in additional geographic markets, "in the right way."

### G.   Misclassification of Assets: Distorting PriceSmart's Liquidity Profile

104.   Meanwhile, in response to an ongoing lack of U.S. dollars in Trinidad and Tobago to pay for goods imported from the United States – a condition referred to as U.S. dollar illiquidity – which limited PriceSmart's ability to convert local currencies into U.S. dollars respecting imported products, the Company's balance of Trinidad and Tobago currency increased.

105.   In response, PriceSmart invested in certificates of deposit ("CDs") with a duration of four to twelve months. During the first quarter of Fiscal Year 2018, ending November 30, 2017, PriceSmart falsely carried such CDs as cash and cash equivalents on its consolidated balance sheet financial reporting in its First Quarter 2018 Form 10-Q in violation of Generally Accepted Accounting Principles ("GAAP"), as more fully discussed below in Part V, subpart F, entitled "False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls." Laparte and Heffner executed the First Quarter 2018 Form 10-Q, which also attached their executed SOX certifications.

106.   The Company's classification of these CD's as cash and cash equivalents in its First Quarter 2018 Form 10-Q, and throughout interim period reporting on its subsequent 10-Qs for the Second and Third Quarter of Fiscal 2018, constituted a material misstatement because this overstated the cash and cash equivalents balances in these financial statements and made PriceSmart's actual liquidity profile appear to be better than it actually was.

107.   Due to these errors, under Laparte's leadership, PriceSmart was forced to eventually disclose in its Annual Report on Form 10-K for the Fiscal Year ending August 31, 2018 ("2018 Form 10-K"), that its internal controls over financial reporting were not

effective as of August 31, 2018 – and therefore were not effective in earlier periods – and restate its classification of such assets.

**H.     False and Misleading Statements of March 19, 2018, April 5, 2018, and April 6, 2018 Respecting the Acquisition of Aeropost**

108.   In a press release entitled "Acquisition of Aeropost, Inc.," that PriceSmart issued on March 19, 2018, after it was reviewed and approved by defendant Laparte, the Company made the following announcement:

SAN DIEGO, March 19, 2018 /PRNewswire -- PriceSmart, Inc. (NASDAQ: PSMT), the largest operator of membership warehouse clubs in Central America, the Caribbean, and Colombia, announced today that it has acquired Aeropost, Inc., an end-to-end cross-border package delivery service and online retailer headquartered in Miami, Florida.

Aeropost is one of the largest and most visible cross border logistics and e-commerce providers in Latin America and the Caribbean, currently offering services to 38 countries and territories, including 11 where PriceSmart currently operates. Aeropost offers convenient local pickup points, and an innovative local payments platform that allows buyers to purchase US-sourced merchandised online.

PriceSmart will operate Aeropost from its headquarters in Miami as a wholly owned subsidiary.

"We admire PriceSmart's operational excellence and commitment to its members. Becoming part of the PriceSmart family gives us the opportunity to take Aeropost.com and PriceSmart to the forefront of retail innovation. We can't think of a better match," said Carlos M. Herrera, Aeropost's CEO.

The technology behind Aeropost.com coupled with its strong team, will allow PriceSmart to offer new online shopping options for its members, strengthening its commitment to provide an exceptional member experience with high quality merchandise at low prices.

"We are very excited to welcome the talented team at Aeropost to the PriceSmart family. Expanding on the strength of our brick and mortar clubs, the acquisition of Aeropost provides an opportunity to accelerate the

37

development of an omni-channel shopping experience for our members" said Jose Luis Laparte, PriceSmart's President and CEO.

109.  PriceSmart's March 19, 2018 Press Release, reporting and adopting the Aeropost CEO's statement that the acquisition "gives us the opportunity to take Aeropost.com and PriceSmart to the forefront of retail innovation," and that "*we can't think of a better match*," represented to the market that Aeropost's operational business model fit with PriceSmart's well-known, cost-efficient, and competitive low price business model, which was the foundation of its success. PriceSmart's March 19, 2018 Press Release statement that "the technology behind Aeropost.com, coupled with its strong team, will allow PriceSmart to offer new online shopping options" with "high quality merchandise at low prices," also gave the impression and constituted a representation to the market that Aeropost possessed the digital platform technology piece that PriceSmart needed to figure out and build a robust Omni-Channel Experience consistent with its business model, the very digital platform that PriceSmart had previously been trying to achieve on its own. The March 19, 2018 Press Release also constituted a representation that acquiring Aeropost had favorably positioned the Company to achieve an Omni-Channel Experience through the acquisition of Aeropost's digital platform and technologies capabilities, which acquisition was the *panacea* respecting PriceSmart's Omni-Channel pursuits, consistent with PriceSmart's legacy business model. And defendant Laparte's statement that "[e]xpanding on the strength of our brick and mortar clubs, the acquisition of Aeropost provides an opportunity to *accelerate the development* of an omni-channel shopping experience for our members" reinforced these favorable impressions created by the announcement.

110.  The terms of the Aeropost acquisition remained undisclosed at that time. Illustrating the positive impression that Defendants' statements created in the marketplace – with the terms as yet still not revealed – *Seeking Alpha* repeated the statement in PriceSmart's press release that "the acquisition will enable PriceSmart to offer new online shopping options for its members, strengthening its commitment to provide an exceptional member experience with high quality merchandise at low prices." The *Seeking Alpha* article

also quoted defendant Laparte's excitement in welcoming Aeropost to the PriceSmart family, and repeated his representation that "the acquisition of Aeropost provides an opportunity to accelerate the development of an omni-channel shopping experience for members."

111.   The March 19, 2018 announcement of the Aeropost acquisition was favorably viewed by investors as an effective strategic solution to achieving an Omni-Channel Experience consistent with PriceSmart's legacy business model upon which its success was founded, without the unbridled costs and delays associated with having to continue to figure out, develop, and build such capability from scratch. Although the market still awaited further detail about the acquisition, the news caused the trading price of PriceSmart's stock to start rising. Its stock price rose from a close of $81.15 per share on March 19, 2018 to close at $81.90 per share on March 20, 2018, rising further still to close at $83.05 on March 22, 2018, then to $83.55 per share on March 29, 2018, and higher still to $83.85 at the close of trading on April 4, 2018.

112.   On April 5, 2018, additional favorable news regarding the Aeropost acquisition was disclosed. PriceSmart issued its Report on Form 10-Q for the Second Quarter of Fiscal Year 2018, ending February 28, 2018. ("Second Quarter 2018 Form 10-Q"), executed by Laparte and Heffner. The Company aggressively stated that "[w]e are in the process of expanding our strategy to include online shopping and the strategic placement of regional distribution centers to support both our traditional warehouse club business and our new online shopping initiative…" It also stated, "[w]e believe our business strategy needs to be broadened to respond to changes in shopping habits so our members will have the shopping experience they desire. Our longer range strategic objective is to combine the traditional membership warehouse club 'brick and mortar' business with online shopping to provide the best shopping experience possible for our members." The Second Quarter 2018 Form 10-Q reported that "the Company acquired Aeropost, Inc., a cross-border logistics and e-commerce provider with presence throughout Latin America and the Caribbean, for total consideration of $30.0 million," adding "Aeropost brings to PriceSmart a technology

and development team, which the Company can leverage to offer new online shopping options for our members."

113.  On the important topic of the Aeropost acquisition – which was revealed to be at a purchase price of $30 million – the Second Quarter 2018 Form 10-Q further reassured investors with regard to the integration of Aeropost into PriceSmart's operating systems and online shopping technology, stating: "[t]he Innovation Team is working with PriceSmart management to facilitate the integration of Aeropost into the operating systems of PriceSmart with the goal of realizing the benefits of the Aeropost acquisition." The Second Quarter 2018 Form 10-Q went on to represent that "[t]hese benefits include efficient and low cost border delivery services, a wider assortment of products and services for members to purchase online, and a more user friendly operating system and delivery services for PriceSmart members."

114.  The Second Quarter 2018 Form 10-Q disclosed that "[t]he company recorded an impairment charge of approximately $1.9 million for the three and six months ending February 28, 2018, related to the write-off of internally developed software for e-commerce due to the Company's acquisition of Aeropost, Inc. … and its digital e-commerce platform," while disclosing later in the same SEC filing that PriceSmart took a "$2.6 million charge for the write-off of costs for an e-commerce platform and $525,000 in deal costs."

115.  On April 6, 2018, during the Company's follow-on Second Quarter 2018 Earnings Conference Call, defendants Laparte and Heffner made additional statements and representations, further placing the Aeropost acquisition in a false or misleading light, especially with regard to its "online business, with online technologies capabilities." Laparte boldly stated that PriceSmart took "$2.6 million in charges for e-commerce development activities that are no longer needed because of that technology purchase as part of the acquisition of Aeropost.…" This representation sent a message to investors that Aeropost's digital e-commerce platform was mature enough to enable the PriceSmart to abandon what it had previously done internally to develop software for its own in-house e-commerce platform. The announcement reinforced the false or misleading impression in

CONSOLIDATED CLASS ACTION COMPLAINT

the market that PriceSmart's own internal developed software for e-commerce was no longer needed owing to the fact that PriceSmart had now acquired an Omni-Channel solution, afforded by the acquisition of a more developed and viable Aeropost digital e-commerce platform and "online technologies capabilities" that it would integrate into PriceSmart and would become its foundation to establish an Omni-Channel Experience "in the right way" – in other words, consistent with PriceSmart's long-standing business model.

116.   Reinforcing the false or misleading impression that the Company had now advanced – even accelerated – toward achieving connectivity between a digital platform and its brick-and-mortar retail business, while trumpeting the fact "Aeropost is one of the largest and most visible cross border logistics in e-commerce providers in Latin America and the Caribbean …," offering "package delivery services …" and that "Aeropost.com enables customers to purchase US sourced products online and receive them in country within days of purchase" and its "services" provide an "exciting, high value addition to the product and services we offer to our members," Laparte represented and assured investors that the "combination of our two companies brings together PriceSmart brick-and-mortar excellence, buying power and distribution and operation expertise, with Aeropost's exceptional cross-border logistics, delivery option and e-commerce know-how." Then, Laparte said what the investment community was longing to also hear: "Aeropost business accelerates PriceSmart's ability to offer online shopping, test and measure new digital strategies and offer delivery options for our members, all while maintaining our commitment to an excellent members experience with high quality merchandise at low prices …" adding "Aeropost will operate as a wholly-owned subsidiary, providing its logistics and technology services to support PriceSmart's omni-channel and digital strategy."

117.   Importantly, Laparte exclaimed that "beyond the charges we took in the current quarter, we do not anticipate any further dilution to our earnings through the end of this fiscal year with this acquisition." This was significant comfort to investors. Given that the Company – including its CEO and CFO – were required to conduct due diligence prior to

41

making the decision to acquire Aeropost, booked significant charges relating to "due diligence," and made no statement that they failed to conduct adequate and required due diligence respecting Aeropost's operations, business model and financial results, before making the decision to acquire Aeropost, Laparte's statement resonated through the marketplace as particularly reliable.

118.   Laparte gave further insight into the acquisition, stating that "some of the activities and investments we were planning to do as part of our innovation initiatives, which we have previously indicated could be up to $5 million in the fiscal year, are now being addressed via Aeropost capabilit[ies]." This too comforted investors, further underscoring the impression that Aeropost had the capability to make PriceSmart's previous online system development unnecessary, as it was being supplanted by the capabilities of "one of the largest and most visible cross-border logistics and e-commerce providers in Latin America and the Caribbean …," reinforced by the fact that the Company had taken a "$2.6 million in charges for e-commerce development activities" that Laparte emphasized "are no longer needed because of that technology purchase as part of the acquisition of Aeropost, Inc."

119.   Laparte further assured investors that "as a result" of the acquisition of Aeropost capabilities, "any incremental costs of integrating Aeropost will largely fall within that previously planned investment amount." This was comforting news that created the false and misleading impression that, beyond accelerating the development of PriceSmart's e-commerce on an even broader scale, PriceSmart was positioned to achieve the integration of Aeropost and the build-out of the Omni-Channel Experience within the ambit of the remaining budget. This was also another affirmation of the capability of the Aeropost online technology solution. Laparte heralded the acquisition stating "we believe we have added exciting new capabilities with Aeropost," which was also relevant with regard to the Company's goal of achieving digital platform and brick and mortar connectivity. This too gave significant assurance and comfort to investors.

120.    During the call, defendant Heffner reported that the cost of acquisition included $525,000 in "deal cost associated with the acquisition for due diligence, legal, tax, accounting and technical advice," reinforcing the impression that Aeropost was acquired with C-Suite eyes wide open, not shut. Heffner also acknowledged $2.6 million in charges "to discontinue development efforts of our e-commerce solution," again reinforcing the representation and assurance that this was no longer necessary for the development in-house because, as he represented, "[t]he acquisition of Aeropost will allow us to utilize Aeropost online technology, along with their in-house digital capability in place of an outsource solution." The words "***in place of an outsource solution***," and especially the careful use of the word ***"solution,"*** alone and in combination with the many related statements by the Defendants, on March 19, 2018, April 5, 2018, and April 6, 2018, was meant to be understood, and was understood, as a representation that acquiring Aeropost solved the "how" in terms of figuring out how to achieve the Omni-Channel Experience consistent with PriceSmart's business model – in the right way. With this solution, PriceSmart was now poised to commence and develop on expansive build-out, as represented.

121.    When one analyst inquired whether PriceSmart wanted to grow Aeropost's "facilitator" business – referred to in Latin America as a "*casillero*" service – Laparte continued to comfort investors, stating "really what we are looking at doing and developing is obviously enhance our value proposition by obviously combining our brick-and-mortar expertise and obviously build – grow our e-commerce business" adding that they "don't necessarily want to just grow the current *casillero* business" and would be "focused more on growing … going to build also – we are looking at building a platform, obviously, through them so that we can offer our own PriceSmart platform to our members."

122.    Defendant Heffner further comforted investors when responding to a question about the size of any additional investments PriceSmart might have to make going forward with the Aeropost acquisition and integration, stating that "in the near term right now, from an investment standpoint, there are investments, but as we mentioned, we had already been planning investments to do things in what we consider innovation area, which are now very

43

much wrapped up into the innovation activities of Aeropost" adding, "so we'd indicated, I think, $3 million to $5 million for this year," and, "if you look at the upper end of that range, of the $5 million, we think we can operate within that with the integration of Aeropost."

123.   Laparte then followed up noting that the Company was "looking at selling merchandise from PriceSmart within the Aeropost platform," and stating that they were "looking at building a platform, that will take a little longer, but as we did the write-off of our current platform, now we have to replace it with a new platform … a lot of good things, obviously, … Aeropost brings to the table for us … technology on one hand, a good team obviously, that will help us get there, time to market, … I guess be a little more faster on what we're trying to accomplish on this omni-channel opportunity."

124.   The announcement of the Aeropost acquisition was met with considerable market enthusiasm, as reflected in the trading price of PriceSmart's common stock. With further details of the acquisition now disclosed, PriceSmart common stock rose from $83.65 per share at the close of trading on April 5, 2018 to $88.23 at the close of trading on April 6, 2018, on trading volume of 711,600 shares – significantly higher than the average daily trading volume of the Company's stock. With this price increase, the market capitalization of the Company increased over $292 million since March 19, 2018, immediately before the acquisition was first announced.

125.   Defendants' positive and affirmative statements and representations were false and failed to disclose material adverse information that was required to be disclosed in order to make them not deceptive and misleading. Defendants deceived investors about the true state of affairs and status regarding the all-important topic of PriceSmart's achievement of an Omni-Channel Experience and its development consistent with its time-honored efficient, low-cost pricing business model.

126.   In truth, PriceSmart had not figured out how to adequately harmonize its core business model in order to offer low cost pricing through a focus on efficiencies in the handling and shipping of goods and merchandise, with the costs and dynamics of international or cross-border e-commerce. Nor had Aeropost provided the solution.

44

Aeropost's digital platform and technological capability did not solve or supply this fundamental requirement so vital to successfully building out, expanding, growing, or otherwise implementing PriceSmart's Omni-Channel Experience initiative. Aeropost's online technology was not highly developed or advanced, and was nascent. Its technological capability and know-how was not mature enough to support an Omni-Channel Experience. And it would require an investment of significantly greater sums of money and development efforts to build out and integrate, even if it possessed the solution – the "how" – to achieve an Omni-Channel Experience "in the right way." The assertion that PriceSmart was able to operate within the upper end of the $3 million to $5 million that was previously allocated for development and innovation (which still had a balance of $2.4 million after backing out the $2.6 million that was written off) with regard to integrating Aeropost, was also false and misleading and made without a reasonable basis given Aeropost's immature, nascent digital platform and technology capability, and the undisclosed fact that neither Aeropost nor PriceSmart had figured out how to achieve an Omni-Channel Experience consistent with PriceSmart's low cost, efficient business model.

127.   In addition, the representation and impression created by the March 19, 2018 Press Release that one could "not think of a better match" – in other words, Aeropost's business model was a good match or fit with PriceSmart – was false, deceptive, and misleading. It was especially misleading and deceptive in combination with Laparte's representations to the effect that the acquisition of Aeropost would not otherwise have a dilutive impact on PriceSmart earnings.

128.   At all times material to the Class Period, both before and after its acquisition by PriceSmart, Aeropost's business model differed substantially from PriceSmart's business model. It allowed consumers to buy products from other web retailers by copying the web address of a particular product, after which Aeropost generated an all-inclusive price for shipment of that product to the customer, covering taxes, custom fees, duties, and delivery.

CONSOLIDATED CLASS ACTION COMPLAINT

129.    Following the acquisition, and through the balance of the Class Period, Aeropost continued these practices in its marketplace and *casillero* business, which PriceSmart refers to as Aeropost's "legacy" business.

130.    Aeropost's business model was not built on a purchasing model that stressed purchasing and shipping in bulk, or focusing on locally-sourced products, as is PriceSmart's, but instead on providing consumers with the ability to purchase a broad range of goods on a singular basis, providing a wide variety at high cost, without the benefits of PriceSmart's efficient model. The platform developed for Aeropost's business model was not designed around the brick and mortar inventory management necessary to integrate PriceSmart's warehouse business model, and these distinctions created unique challenges in integrating the Aeropost platform in a manner that was consistent with PriceSmart's business model.

131.    Both before and after Aeropost's acquisition by PriceSmart, Aeropost's business model was hobbled by the challenges presented in providing accurate, all-inclusive prices in the many nations in which it operates. Indeed, as set forth in ¶ 134, Aeropost failed to capture or adequately reflect the costs of its services in the amounts that it charged its customers. Moreover, Aeropost's inability to move small shipments in a timely fashion was a continuing source of consumer complaints, as reflected on trustpilot.com, a website for consumer reviews of companies, as noted below:[4]



---

[4]    https://www.trustpilot.com/review/aeropost.com, last visited on December 4, 2019,

CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18      132.   Aeropost's operational shipping and pricing templates and structure were not

19  fully compatible with PriceSmart's core, uber-efficient, operational model upon which it

20  relied to control costs in order to provide the lowest competitive pricing to customers and

21  maintain its pricing integrity mantra. Aeropost's legacy business model represented and

22  imposed on PriceSmart an ongoing drag on earnings. This was apparent upon conducting

23  any reasonable due diligence. Acquiring Aeropost put PriceSmart in the position of having

24  to absorb, on its consolidated balance sheet, losses that Aeropost was absorbing, as a

25  consequence of additional shipping and handling costs that had not been taken into account

26  or absorbed into Aeropost's "all inclusive" prices, as advertised.

27      133.   The fact that Aeropost's business model regarding its facilitator or *casillero*

28  services was incompatible with PriceSmart's low cost and efficient business model, which

CONSOLIDATED CLASS ACTION COMPLAINT

1   was apparent upon the exercise of reasonable due diligence, created tension between
2   physical retail and online e-commerce development in countries PriceSmart serviced, and
3   with regard to any expanded geographic markets in which Aeropost used a different
4   shipping and pricing template than PriceSmart.

5       134.   For example, according to Confidential Witness ("CW-1"), a former employee
6   of PriceSmart who worked at the Company as a pricing/margin manager from April 2004
7   until 2019, and observed what PriceSmart was doing with respect to shipping goods,
8   Aeropost "processes" lacked the processes that PriceSmart had established for its regular
9   business. Shipping carts for commerce "just had freight." They "didn't have duties or other
10  charges and expenses necessary to move goods across borders and what it would cost for
11  Aeropost to accomplish such shipping, including fees, freight charges, duties, and related
12  costs of doing business. CW-1 "had knowledge of what types of things should be on their
13  template, and they were not on their template." CW-1 observed that "I don't think they paid
14  enough attention or had an understanding of how it was affecting their cost … the template
15  didn't have enough of the other cost. The freight was there, and either duty was missing or
16  it was wrong duty rate. But also, looking at the normal template, there was a cost associated
17  with moving inventory – above and beyond freight cost – and they didn't have it. They
18  either had too much or they didn't have enough." These systemic problems with Aeropost's
19  business model, including an inability to serve customers consistently and an inability to
20  accurately and consistently quote accurate prices for its products, would obviously plague
21  Aeropost and PriceSmart's consolidated financial results, post-acquisition.

22      135.   From the very outset of its acquisition, Aeropost had an immature e-commerce
23  technological capability. Its online system was nascent, and Aeropost's online platform and
24  system required PriceSmart to invest far more than the allocated $3 to $5 million balance
25  to develop and achieve the Omni-Channel Experience, contrary to Heffner's reassuring
26  statement that "we think we can operate within that with the integration of Aeropost."

27      136.   The acquisition of Aeropost, which was highly touted and portrayed as a very
28  positive new development, actually saddled PriceSmart with a heavy yoke of expenses,

creating a significant drag on its earnings, both by reason of continuing operational expenses for Aeropost's "legacy" *casillero* and facilitator business, as well as expenditures needed to achieve an Omni-Channel Experience in "the right way."

137.   During the course of reasonable due diligence respecting the transaction so critical to the Company's e-commerce success, PriceSmart, Laparte, and Heffner would necessarily have learned that Aeropost's online capability and development was nascent and that Aeropost did not possess the solution and online platform capable of achieving an Omni-Channel Experience consistent with PriceSmart's business model. Neither company had figured out how to do that, which constituted a fundamental building block needed to successfully construct the requisite digital platform. PriceSmart's lack of direction of its CEO Laparte, its rush to purchase Aeropost, and the fact that neither the Company nor Aeropost had figured out how to harmonize its own cost efficiency/low cost core business model with international e-commerce, created a toxic brew that did not and could not accelerate PriceSmart's launch of a seamless Omni-Channel Experience, and certainly not within the allocated $3 million to $5 million balance, as represented.

138.   Unbeknownst to the market, Aeropost's operations constituted a continuing drag on PriceSmart's earnings per share, putting adverse pressure on the Company's operating margins due to Aeropost "legacy" operational expenses. PriceSmart ultimately had to absorb these costs on its consolidated balance sheet, and was required to make far more extensive and continuous investments in attempting to create an Omni-Channel Experience built upon on Aeropost's nascent digital platform. The exercise of a reasonable degree of due diligence in connection with the Aeropost acquisition must necessarily have revealed the significant adverse effect of this acquisition on PriceSmart's EPS.

## I.   Continuing Falsity and Deception in Statements of July 5, 2018 and July 6, 2018

139.   The Defendants' deception of the market, arising from their false and misleading statements and material omissions, continued to buoy and inflate the trading

CONSOLIDATED CLASS ACTION COMPLAINT

price of PriceSmart's common stock. By the close of trading on July 5, 2018, the trading price of PriceSmart's common stock reached $93.40 per share, representing a market capitalization increase of over $373 million from its closing trading price of $81.15 just before the Aeropost acquisition was announced on March 19, 2018.

140.   Then, after the market closed on July 5, 2018, PriceSmart was compelled to announce a material adverse hit to its EPS arising from the acquisition of Aeropost and its legacy operational expenses and losses. Still, the Company, Laparte, and its new CFO Jager, were trying to paint a very positive picture regarding PriceSmart's movement towards and development of a seamless Omni-Channel Experience connecting a digital online platform with its traditional bricks and mortar retail business, and that it was not behind the e-commerce curve.

141.   On July 5, 2018, the Company issued its Report on Form 10-Q for the Third Quarter of 2018, ending May 31, 2018 ("Third Quarter 2018 Form 10-Q"), signed by Laparte and Jager. Like the reporting of the two preceding quarters, the Third Quarter 2018 Form 10-Q continued to misclassify PriceSmart's assets and the effectiveness of its internal controls over financial reporting, thus skewing its true liquidity profile by making it appear better than it actually was, as more fully discussed below in Part V, subpart F, entitled: "False Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls."

142.   Placing a positive spin on the Aeropost e-commerce technology capability and its acquisition, the Third Quarter 2018 Form 10-Q affirmatively emphasized that "Aeropost will allow us to offer new online shopping options and provide an opportunity to accelerate the development of an omni-channel shopping experience for our members providing them with efficient and low-cost cross-border delivery services, a wider assortment of products and services available to purchase online and a more user friendly ordering system and delivery service." However, that statement was materially false or misleading and omitted material adverse facts. No mention was made that PriceSmart still had not yet figured out how to achieve that Omni-Channel Experience consistent with its business model, and

especially not in any expansive or broadened way. The Aeropost acquisition did not provide the "solution."

143.   Rather than confess the truth, the Third Quarter 2018 Form 10-Q, signed by CEO Laparte and CFO Jager, effectively doubled-down, camouflaging prior falsity by reiterating that the Company had broadened its business strategy. The Third Quarter 2018 Form 10-Q stated, in pertinent part, that the Company was in the process of "*expanding* our strategy to include online shopping and the strategic placement of regional distribution centers to support both our traditional warehouse club business and our new online shopping initiative[,]" while adding that because "technology is having an increasingly profound impact on shopping habits …. [w]e believe our business *strategy needs to be broadened*," and acknowledging that "[o]ur longer range strategic objective is to combine the traditional membership warehouse 'brick and mortar' business with online shopping to provide the best shopping experience possible for our members."

144.   However, bundled with such positive information, the Third Quarter 2018 Form 10-Q disclosed that "[c]osts associated with the consolidation of Aeropost were recorded for approximately $4.2 million related to warehouse club and other operations cost and approximately $3.8 million related to a general and administrative costs for a combined total of $8.0 million...." Aeropost created a negative drag on EPS of ($0.08), arising primarily from its legacy operations and the cost of omni-channel investment. Although it was disclosed that Aeropost's legacy operation had caused PriceSmart to absorb losses, diluting its earnings and EPS in the Third Quarter, Defendants did not explicitly disclose the material adverse fact that Aeropost's business model and its shipping practices or templates were inconsistent with PriceSmart's and its efficient low cost business format and model. This was a systemic problem representing a troubling and persistent drag on its earnings, which remained undisclosed at that time, thus hiding the whole truth.

145.   On July 6, 2018, during the Company's Third Quarter 2018 Earnings Conference Call, CEO Laparte and CFO Jager discussed the adverse impact that the Aeropost acquisition and operations had on PriceSmart's business in the quarter – despite

51
CONSOLIDATED CLASS ACTION COMPLAINT

the reassurances to the contrary provided on April 5, 2018, after acquisition due diligence – while still painting a positive picture of the benefits of the acquisition as it related to the development of PriceSmart's Omni-Channel Experience. Laparte stated that "we keep looking at ways to enhance the value proposition to our members and the Aeropost acquisition should help us combine it with our warehouse club formula that has been successful for many years." Stating that "one of our goals is to integrate the best of our traditional brick-and-mortar warehouse clubs with the new trends of online shopping to create the right omnichannel experience for our members[,]" Laparte represented that the "e-commerce platform now in development" "would be able to offer our members most of the selection of items available in the other warehouse clubs," which initiative he characterized as "important," while further representing that "[t]he Aeropost service is an exciting high value addition to the product and services we offer to our members." Laparte further stated that the "combination of our two companies brings PriceSmart brick-and-mortar excellence, buying power and distribution and operational expertise, together with Aeropost's exceptional cross-border logistics, delivery options and e-commerce know-how," and reiterated that "Aeropost's business accelerates PriceSmart ability to offer online shopping, test and measure new digital strategies, and offer delivery options for our members, all while maintaining our commitment to an excellent members' experience with high quality merchandise at low prices."

146.   On the heels of emphasizing PriceSmart's "broadened" or "expanding" strategy, Laparte indicated that "one of the tasks already initiated by the Aeropost tech team is the development of our new e-commerce platform, which will be launched in some countries, at some point, during our next fiscal year 2019 [ending August 31, 2019]." The timeline had shifted. With respect to the new date of a launch of the digital platform, which he characterized as "a key component," Laparte further disclosed that "our platform will probably launched (sic) until next year, they are working, a portion of that may be launched with some membership component probably by September, October, but the facility for the members to actually access the PriceSmart.com platform will be in place during the spring

CONSOLIDATED CLASS ACTION COMPLAINT

2019." This timeline was longer than the prior representations – ostensibly because of the broadened and expanding strategy – and inconsistent with the assurance that acquiring Aeropost accelerated the e-commerce connectivity for PriceSmart. Despite having written off the cost associated with development of its own internal e-commerce platform due to the Aeropost acquisition, acquiring Aeropost's "technologies capabilities and "know-how," had not accelerated the development and launch of PriceSmart's Omni-Channel platform and seamless Omni-Channel Experience. Again, there was no revelation that, in fact, PriceSmart had not figured out how to achieve an Omni-Channel Experience in the right way: it still did not have an Omni-Channel solution consistent with the business model PriceSmart relied upon for its success. This critically important fact still remained concealed from the market, even as Laparte spoke about expanding the Company's strategy.

147.   The Defendants continued to paint a false picture of PriceSmart's then-existing business condition and status. Jager asserted that "PriceSmart is ***well- positioned***" with "a unique competitive position in our markets …," adding that it is "also exciting to see Aeropost now an integral part of our team, energized to bring … more value to our existing members …" while adding that "Aeropost brings us several strategic benefits not the least of which is technology." CFO Jager mentioned Aeropost's $8 million impact on SG&A expenses in passing, stating that it included the effects of "amortization, operating expenses and general and administrative expenses," without breaking down how much of [the] Aeropost $8 million expense hit to PriceSmart's consolidated financial results, or negative ($0.08) EPS hit, was due to losses in Aeropost's legacy operation and how much was due to Omni-Channel development expenses. PriceSmart's financial reporting lacked transparency in that regard, and still continued to misrepresent the adequacy and effectiveness of its internal controls over financial reporting, while deceptively misclassifying its assets, as more fully discussed below in Part V, subpart F, entitled "False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls."

148.   During the Third Quarter 2018 Earnings Conference Call, following Defendants' partially corrective disclosures, one analyst inquired as to whether "in terms of the operating expenses from Aeropost," did Laparte and Jager "think that Aeropost has the necessary infrastructure" to "take your e-commerce to the necessary level? Or are you going to have to ramp up spending, ramp up investment? I'm trying to get an idea of what it might take to get to where you wanted to be?" In response, Laparte stated in pertinent part, "I will say that, yes, Jon, it will require some investment, there's no question. We definitely have a great team with the Aeropost … *we do have the plans* and then we started already investing in different initiatives to create – to improve the marketplace, to improve the whole Aeropost for – just to build our platform there, different initiatives that will not happen just without the investing … it may be short term, it may have some impact, but obviously, long-term, we do believe that it's the right thing to do."

149.   The analyst then inquired "[a]ny sense – any idea you can give us on what that level of investment might be[?]" Laparte side-stepped giving a direct answer, stating in pertinent part, "[n]ot at this point, although we're putting together our plans … we wouldn't set any direct expectation … but in terms of additional investment, we don't provide anything right now." Given that Aeropost had such a nascent platform when it was acquired, the two companies' lack of a viable seamless Omni-Channel Experience consistent with PriceSmart's business model, and the amount already spent since acquiring Aeropost to develop the Omni-Channel Experience that PriceSmart was representing it was developing, a truthful answer would have been for Laparte to disclose that the required level of investment would vastly exceed the balance of the $5 million allocation, that the ongoing required investment extended out in significant amounts, for a significant period of time, that the negative ($0.08) per share drag in the third quarter from Aeropost would also necessarily continue in subsequent quarters due to Aeropost's legacy operational inefficiencies and costs and the continuing need to invest more and more money into the Omni-Channel Experience launch, especially since they had not yet figured out "how" to

achieve the Omni-Channel Experience in adherence to PriceSmart's business model – a solution that had always been eluding them before and throughout the Class Period.

150.   By the time of Third Quarter 2018 Earnings Conference Call of July 6, 2018, the Defendants – especially Laparte – already had the added benefit, beyond any pre-acquisition due diligence, of an entire quarter of internal experience with Aeropost's legacy and *casillero* operations, its "technologies capabilities," and "know-how," which had been the represented basis ostensibly justifying the write-off of PriceSmart's in-house e-commerce related development, while assuring investors that Aeropost "accelerated" such development, and that the acquisition of Aeropost's operations would not adversely impact earnings.

151.   The Third Quarter 2018 statements and partial corrective disclosures by PriceSmart and its senior executive management, Laparte and Jager, surprised the market, as reflected in the trading price of its common stock, which fell from $93.40 per share at the close of trading on July 5, 2018 to $83.40 per share at the close of trading on July 6, 2018, on unusually high trading volume of 1,209,000 shares. The stock continued to trade lower still, falling to a close of $79.85 per share on July 9, 2018, and to $77.90 at the close of trading on July 10, 2018.

152.   Still, as a result of the materially false and/or misleading statements, and/or failure to fully disclose the whole truth, PriceSmart common stock continued to trade at artificially inflated prices through the remainder of the Class Period.

## J.   The Entire Truth Finally Emerges

153.   On October 25, 2018, the Company announced Fourth Quarter 2018 and Fiscal Year 2018 results. The Company disclosed total revenue of $777.9 million, and operating income of $27.2 million, compared to operating income of $30.8 million from the prior year. On that same day, the Company also announced that certain financial statements would be "restated" to correct a balance sheet "***misclassification***" of certain ***assets***. With

regard to the issue of "misclassification," which had never previously been disclosed, the Company stated:

> During the preparation process for the 2018 Annual Report on Form 10-K for PriceSmart, Inc. (the "Company"), a balance sheet misclassification (with no impact on earnings per share, revenue, operating income, net income, cash flow from operations, total assets or total current assets) within current assets was identified involving the Company's presentation of short-term investments as cash and cash equivalents in its previously issued unaudited interim consolidated financial statements for fiscal year 2018; specifically, the three, six and nine month periods ended November 30, 2017, February 28, 2018, May 31, 2018 (collectively, the "Relevant Periods").
>
> In the past, the Company has disclosed a lack of availability of U.S. dollars in certain markets (U.S. dollar illiquidity), which impedes our ability to convert local currencies obtained through merchandise sales into U.S. dollars to settle the U.S. dollar liabilities associated with our imported products. Also, as we have previously disclosed, during fiscal year 2017 and fiscal year 2018, we experienced this situation in Trinidad. We are working with our banks in Trinidad to source tradeable currencies (including Euros and Canadian dollars), but until the central bank in Trinidad makes more U.S. dollars available, this condition is likely to continue. As part of the actions taken in Trinidad, the Company began investing the excess Trinidad and Tobago (TT) dollars into Certificates of Deposit or similar time-based deposits with financial institutions (referred to collectively herein as "CDs") with terms of three months or less, which the Company correctly presented as Cash and cash equivalents on the consolidated balance sheet. As the Company's balance of TT dollars increased, the Company began investing in CDs with terms of four months and up to twelve months. The Company entered into these four to twelve month CDs to gain priority with the respective financial institutions to make more U.S. dollars available for conversion of TT dollars, as well as in order to take advantage of the higher interest rates on these CDs for cash that was not otherwise needed for operations, capital commitments or debt service. ***During the first three quarters of fiscal 2018, the Company presented these four to twelve month CDs as Cash and cash equivalents in its consolidated balance sheet. However, in accordance with generally accepted accounting principles, these four to twelve month CDs should have been presented as Short-term investments. The correction of the misclassification of these investments within the Total current assets section of the consolidated balance sheets also requires the Company to disclose in the Cash provided***

56

*by (used in) investing activities section of the consolidated statements of cash flows the cash used in Investments in and Settlements of short-term investments.*

On October 24, 2018, the Audit Committee of the Company's Board of Directors met and determined that, as a result of the misclassification described above, the ***financial statements*** included in the Company's Quarterly Reports on Form 10-Q for the Relevant Periods ***should no longer be relied upon***. The required restatements will be included in a footnote to the Company's timely filed Form 10-K as of and for the year ended August 31, 2018, which the Company expects to file after the close of the market on October 25, 2018. ***The Company also expects to include in this Form 10-K a conclusion that there was a material weakness in internal controls over financial accounting related to this misclassification***. However, as stated above, there was no impact on earnings per share, revenue, operating income, net income, cash flow from operations, total assets or total current assets as a result of this misclassification.

154.    According to PriceSmart's 2018 Form 10-K, the Company was continuing "to explore ways to improve the efficiency, reduce costs and ensure a good flow of merchandise to our warehouse clubs," further noting that management was "currently working to facilitate the integration of Aeropost into our business" and disclosing that the Company had recorded "approximately $4.6 million in net losses from Aeropost operations and acquisition related expenses, net of tax benefits during the Fourth Quarter of Fiscal Year 2018 and "$9.3 million for entire fiscal year 2018.…"

155.    According to the 2018 Form 10-K, the Company experienced an increase of approximately $16.1 million in total selling, general and administrative expenses "due to the additional ***costs of our Aeropost subsidiary***.…" The Company further disclosed a total net loss from Aeropost and acquisition related expenses after tax benefits of $2,420,000 in the Second Quarter 2018; $2,290,000 in the Third Quarter 2018; $4,611,000 in the Fourth Quarter 2018 and for Fiscal Year 2018 a total of $9,321,000. Overall, the negative impact of the Aeropost acquisition on earnings per share for the Second Quarter 2018 was ($0.08); for the Third Quarter 2018 ($0.08); and for the Fourth Quarter 2018, ($0.15). The total Fiscal Year 2018 "year to date" drag on earnings per share arising from Aeropost and

acquisition related expenses was a negative ($0.31); this was massive and hardly non-dilutive.

156.   More critically, and on a related note, the Company announced that on October 25, 2018, CEO Laparte had submitted his "resignation" effective November 16, 2018, which the board of directors accepted that very same day. The board did not wait to accept it while it searched for a new CEO. As stated by an analyst with Kansas City Capital Associates in a report of October 29, 2018, "it was the resignation of the CEO … Laparte that captured most of our attention.…"

157.   Laparte admitted, in the Company's Fourth Quarter and Fiscal Year End 2018 Earnings Conference Call on October 26, 2018, that PriceSmart needed a "fresh perspective," while interim CEO Sherry Bahrambeygui connected the Aeropost and Omni-Channel Experience issues with respect to Laparte's departure, noting that "as the world of retailing is changing, and the world of merchandising is rapidly changing" it was "time for a fresh perspective" and need for a CEO to "bring a different set of skills … to help expedite our growth." That was a clear reference to the Laparte's consistent failure to deliver on the goal of e-commerce connectivity consonant with PriceSmart's business model, and a signal to investors that the Aeropost acquisition was not the *panacea*, and had not delivered what had been represented previously. The departure of Laparte was also a signal and a disclosure that he had misled regarding the Aeropost acquisition and Omni-Channel development, beyond maintaining "material weakness" in PriceSmart's internal controls necessitating a restatement, and that his conduct was neither benign, nor in good faith.

158.   During the Fourth Quarter and Fiscal Year 2018 Earnings Conference Call, defendant CFO Jager noted that the Fiscal Year 2018 "impact of our investment in Aeropost was ($0.31) per share.…" This was an extremely adverse impact for a company that had been purchased and its financial results consolidated with PriceSmart only about five months earlier. Company co-founder and board chairman Robert Price participated in the call. He bluntly acknowledged that the "Aeropost factors created a general reduction in our earnings" among other factors. Effectively disclosing the incompatibility between

58

PriceSmart's cost efficient business model necessary to compete and the Aeropost business model and related international shipping and distribution cost challenges, Mr. Price remarked that the Company was seeking to achieve the distribution of goods "more efficiently," while noting that "efficiency in the distribution chain will hopefully translate into lower prices and ultimately, more sales."

159.   Mr. Price then acknowledged that, with respect to the issue of connectivity between brick-and-mortar and online e-commerce, PriceSmart had to "*figure out how* … we sell … the way people want to use technology for shopping online." He acknowledged that the Company was "*struggling with the issue of how do you connect brick-and-mortar to online in a way that really works*," and that, in fact, they "*don't think anybody's totally figured it out* … The key is how we're going to combine what we sell in the club with online," commenting that "we are studying … *how* we can *offer* our members *home delivery* or *business delivery out of assortments that are in our clubs*." This disclosure made it obvious that the Company was still lost in such regard, and that the Aeropost acquisition had not provided the solution.

160.   Elaborating, Mr. Price further disclosed that the Company was going to "rethink cost structure of operations, the way we merchandize and everything, soup to nuts, to determine whether or not we can come up with something that's going to respond properly to the new world in which we live." He added, "you *can't disaggregate the stores from the online* … part of a whole … what is that sweet spot … *how* do you make sure that you can *integrate properly the technology*, the benefits of technology *with the traditional ways* in which people have been shopping."

161.   As a consequence of the 2018 Form 10-K and the aforesaid statements by the highest level executives and board members of the Company after the departure of Laparte, it became apparent to the market that the Company was, and had always been, shooting in the dark with respect to a solution affording the Omni-Channel Experience consistent with PriceSmart's business model and low-cost, low-pricing mantra. It also became apparent that the Aeropost acquisition was, and had always been, a significant yoke around the

Company's neck that was dragging down earnings as a result of its operational legacy related costs and the much greater investment into the e-commerce platform than had ever been represented during the March 19, 2018 Press Release, as well as the April 5, 2018, April 6, 2018, July 5, 2018, and July 6, 2018 statements, as alleged above.

162.   The issuance of the 2018 Form 10-K and Aeropost-related financial results, the follow-on conference call of October 26, 2018, and the Aeropost-related adverse information to which Laparte's abrupt "resignation" was connected, further revealing the falsity of Defendants' prior statements and omissions, caused a significant decline in the trading price of PriceSmart common stock. The stock fell from a close of $81.57 per share on October 25, 2018, to just $69.16 per share at the close of trading on October 26, 2018 on heavy volume of 901,300 – far greater than the average daily trading volume of PriceSmart stock.

163.   On October 29, 2018, a securities analyst with Kansas City Capital Associates reported that the "real surprise in the quarter was the mutually agreed upon resignation of the CEO…." Based on the public information provided by the Company, and as a consequence of Mr. Price and the interim CEO's having connected the dots, the analyst report noted that the "board was not confident that Mr. Laparte" could "successfully and expeditiously develop an online sales platform and layer that onto PSMT's brick and mortar business." The analyst lowered EPS guidance for fiscal 2019, noting that "we expect that Aeropost development expenses will remain elevated and pinch margins."

164.   On January 9, 2019, PriceSmart issued a Report on Form 10-Q for the First Quarter of Fiscal Year 2019, ending November 30, 2018, ("First Quarter 2019 Form 10-Q") in which it disclosed that it suffered a net loss from Aeropost operations, and related omni-channel development, of $3,900,000 (including $700,000 in acquisition costs), causing an adverse impact to the Company's EPS of negative ($0.13) per share. The Company also acknowledged that it still did not maintain adequate internal controls respecting the classification of financial instruments as cash or short term investments and that it had not yet remediated such existing material weakness. A report disseminated to the

60

market by a securities analyst with the financial services firm IFS, noted that PriceSmart's "shifts in corporate strategy and management" occasioned "higher execution risk."

165.   During PriceSmart's follow-on January 10, 2019, First Quarter 2019 Earnings Conference Call, when asked by an analyst on the call whether PriceSmart had "seen any traction yet … in terms of your online activities," interim CEO Bahrambeygui noted, in pertinent part, that it was "early on in the process," and that they were "trying to understand where the greatest value is to be unlocked from this acquisition, and how best to apply it and integrate those capabilities and the talent into the very core of our business at PriceSmart."

166.   When an analyst on the call asked interim-CEO Bahrambeygui whether "going forward … you might disclose within Aeropost revenues what might be facilitated revenue versus online transactional revenues," interim CEO Bahrambeygui responded, "don't know that I can answer that question yet … I'm sure we're going to be able to articulate it in a much clearer fashion if they give us a little bit more time." Then, when an analyst asked on the same call "when you look at the pace of investments that you're making in Aeropost, would you anticipate that pace to level off here, or ratchet up, decline a little bit?", interim CEO Bahrambeygui candidly disclosed that ***Aeropost was not a "plug-and-play" that was going to "be the answer to all of our e-commerce and omni-channel needs…."***

167.   On April 9, 2019, over a year since the Aeropost acquisition, PriceSmart issued a Report on Form 10-Q for the Second Quarter of 2019, ending February 28, 2019 ("Second Quarter 2019 Form 10-Q"), which disclosed that the Company's quarterly EPS was adversely impacted by a total of negative ($0.14) per share due to Aeropost's acquisition, operational and Omni-Channel costs. During the follow-on earnings conference call with analysts on April 10, 2019 ("Second Quarter 2019 Earnings Conference Call"), it was disclosed that of the $4,200,000 in Aeropost-related costs adversely impacting PriceSmart's Second Quarter 2019 EPS, $1,700,000 consisted of losses due to Aeropost's operations or "legacy" business, and $1,300,000 was due to the costs of development of the Omni-Channel platform.

168.   While referring to the Company's effort at "getting back to basics" during the Second Quarter 2019 Earnings Conference Call, CEO Bahrambeygui acknowledged a "need to leverage the technology and the talent we've acquired through what has been referred to as Aeropost, the company we bought last year", adding that "we need to accelerate our digital and omnichannel transformation to also drive growth," and noted that the "integration of the company that we've been referring to as Aeropost into PriceSmart" was "another area of priority". CEO Bahrambeygui disclosed that the "team is working closely to launch an e-commerce website as part of a new formal launch in the Dominican Republic." This was hardly the broadened Omni-Channel strategy investors had been led to believe was being pursued in July 2018, or prior thereto. CEO Bahrambeygui also disclosed that PriceSmart had formed a "Digital Transformation Committee of the Board of Directors."

169.   Reacting to the revelations of April 9-10, 2019, Kansas City Capital Associates reported, on April 11, 2019, that the "Aeropost acquisition continues to be a drag on earnings," and that the "Aeropost acquisition and omni-channel retail strategy continue to be a work in progress," observing that the "*Aeropost acquisition* has been used to *jump-start PSMT's omni-channel capabilities*, but it all remains in development." The acquisition had not jump-started or accelerated achievement of PriceSmart's Omni-channel Experience.

170.   On July 10, 2019, PriceSmart issued its Report on Form 10-Q for the Third Quarter of 2019, ending May 31, 2019 ("Third Quarter 2019 Form 10-Q"), in which it reported an Aeropost-related net loss for the quarter of $2,879,000, translating to a loss of ($0.09) per share. In the follow-on July 11, 2019 earnings conference call with securities analysts for the fiscal Third Quarter of 2019 (Third Quarter 2019 Earnings Conference Call"), upon talking about the negative ($0.09) per share adverse impact, defendant Jager disclosed that "the legacy Aeropost business" and the "investments into our digital platform" cost $1,000,000 and $1,800,000 respectively. Jager stated that the Company was continuing to focus on "launching and continuing to develop our digitally enabled Omni-

Channel platform". CEO Bahrambeygui added that PriceSmart wanted to "really strengthen that interrelationship between the digital capabilities with the brick-and-mortar to be able to maximize our opportunity to flow merchandise in the most cost effective manner to members."

171.   On October 29, 2019, PriceSmart issued its Annual Report on Form 10-K for the Fourth Quarter and Fiscal Year ending August 31, 2019 ("2019 Form 10-K"). The 2019 Form 10-K reported a total increase of $28.9 million in SG&A expenses. Over 2018. $9.9 million was attributable to inclusion of a whole year of Aeropost business as opposed about five months of the prior fiscal year. The Company further disclosed that $9.8 million was attributable to efforts to expand both Omni-Channel and Aeropost's *casillero* business. Thus, more than two-thirds of the increased SG&A expenses in Fiscal Year 2019 were attributable to Aeropost and/or the related Omni-Channel development. According to the 2019 Form 10-K:

> General and administrative expenses increased to 3.1% compared to 2.8% for the twelve month period ended August 31, 2019. Our investments to expand our omni-channel capabilities, together with our marketplace and casillero business added approximately $9.8 million or 30 basis points (0.3%), in costs to this line item for the twelve-month period.

172.   The Company's 2019 Form 10-K acknowledged that Aeropost was a significant component of the year-over-year decline in operating income stating: "Operating income for the twelve months ended August 31, 2019, decreased to $115.2 million (3.6% of total revenue) compared to $126.1 million (4.0% of total revenue) for the same period last year." And it was reported that "lower merchandise margins as a percent of sales, higher expenses year-on-year related to investments to expand our omni-channel capabilities and the inclusion for the full twelve months ended August 31, 2019 of the net operating results from our marketplace and casillero business acquired in March 2018 were the primary factors for the decrease in operating income."

CONSOLIDATED CLASS ACTION COMPLAINT

173.   The Company's 2019 Form 10-K also disclosed that not only were Aeropost activities a continued and significant drag on EPS, the amount of the adverse drag on EPS was higher for the full Fiscal Year, stating:

> The following table summarizes the costs recorded as part of our consolidation of Aeropost-related activities (net of tax benefit), including costs to expand our omni-channel capabilities, the net operating results of our marketplace and casillero business and ongoing costs we recorded as part of our post-acquisition purchase accounting.

| | Years Ended | |
| --- | --- | --- |
| (in thousands, except for per share amounts) | August 31, 2019 | August 31, 2018[1] |
| Negative impact of Aeropost-related activities (net of tax benefit) on Net income attributable to PriceSmart, Inc., before amortization | $    10,319 | $    4,620 |
|    Amortization of intangibles (net of tax benefit) | 1,870 | 872 |
|    Amortization of compensation expense | 2,273 | 1,409 |
| Negative impact of Aeropost-related activities (net of tax benefit) on Net income attributable to PriceSmart, Inc. | $    14,462 | $    6,901 |
| Less: | | |
|    Asset impairment of software (net of tax benefit) | $    — | $    1,416 |
|    Liabilities recorded for software-related impairment (net of tax benefit) | — | 514 |
|    Acquisition costs (net of tax benefit) | — | 490 |
| Negative impact from Aeropost-related activities (net of tax benefit) | $    14,462 | $    9,321 |
| Impact of Aeropost-related activities (net of tax benefit) on earnings per share | $    (0.47) | $    (0.31) |

[1] Our marketplace and casillero business was acquired in March 2018. This impact represents five and a half months of activity versus the entire twelve

64

months of activity in the current year.

174.    Finally, during PriceSmart's October 30, 2019 Fourth Quarter and Fiscal Year 2019 year-end earnings conference call ("2019 Fiscal Year Earnings Conference Call") hosted by the newly appointed CEO and continuing director, Bahrambeygui, and then-CFO Jager (who shall leave the Company effective January 10, 2020), it was revealed that PriceSmart was operating with a *renewed focus* on its founding "*Six Rights of Merchandising*," with the effort to "expedite our growth strategies in a manner consistent with our *core values*…." On the subject of connectivity between physical retail and a digital platform, after a substantial period of time since the advent of the Class Period, and over two years since suspending its online international catalog, CEO Bahrambeygui disclosed that the Company "launched pricesmart.com to initially support clubs in the Dominican Republic with an extended catalog of cross-border products." This is little progress.

175.    A comparison of PriceSmart's website for its Dominican Republic locations suggests little change, other than cosmetics, between 2013 and 2019. For example, screenshots pulled from www.archive.org of the website as of July 2, 2013 identifies products, including products imported from outside of the Dominican Republic, available for purchase via the internet at www.PriceSmart.com.

CONSOLIDATED CLASS ACTION COMPLAINT



66

176.   Moreover, in 2013, the Company maintained the ability to provide express shipping of some products to PriceSmart members at prices that were inclusive of "all EXPRESS shipping, handling, duties, and taxes."

177.   Even now, PriceSmart's efforts at Omni-Channel development do not appear to have extended the Company's capabilities substantially beyond its capabilities prior to the announcement of the Omni-Channel initiative at the start of the Class Period.

## V.   ADDITIONAL ALLEGATIONS SUPPORTING *SCIENTER*

178.   The Defendants' false and deceptive material misstatements and omissions, as alleged above, were made intentionally, knowingly, and/or with deliberate recklessness. They had the purpose and effect of concealing from the investing public the adverse truth about the Aeropost acquisition, Aeropost's financial performance and operational deficiencies, its incompatible business model and culture, the fact that the "how," or the solution to achieve an Omni-Channel Experience consistent with PriceSmart's efficient, low cost business model had not been "figured out," and the consequent fact that there was no reasonable basis to opine on how much additional investment in Omni-Channel development after acquiring Aeropost was necessary, that it could not be achieved within the balance of the allocated $3 to $5 million, that Aeropost's "technologies capabilities" and

68

e-commerce "know-how" was immature, nascent and did not "accelerate" PriceSmart's Omni-Channel development, and the ineffective and materially weak internal controls rendering PriceSmart's financial reporting and "cash and cash equivalents" liquidity-related profile false and unreliable, consequently buoying and artificially inflating the trading price of PriceSmart common stock. The following additional facts combined with those alleged above supporting *scienter*, when altogether viewed in their *totality*, demonstrate a strong inference that the Defendants' false statements and material omissions were made with actual knowledge of their falsity and/or without a reasonable basis for them, and/or in the face of and in possession of facts contradicting them, and/or with deliberate recklessness, i.e. *scienter*.

### A.      An Inference of *Scienter* Arising from Required Acquisition Due Diligence Relating to Aeropost

179.    PriceSmart and its C-Suite executives, especially its CEO and CFO, conducted acquisition "due diligence" before the Company acquired Aeropost. "Due diligence" means a "comprehensive appraisal of a business undertaken by a prospective buyer, especially to establish its assets and liabilities and evaluate its commercial potential." *Oxford Dictionary*.

180.    Due diligence refers to the research done before entering into an agreement or a financial transaction with another party. Performed by companies seeking to make acquisitions, it is an investigation of a potential investment to confirm all facts and ordinarily includes the review of financial records.

181.    In the merger and acquisition world there is a delineation between "hard" and "soft" forms of due diligence. An acquiring firm engages in risk analysis by studying costs, benefits, structure, assets, and liabilities – colloquially known as "hard" due diligence. In addition, acquisition due diligence necessarily involves the study of a company's culture, management, and human elements – often referred to as "soft" due diligence. The *Harvard Business Review* dedicated part of its April 2007 issue to what it termed "human capital due diligence" and warned that companies ignore it at their own peril. Such due diligence

CONSOLIDATED CLASS ACTION COMPLAINT

necessarily involves ascertaining whether there will be a cultural shift imposed by the acquisition, or whether the corporate cultures of the merging or acquisition parties are a good fit. This requires the acquiring entity to determine whether the target company's culture will mesh with its own.

182. Given the Company's representation via defendant Heffner on April 6, 2018 that it conducted acquisition "due diligence," the cost for which was $525,000, including "deal costs" expended as accounted for in its financial reporting, Lead Plaintiff is informed and believes and thereupon alleges that PriceSmart's executive officers, including Laparte and Heffner, were necessarily provided with access to Aeropost's financial books, records, and key personnel necessary to adequately inform them regarding its business model and its handling of shipping, distribution, pricing, and customer payments. Such acquisition due diligence necessarily provided them with access to Aeropost's online digital platform and technology sufficient to ascertain its status, level of sophistication, technological capabilities, and any financial expenditures needed to integrate it into and achieve PriceSmart's Omni-Channel Experience. In addition, such acquisition due diligence necessarily provided PriceSmart's executive officers, including Laparte and Heffner, the opportunity to examine Aeropost's *casillero* business and ascertain its approach to controlling costs in the distribution and shipping of merchandise and Aeropost's associated business template with respect to the handling of shipping, distribution, and pricing. In that regard, conducting such acquisition due diligence was ***integral to determining*** Aeropost's business model and culture in order to determine ***if they were a good fit or match*** with PriceSmart's.

183. There were certain basic, ***"core" issues fundamental to the acquisition*** and integration of Aeropost that needed to be investigated. They could not be overlooked in the performance of reasonable due diligence in advance of the close of ***the most important transaction in PriceSmart's existence*** since becoming a publicly traded company. Chiefly among them was whether Aeropost's business model conflicted with PriceSmart's business model emphasizing efficiency and controlling costs so as to enable it to offer the lowest

70

competitive pricing for its goods. Another core issue that was vital to ascertain, given the critical importance and goal of achieving an Omni-Channel Experience, was whether Aeropost's digital platform and technology provided PriceSmart with the solution for achievement of an Omni-Channel Experience, and thereby enabling it to do so faster than its previous strategy of building in-house its own digital platform.

184.    Any reasonable due diligence necessarily required PriceSmart to study and familiarize itself with these critical issues given their importance to the reasons behind acquiring Aeropost in the first place. Absent securing the answers to these vitally important issues, the Defendants knew that they did not possess a reasonable basis to give any statement and/or create or foster the impression that: Aeropost's operations would not have a dilutive effect on PriceSmart's earnings; Aeropost was a "match" with PriceSmart; the acquisition of Aeropost's digital online platform and technology "accelerated" PriceSmart's ability to achieve the aforesaid goal of an Omni-Channel Experience; PriceSmart would accomplish the integration of Aeropost within the allocated balance of the $3-5 million; Aeropost was the solution to build the Omni-Channel Experience in accordance with PriceSmart's business model; or that PriceSmart was able to leverage Aeropost's technology to achieve the Omni-Channel Experience.

185.    Any due diligence by PriceSmart would readily uncover the fact that Aeropost's operational business model was not consistent with PriceSmart's emphasis on efficiency, controlling costs, and providing the lowest possible price for its goods to consumers. Aeropost's legacy business model was not compatible with PriceSmart's legacy business model. Even superficial due diligence would have necessarily revealed that Aeropost's business model did not emphasize controlling costs, and that, in fact, Aeropost often absorbed the costs of delivery. Even superficial due diligence would have unveiled the fact that shipping and direct delivery to customers in the Caribbean, Central America, and Latin America markets, rather than delivering the goods to a brick and mortar store, required expensive courier services, which exposed Aeropost and, in effect, PriceSmart (on a consolidated reporting basis), to ultimately absorb such significant delivery costs because

71

Aeropost often included such delivery in its advertised purchase pricing, effectively increasing the costs of goods sold and otherwise rendering the price charged consumers unprofitable.

186.   Even superficial due diligence would have revealed that Aeropost had an immature, nascent digital platform and technological capability, that was not significantly more advanced than the digital platform PriceSmart had decided to abandon. Even superficial due diligence would have revealed that Aeropost did not provide the solution to "how" to achieve the Omni-Channel Experience in "the right way" and that PriceSmart had not itself figured out.

187.   The acquisition of Aeropost created the "illusion" of being the answer to PriceSmart's quest for achieving an Omni-Channel Experience when, in truth, it had simply acquired business practices that conflicted with its own time-honored business model, higher costs, losses created by Aeropost's legacy operations, and a nascent online capability requiring significant investment of funds without a clear end-game, time-line or solution that achieved an Omni-Channel Experience, consistent with PriceSmart's business model.

188.   As a consequence of the required due diligence, and, in particular, the fundamental need to ascertain information and answers to the core issues of inquiry as noted above, Defendants must have learned and known the adverse information contradicting their positive statements about the Aeropost acquisition and/or that those statements were untrue and therefore deceptive and misleading. It would be **absurd** to infer otherwise. Alternatively, if such required due diligence with respect to those crucial issues was not conducted so that answers to those core issues could be and were ascertained, then Defendants had no reasonable basis to make the false positive statements that they made and would have known this.

CONSOLIDATED CLASS ACTION COMPLAINT

**B.** **Inference of Knowledge: The Aeropost Acquisition Was a Critically Important Transaction that Involved a Key Issue Vital to PriceSmart's Success and Competitiveness**

189.    The Aeropost acquisition was a significant transaction involving an issue that was vital to PriceSmart's success, competitiveness, and growth: Omni-Channel – an issue upon which the market and Defendants were keenly focused. It would be illogical for the Defendants to have been unaware of Aeropost's contrary business model, or that they had not figured out how to achieve an Omni-Channel Experience consistent with PriceSmart's business model using Aeropost's existing "technologies capability" and digital platform. Defendants would have known that they had not yet figured out how to achieve an Omni-Channel Experience consistent with PriceSmart's business model, even with the Aeropost acquisition, and that its digital platform and technologies capabilities were nascent, and not significantly more advanced than PriceSmart's own in-house online platform, which it had abandoned as valueless. And they must have and would have known that there was no alchemy – no good match – between the two companies given their contradictory business models and cultures.

**C.** **The Departure of Laparte in Close Proximity to the Aeropost Acquisition Supports an Inference that He Knowingly Entered into a Damaging Transaction that did not Provide the Solution that was the Keystone to Building or Accelerating the Seamless Omni-Channel Experience**

190.    The effective termination of Laparte, whose resignation was announced at the end of the Class Period on October 25, 2018, and which was related to the failed Aeropost acquisition that he advocated for and extolled when speaking to the market, demonstrates a strong inference that he knew the adverse truth about Aeropost's legacy operations and digital online technology and status, and concealed this adverse truth when the false statements were made. His actions were not the product of mere negligence or innocent

73

mistake, as this would not have engendered seeking his resignation, especially at a time when a new CEO had not yet been found to replace him.

191.   At a minimum, his swift departure so soon after the acquisition strongly infers that he intentionally misled, and/or knew that he lacked a reasonable basis to have made the statements and representations that he made, or that he caused the Company to make, in the Press Release of March 19, 2018, the April 5, 2018 announcements to the market, and related filings with the SEC, the April 6, 2018 conference call with analysts, and the July 5-6, 2018 Aeropost related statements.

### D.   The Proximity, Magnitude, and Ongoing Duration of the Adverse EPS Impact from Aeropost Supports *Scienter*

192.   The acquisition of Aeropost caused an immediate drag on Third Quarter 2018 earnings and resulted in a large and continuing adverse impact on PriceSmart's EPS from the full quarter in which it was acquired in Fiscal Year 2018 and through all of Fiscal Year 2019. The Company had acquired a continuing and significant problem respecting Aeropost's legacy operations, and continued need to devote significant funds to develop its nascent digital platform and technology before it could ever achieve the development of an Omni-Channel Experience.

193.   The Aeropost acquisition caused PriceSmart to absorb a loss of ($0.31) per share in earnings dilution in Fiscal Year 2018 for the two quarters in which it operated post-acquisition, and a ($0.47) per share adverse dilutive impact for all of Fiscal Year 2019. Aeropost's operational losses, and the amount of money PriceSmart has already and continues to pour into it, has had a sustained and highly material adverse impact on PriceSmart's consolidated earnings and results, the duration and magnitude of which creates a strong inference that Aeropost-related problems and issues already existed and were systemic and obvious to defendant Laparte, in particular, when he spoke to the market about the acquisition.

CONSOLIDATED CLASS ACTION COMPLAINT

194.   There was no independent adverse event or calamity that befell Aeropost subsequent to the acquisition. The proximity, magnitude, and ongoing duration of the Aeropost losses reported by PriceSmart commencing in the Third Quarter of 2018 and through the present, demonstrate the severe depth of its problems and deficiencies, the fact that Aeropost had operational problems and deficiencies that were in existence prior to, not just after, its acquisition, that the two companies lacked a harmonious, consistent, or matching business model and culture, and an obvious disconnect with respect to PriceSmart's acquisition.

E.   **Admissions that PriceSmart had not Figured out Connecting Brick-and-Mortar to Online in a way that Really Works Support a Strong Inference of *Scienter***

195.   On October 26, 2018, PriceSmart co-founder Robert Price acknowledged, with respect to the issue of connectivity between brick and mortar and online e-commerce, that PriceSmart had to "figure out how … we sell … the way people want to use technology for shopping online" and that the Company was "struggling with the issue of ***how*** do you connect brick-and-mortar to online ***in a way that really works***." Mr. Price acknowledged that they "***don't think anybody's*** totally ***figured it out*** … the key is how we're going to combine what we sell in the club with online," further adding that "we are studying … ***how*** we can offer our members home delivery or business delivery out of assortments that are in our clubs." Mr. Price's statements were a direct admission that the Company did not possess or have a viable Omni-Channel Experience solution when it acquired Aeropost, or at all times material.

196.   Defendants also knew – as defendant Laparte admitted in statements of January 2018 – that prior to the acquisition of Aeropost and its digital platform and technology, PriceSmart was saddled with having to "continue investing ***until we figure out how*** to get on that space and ***create that omni-channel experience***." The Defendants knew that PriceSmart had never figured it out in-house, and was not providing a viable Omni-

75

Channel solution or plan when it acquired Aeropost. The foregoing admissions create a strong inference that Defendants knew that acquiring Aeropost still did not provide PriceSmart with a viable solution for achieving the Omni-Channel Experience in a way that was consistent with PriceSmart's business model – "the right way."

## F.   False and Misleading Financial Reporting, Lack of Transparency and Material Weakness of Internal Controls

### ➤ *General Principles of Financial Reporting*

197.   The accounting profession and the SEC recognize GAAP as the set of uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time. GAAP are the official accounting standards against which to measure financial presentations.[5] GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB"), a private American entity, which codifies the accounting rules that are then accepted by the SEC and the American Institute of Certified Public Accountants ("AICPA").

198.   Financial statements (including footnote disclosures) are a central feature of financial reporting. Financial statements also are a principal means of communicating accounting information to external parties, such as investors.[6] In light of their importance, the SEC requires that public companies present financial statements in accordance with GAAP.[7] SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or

---

[5]   Statement on Auditing Standards § ("AU") 411, *The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles in the Independent Auditor's Report* ("AU 411"), ¶ 2.

[6]   FASB Statement of Financial Accounting Concepts ("FASCON") No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), ¶ OB5; FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), ¶ 5.

[7]   17 C.F.R. § 210.4-01(a) (1).

CONSOLIDATED CLASS ACTION COMPLAINT

inaccurate, despite footnote or other disclosures."[8] Violations of GAAP, therefore, equate to violations of SEC Regulations for publicly-traded companies.

199.   One of the fundamental objectives of financial reporting is to provide accurate and reliable information about an entity's financial performance. FASB's Statement of Financial Accounting Concepts (or "FASCON") provides the framework for financial accounting. As stated in FASCON 8, the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (*FASCON 8, ¶ OB2*).

200.   To be complete, the financial information must include all information necessary for a user to understand the phenomenon being depicted, ***including all necessary descriptions and explanations.*** (FASCON 8, ¶ QC13). To be neutral, the financial information must be without bias in the selection or presentation of financial information. (FASCON 8, ¶ QC14). ***Moreover, a neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users.*** (FASCON 8, ¶ QC14).

201.   The other key characteristic of financial information is *relevance*. According to FASCON 8, ***relevant financial information is information that is capable of making a difference in the decisions made by users***. (FASCON 8, ¶ QC6). Information is capable of making a difference if it has predictive value, confirmative value, or both. (FASCON 8, ¶ QC7).

202.   Starting with the Company 2017 Form 10-K, filed October 26, 2017, and/or Reports on Form 10-Q thereafter, PriceSmart's financial reporting was false and/or deceptive in the following ways: (a) falsely representing from the advent of the Class Period that its internal controls over financial reporting were adequate and effective, and executing

---

[8]    17 C.F.R. § 210.4-01(a) (1).

CONSOLIDATED CLASS ACTION COMPLAINT

false SOX certifications; and (b) falsely misclassifying, in its financial reporting for the First, Second and Third Quarter of Fiscal Year 2018, ending November 30, 2017, February 28, 2018, and May 31, 2018, respectively, PriceSmart's cash and cash equivalents/"short-term investments," as more fully discussed below. In addition, basic tenets of financial reporting were not honored by failing to be transparent, post-acquisition of Aeropost, and obscuring the amount of financial losses associated with its legacy operations versus losses from its omni-channel development.

> ### ➢ *Material Weakness of Internal Controls and False and Misleading SOX Certifications*

203.    PriceSmart's 2017 Form 10-K, filed on October 26, 2017, made the following representations, *inter alia*, about the adequacy and effectiveness of the Company's internal controls and procedures including internal controls over financial reporting:

(a) Evaluation of disclosure controls and procedures.

As of August 31, 2017, under the supervision and with the participation of the Company's management, including the Company's ***principal executive officer*** and ***principal financial officer***, the Company carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rules 13a-15(e) and 15d-15(e). These disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by the Company in its periodic reports with the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that the ***information is accumulated and communicated to the Company's management, including*** the ***principal executive officer*** and ***principal financial officer***, as appropriate to allow timely decisions regarding required disclosure.

204.    The 2017 Form 10-K reported and represented that based upon their evaluation, the ***principal executive officer*** (CEO Laparte) and ***principal financial officer*** (CFO Heffner) concluded that the Company's disclosure controls and procedures were

effective as of the end of the period covered by this Annual Report on Form 10-K, stating in pertinent part:

(b) Management's report on internal control over financial reporting

Internal control over financial reporting refers to the process **designed by, or under the supervision** of, the Company's **principal executive officer** and **principal financial officer**, and effected by its board of directors, management and other personnel, to provide **reasonable assurance regarding the reliability of financial reporting** and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles, and includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit **preparation of financial statements in accordance with U.S. generally accepted accounting principles** and that receipts and expenditures are being made only in accordance with authorizations of the company's management and directors…

\*\*\*

**Management is responsible for establishing** and **maintaining adequate internal control over** the Company's **financial reporting**, as such term is defined in Rule 13a-15(f) under the Exchange Act. Under the supervision, and with the participation, of the Company's management, **including its principal executive officer** and **principal financial officer**, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting. Management has used the 2013 framework set forth in the report entitled "Internal Control-Integrated Framework" published by the Committee of Sponsoring Organizations of the Treadway Commission to evaluate the effectiveness of its internal control over financial reporting. Based on its evaluation, **management has concluded that the Company's internal control over financial reporting was effective as of August 31, 2017, the end of its most recent fiscal year.**

205.   In addition, Laparte's and Heffner's executed SOX certifications, appended and filed with the 2017 Form 10-K, and appended to PriceSmart's Report on Form 10-Q for its quarterly periods ending November 30, 2017, February 28, 2018, and May 31, 2018,

CONSOLIDATED CLASS ACTION COMPLAINT

including CFO Jager's SOX certification executed July 5, 2018, supported the portrayal of adequate and effective internal controls over PriceSmart's financial reporting and the accuracy and reliability of the Company's reported financial statements.

206.   In truth, the Company's internal controls over financial reporting were not effective. They were deficient and inadequate at all times material, including through the Class Period. On October 25, 2018, PriceSmart – under a new, interim CEO – disclosed and admitted that it had "material weakness" in its internal controls over financial reporting due to the fact that "adequate controls did not exist over the classification of certain financial instruments as cash equivalents or short-term investments." Therefore, its internal controls over financial reporting were not effective during the entire Class Period. Defendants Laparte, Heffner, and Jager exploited such material weakness.

> ➤ *Misclassification of Assets: Short Term Investments*

207.   During the Class Period, a lack of availability of U.S. dollars in certain foreign markets ("U.S. dollar illiquidity"), including Trinidad and Tobago, impeded the Company's ability to convert local currencies, paid by consumer purchase of PriceSmart merchandise into U.S. dollars to settle the U.S. dollar liability associated with those imported products. In reaction, PriceSmart began investing excess Trinidad and Tobago (TT) dollars into certificates of deposit or similar time-based deposits with financial institutions (collectively referred to as "CDs") with terms of three months or less and presented such invested dollars as "cash and cash equivalents" on its consolidated balance sheet. As the Company's balance of TT dollars increased, the Company began investing in CDs with terms of four months and up to twelve months. During the first three quarters of Fiscal Year 2018, the Company and individual defendant CEO and CFOs for such interim reporting periods, consciously presented these four to twelve-month CDs as Cash and "cash equivalents" in its consolidated balance sheet. This type of reporting decision and classification is done with

CONSOLIDATED CLASS ACTION COMPLAINT

1    C-Suite level input. This violated GAAP as the four to twelve-month CDs should have been
2    presented as "short-term investments."

3         208.   GAAP defines *Cash equivalents* as "only investments with original attruities
4    of three months or less" (ASC-230-10-20). The TT related CDs had maturities greater than
5    three months and thus, under GAAP, did not qualify as *cash equivalents.* They should have
6    been classified as short term investments. PriceSmart's misclassification of these assets as
7    cash and cash equivalents throughout interim periods in Fiscal Year 2018 ending November
8    30, 2017, February 28, 2017 and May 31, 2017, constituted a material misstatement. Not
9    only was the cash and cash equivalents balance overstated in PriceSmart's previously-issued
10   balance sheets, the cash statement contained in its financial statements was materially
11   misstated in multiple areas. As a consequence, the Company was required to restate – and
12   ultimately as announced on October 25, 2018 did restate – its previously issued consolidated
13   balance sheet and consolidated statements of cash flows as of and for the 3, 6 and 9 month
14   interim periods of Fiscal Year 2018 ended November 30, 2017, February 28, 2018 and May
15   31, 2018, respectively.

16        209.   As a result of asset misclassification, PriceSmart's financial reporting for its
17   First Quarter of Fiscal Year 2018, ending November 30, 2017, overstated its "total cash and
18   cash equivalents" balance as $129,183,000 when, in truth, it was materially less -
19   $89,844,000. This material misclassification was not disclosed until the Company issued
20   its 2018 Form 10-K at the end of the Class Period.

21        210.   The ongoing misclassification carried over in PriceSmart's financial reporting
22   for its Second Quarter of Fiscal Year 2018, ending February 28, 2018, in which it overstated
23   its cash and cash equivalents balance as $152,132,000, when, in truth, it was materially less
24   – $93,387,000. This material misclassification was not disclosed until the Company issued
25   its 2018 Form 10-K.

26        211.   The following table reflects the material impact of these misstatements on the
27   balance sheet and cash flow statement reflected in PriceSmart's previously-issued financial
28   statements as of, and for, the nine-month period ending May 31, 2018. As seen in the table,

correcting for the aforementioned misstatements reduced the previously reported cash and cash equivalents balance as of May 31, 2018 by 37% and increased the previously reported net decrease in cash, cash equivalents, and restricted cash by 258%:

| Balance Sheet - May 31, 2018 | | | | |
|---|---|---|---|---|
| $ in thousands | As Previously Reported | Adjustment | As Restated | Impact of Adjustment |
| Total cash and cash equivalents | 144,813 | (53,890) | 90,923 | -37% |
| Short-term Investments | - | 53,890 | 53,890 | N/A |

| Cash Flow Statement - For the Nine Months Ended May 31, 2018 | | | | |
|---|---|---|---|---|
| $ in thousands | As Previously Reported | Adjustment | As Restated | Impact of Adjustment |
| Net cash provided by (used in) operating activities | 90,765 | - | 90,765 | 0% |
| | | | | |
| Investing Activities | | | | |
| Business acquisition, net of cash acquired | (23,895) | - | (23,895) | 0% |
| Additions to property and equipment | (74,788) | - | (74,788) | 0% |
| Short-term investments | - | (72,953) | (72,953) | N/A |
| Proceeds from settlements of short-term investments | - | 19,063 | 19,063 | N/A |
| Deposits for land purchas option agreeements | 300 | - | 300 | 0% |
| Proceeds from disposal of property and equipment | 93 | - | 93 | 0% |
| Net cash provided by (used in) investing activities | (98,290) | (53,890) | (152,180) | 55% |
| Net cash provided by (used in) financing activities | (12,389) | - | (12,389) | 0% |
| Effect of exchange rate changes on cash and cash equivalents, and restricted cash | (985) | - | (985) | 0% |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | (20,899) | (53,890) | (74,789) | 258% |
| Cash, cash equivalents, and restricted cash at beginning of period | 165,712 | - | - | 0% |
| Cash, cash equivalents, and restricted cash at end of period | 144,813 | (53,890) | (74,789) | -37% |

212.    PriceSmart's ongoing misclassification had made its cash and cash equivalents profile look materially better than it actually was, thereby also making its liquidity appear to be better – or less adverse – than it actually was.

213.    These false financial reporting representations persisted throughout all of the Company's filings with the SEC on its Form 10-Qs for its First, Second and Third Quarters of Fiscal Year 2018, thereby also continuing to conceal the material weakness and

ineffectiveness of internal controls over financial reporting that enabled the Company to misclassify assets quarter to quarter, until the restatement was disclosed on October 25, 2018.

> ### Lack of Transparency, Obscuring Losses from Aeropost Legacy Operations Versus Losses from Its Omni-Channel Development

214.   PriceSmart's Third Quarter 2018 Form 10-Q, filed with the SEC on July 5, 2018, reporting of the amount of net losses from Aeropost, did not disclose how much of that net losses amount was from Aeropost's legacy business and how much of it arose from Omni-Channel development. This lack of transparency **obscured the picture** of the true adverse impact of the acquisition.

215.   It was not until after Laparte was abruptly removed as CEO, upon which Bahrambeygui took over as interim CEO, that PriceSmart began providing more meaningful transparency. Beginning with its First Quarter 2019 Form 10-Q, the Company adopted changed verbiage, referring to "Net Loss from Aeropost's operations and development of our omni-channel initiatives." And during quarterly earnings conference calls announcing the results of each of the first three quarters of 2019, PriceSmart disclosed more granular detail, referring to "three buckets" relating to Aeropost: "the legacy business, the pricesmart.com enabled omnichannel business, and third, acquisition related accounting."

216.   The above-stated accounting failures, flaws and lack of transparency obscuring or hiding material information were knowing and intentional. The accounting standards Defendants were required to adhere to were straightforward. The circumstances under which they were required to be applied did not involve ambiguity or subjective judgment. The existence of false and misleading accounting, materially weak internal controls which were exploited with respect to asset classification, false SOX certifications used to comfort investors, and the lack of transparency, collectively support the demonstration that defendants Laparte, Heffner, and Jager acted knowingly and with the requisite *scienter*

83

CONSOLIDATED CLASS ACTION COMPLAINT

when speaking to the market during the Class Period. The effective termination of Laparte also reflects that he was involved in the false or deceptive financial reporting and related misstatements and lack of transparency described above, further supporting the demonstration of a strong inference of his *scienter*.

## VI.    CLASS ACTION ALLEGATIONS

217.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired PriceSmart publicly traded common stock between October 26, 2017 and October 25, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

218.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PriceSmart common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of PriceSmart common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by PriceSmart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

219.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

CONSOLIDATED CLASS ACTION COMPLAINT

220.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

221.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PriceSmart; and (c) to what extent the members of the Class have sustained damages caused by the Defendants' misstatements, and the proper measure of damages.

222.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.   LOSS CAUSATION

223.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PriceSmart securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PriceSmart's business, operations, asset classification and internal controls over financial reporting, omni-channel

CONSOLIDATED CLASS ACTION COMPLAINT

development, expense and status, and the true impact of the Aeropost acquisition on PriceSmart's earnings and earnings per share, as alleged herein.

224. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the reliability of PriceSmart's financial statements and internal controls, the true status of development of the Omni-Channel Experience, its acquisition of Aeropost and the impact of Aeropost on the Company's earnings and financial results. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and were damaged thereby. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class as the price of PriceSmart common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, in whole or in part, by the disclosures of July 5 and 6, 2018, and/or the disclosures of October 25 and/or 26, 2018, and thereafter, as more fully alleged above.

## VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

225.  The market for PriceSmart common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PriceSmart common stock traded at artificially inflated prices

during the Class Period. On June 25, 2018, the Company's share price closed at a Class Period high of $93.83 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PriceSmart securities and market information relating to PriceSmart, and have been damaged thereby.

226.    During the Class Period, the artificial inflation of PriceSmart shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PriceSmart's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of PriceSmart and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

227.    At all relevant times, the market for PriceSmart common stock was an efficient market for the following reasons, among others:

(a) PriceSmart met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, PriceSmart filed periodic public reports with the SEC and/or the NASDAQ;

(c) PriceSmart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) PriceSmart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

228.   As a result of the foregoing, the market for PriceSmart securities promptly digested current information regarding PriceSmart from all publicly available sources and reflected such information in PriceSmart's share price. Under these circumstances, all purchasers of PriceSmart securities during the Class Period suffered similar injury through their purchase of PriceSmart securities at artificially inflated prices and a presumption of reliance applies.

229.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims of the Class are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.   NO SAFE HARBOR

230.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint that relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, whether or not they were identified as "forward-looking statements" when made, there were no

CONSOLIDATED CLASS ACTION COMPLAINT

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PriceSmart who knew that the statement was false when made.

231. PriceSmart's Third Quarter 2018 Form 10-Q identified certain "risks" concerning the Aeropost acquisition and the related build-out of the Omni-Channel Experience. The risk disclosures were inadequate and not meaningful. Instead, they were themselves misleading and failed to disclose already existing problems and adverse facts and events. In addition, the purported disclosure of "risk factors" regarding the Aeropost acquisition were issued too late to adequately and meaningfully warn investors. Aeropost's acquisition related risk disclosures stated, in pertinent part, the following:

**Acquisitions may expose us to additional risks**

From time to time, we may consider acquisition and strategic investment opportunities. On March 15, 2018, we acquired Aeropost, Inc., a cross-border logistics and e-commerce provider with presence throughout Latin America and the Caribbean. Acquisitions involve risks: we may overpay for a business or fail to realize the synergies and other benefits we expect from the acquisition; we may experience difficulty in integrating new employees, business systems, and technology; we may be unable to retain key personnel; future developments may impair the value of our purchased goodwill or intangible assets; or we may encounter unforeseen accounting, internal control, regulatory or compliance issues.

232. Nowhere did the aforesaid disclosures disclose or otherwise alert investors to the **already existing** fact – and serious, omnipresent problem – that the acquisition of Aeropost did not provide PriceSmart with a viable Omni-Channel solution consistent with

CONSOLIDATED CLASS ACTION COMPLAINT

PriceSmart's way of doing business and its time-honored, efficient, low-cost business model. They did not disclose that PriceSmart had not figured out a viable way to achieve an Omni-Channel Experience consistent with its business model, as Mr. Price admitted on October 25, 2018. Nowhere did the aforementioned disclosures reveal or disclose that Aeropost's digital platform acquired by PriceSmart was immature, and nascent, or that it was not significantly more advanced than the digital platform PriceSmart had previously been building and had abandoned, and/or written off. Nowhere did the aforesaid disclosures reveal that, without a viable Omni-Channel Experience solution upon which an expansive build out could be based, PriceSmart was facing undeterminable long-term development costs, beyond any unspent balance of the $3 to 5 million allocated by PriceSmart's board for its Innovation Team in October 2017.

233.   The aforesaid disclosure failed to disclose the already existing lack of synergy arising from the fact that Aeropost's business model and underlying shipping template was not a good fit or a good match with, and was contrary to, PriceSmart's time-honored business model. Aeropost's business model, reflective of its culture, was inconsistent with PriceSmart's and was directly causing PriceSmart to suffer losses due to, *inter alia*, non-matching shipping templates, as discussed above.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder) Against All Defendants

234.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

235.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase PriceSmart's securities

CONSOLIDATED CLASS ACTION COMPLAINT

at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

236. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PriceSmart's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

237. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PriceSmart's financial well-being, omni-channel development and status, the Aeropost acquisition and prospects, as specified herein.

238. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PriceSmart's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PriceSmart and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

239. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

240.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PriceSmart's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements throughout the Class Period, as aforesaid, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

241.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PriceSmart's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not

disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired PriceSmart's securities during the Class Period at artificially high prices and were damaged thereby.

242.   At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PriceSmart was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their PriceSmart securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

243.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

244.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act)**
**Against the Individual Defendants**

245.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246.   Individual Defendants acted as controlling persons of PriceSmart within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly

CONSOLIDATED CLASS ACTION COMPLAINT

or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

247.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

248.   As set forth above, PriceSmart and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

CONSOLIDATED CLASS ACTION COMPLAINT

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: January 3, 2020

Respectfully submitted,

BARRACK, RODOS & BACINE


/s/JEFFREY A. BARRACK

JEFFREY A. BARRACK (*pro hac vice*)

MARK R. ROSEN (139506)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
E-mail: jbarrack@barrack.com
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

and

/s/ STEPHEN R. BASSER

STEPHEN R. BASSER

SAMUEL M. WARD (216562)
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

*Counsel for Lead Plaintiff, Public
Employees Retirement Association of
New Mexico, and Lead Counsel for the
Proposed Class*

95

CONSOLIDATED CLASS ACTION COMPLAINT

CONSOLIDATED CLASS ACTION COMPLAINT