1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9        SOUTHERN DISTRICT OF CALIFORNIA

10

11   MAX MORRIS HARARI, individually      Case No.:  19-CV-958 TWR (LL)
     and on behalf of all others similarly
12   situated,                           **ORDER (1) GRANTING
13                          Plaintiff,    DEFENDANTS' MOTION TO
                                          DISMISS CONSOLIDATED CLASS
14   v.                                   ACTION COMPLAINT, AND
                                          (2) DISMISSING WITHOUT
15   PRICESMART, INC.; JOSE LUIS          PREJUDICE LEAD PLAINTIFF'S
     LAPARTE; JOHN M. HEFFNER; and        CONSOLIDATED CLASS ACTION
16   MAARTEN O. JAGER,                    COMPLAINT**
17                          Defendants.
                                          (ECF No. 29)
18

19

20        Presently before the Court is Defendants PriceSmart, Inc.; Jose Luis Laparte; John

21   M. Heffner; and Maarten O. Jager's Motion to Dismiss Consolidated Class Action

22   Complaint ("Mot.," ECF No. 29), as well as Lead Plaintiff Public Employees Retirement

23   Association of New Mexico's ("PERA") Opposition to ("Opp'n," ECF No. 32) and

24   Defendants' Reply in Support of ("Reply," ECF No. 38) the Motion.  Also before the Court

25   is Defendants' Request for Judicial Notice ("RJN," ECF No. 29-2), as well as Lead

26   Plaintiff's Objection to ("Obj.," ECF No. 33) and Defendants' Reply in Support of ("RJN

27   Reply," ECF No. 38-1) the Request for Judicial Notice.  The Honorable Janis L.

28   Sammartino took the Motion under submission without oral argument pursuant to Civil

Local Rule 7.1(d)(1), (*see* ECF No. 39), after which this action was transferred to the undersigned. (*See* ECF No. 40.)  Having carefully reviewed the Consolidated Class Action Complaint ("CCAC," ECF No. 26), those materials properly subject to judicial notice or incorporation by reference, the Parties' arguments, and the law, the Court **GRANTS** Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiff's Consolidated Class Action Complaint.

## BACKGROUND[1]

### I.   Factual Background

#### A.   *PriceSmart and Its Business Model*

PriceSmart owns and operates membership clubs that offer high quality brand name and private label consumer goods at low prices to individuals and businesses.  (CCAC ¶¶ 4, 57.)  PriceSmart has membership clubs in thirteen countries and territories in Central America, the Caribbean, and Columbia, and distribution centers in Miami, Florida, and Costa Rica.  (*Id.*)  PriceSmart's business model is to offer low-priced goods aided by a constant focus on achieving cost efficiencies.  (*See id.* ¶¶ 5, 60–64.)

PriceSmart made its initial public offering on the NASDAQ exchange in 1997.  (*Id.* ¶¶ 52, 58.)  The company grew rapidly over the next sixteen years, and the trading price of PriceSmart's common stock reached an all-time high of $125.36 per share on November 27, 2013.  (*Id.*)

PriceSmart's corporate offices are in San Diego, California.  (*Id.* ¶ 5.)  Defendant Laparte was the President, the Chief Executive Officer, and a Director of PriceSmart until his departure November 16, 2018.  (*Id.* ¶ 53.)  Defendant Heffner served as PriceSmart's Chief Financial Officer from 2004 until April 24, 2018, (*id.* ¶ 54), at which point Defendant Jager became CFO.  (*Id.* ¶ 55.)

/ / /

---

[1] For purposes of Defendants' Motion, the Court accepts as true the allegations in Lead Plaintiff's Consolidated Class Action Complaint and draws all inferences in Lead Plaintiff's favor.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (citing *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016)), *cert. denied*, 139 S. Ct. 2615 (2019).

### B.     PriceSmart's Unsuccessful Efforts to Develop an "Omni-Channel Experience" In-House

#### 1.     The Growth of E-Commerce

In recent years, consumers have increasingly turned to shopping online, also known as "e-commerce."  (*See* CCAC ¶¶ 6, 65.)  As a result of this trend, brick-and-mortar retailers, such as PriceSmart, have suffered adverse business repercussions.  (*See id.* ¶¶ 6, 65–66.)  Consequently, retailers all over the world began investing heavily in developing a seamless omni-channel experience ("OCE") connecting digital and brick-and-mortar retail.  (*See id.* ¶ 7; *see also id.* ¶ 68.)

PriceSmart was no exception—one critical goal of its executives was to achieve an OCE consistent with PriceSmart's business model.  (*See id.* ¶¶ 7–8, 70.)  Indeed, failure to do so posed a threat to PriceSmart's ongoing profitability and success.  (*See id.* ¶ 8; *see also id.* ¶¶ 73, 79.)  In 2016, PriceSmart therefore assured its investors that it was "invest[ing] in [its] websites and systems with the long-term objective of offering [its] members a seamless multichannel experience."  (*Id.* ¶ 71.)

PriceSmart initially tried to develop the necessary OCE in-house.  (*See id.* ¶ 9.)  On April 7, 2017, Mr. Laparte announced that PriceSmart was going to "replace" its online platform and "relaunch" a "more robust" platform "soon," "hopefully by the end of [the third quarter], in all [its] countries."  (*Id.* ¶¶ 10, 73.)  Similarly, on July 6, 2017, during PriceSmart's third quarter Fiscal Year 2017 earnings conference call, Mr. Laparte announced that PriceSmart was "developing a strategic plan and investing in technology to satisfy the shopping needs of [its] business and retail members . . . that[,] if done well, . . . can integrate the best of [its] traditional brick-and-mortar warehouse clubs with the new trends of online shopping and create the right omnichannel experience for [its] members."  (*Id.* ¶¶ 11, 74; *see also id.* ¶ 75.)  As investors awaited PriceSmart's OCE, the trading price of PriceSmart's common stock price fluctuated between $80 and $90 per share.  (*Id.* ¶¶ 12, 77.)

/ / /

PriceSmart's in-house OCE operations and development, however, remained nascent, and PriceSmart had yet to figure out how to achieve digital and brick-and-mortar connectivity in a way that was consistent with its business model. (*Id.* ¶ 76.) Consequently, pressure mounted on PriceSmart and its executives to find a solution. (*See id.* ¶¶ 13, 80.)

### 2. *PriceSmart's 2017 Form 10-K and Earnings Call*

On October 26, 2017, PriceSmart issued its Annual Report on Form 10-K for Fiscal Year 2017, ending August 31, 2017 (the "2017 Form 10-K"), which reported "disappointing" financial results. (*See* CCAC ¶ 81.) Further, and unknown to the market, PriceSmart's financial reporting, commencing with the issuance of its 2017 Form 10-K, failed accurately to reflect the effectiveness of PriceSmart's internal controls over its financial reporting. (*Id.* ¶¶ 14, 91, 94, 202.) Specifically, its internal controls over asset valuation and classification were materially weak and ineffective. (*Id.*)

Because of a lack of U.S. dollars in Trinidad and Tobago, PriceSmart faced difficulties converting local currencies into U.S. dollars. (*Id.* ¶¶ 104, 207.) This led PriceSmart to invest in certificates of deposit ("CDs"), initially with terms of three months or less, which would be reported as "cash and cash equivalents" on its consolidated balance sheet. (*Id.* ¶ 207.) As its balance of Trinidad and Tobago dollars increased, the company began investing in CDs with a duration of four-to-twelve months. (*Id.* ¶¶ 105, 207.) PriceSmart inaccurately carried these four-to-twelve-month CDs as cash and cash equivalents as opposed to "short-term investments" on its consolidated balance sheet in violation of Generally Accepted Accounting Principles ("GAAP"),[2] making the company's liquidity profile appear better than it was. (*Id.* ¶¶ 105, 207–08.) Nonetheless, Mr. Laparte and Mr. Heffner represented in the 2017 Form 10-K that PriceSmart's disclosure controls and procedures were "effective at the reasonable assurance," and the executed

---

[2] GAAP are the official accounting standards against which to measure financial presentations, primarily promulgated by the Financial Accounting Standards Board ("FASB"). (CCAC ¶ 197.) The U.S. Securities and Exchange Commission ("SEC") requires public companies to present their financial statements in accordance with GAAP. (*Id.* ¶ 198.)

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  (*Id.* ¶ 92–93, 202–06.)

As for PriceSmart's OCE, the 2017 Form 10-K noted that "significant opportunity to increase sales and profits through increasing online shopping opportunities," capabilities that were "currently under development." (*Id.* ¶ 82.) PriceSmart also disclosed that it was "increasing [its] investments in e-commerce, technology and other customer initiatives" and that "fail[ure] to successfully implement [PriceSmart's] ecommerce initiative" could "adversely affect[]" PriceSmart's "market position, net sales and financial performance." (*Id.* ¶ 83.) "In addition, the cost of certain ecommerce and technology investments w[ould] adversely impact [PriceSmart's] financial performance in the short-term and m[ight] adversely impact [its] financial performance over the longer term." (*Id.*)

The 2017 Form 10-K also announced that PriceSmart had created an "Innovation Committee" and that the Board of Directors had "designated an incremental $3.0 to $5.0 million of technology-related spending for this fiscal year 2018" to, among other things, "fund a newly established team to direct [PriceSmart's] technology investment and pre-opening spending to develop a new online business [it] hope[d] to launch during the Summer of 2018." (*Id.* ¶¶ 15, 84.) The 2017 Form 10-K cautioned that PriceSmart would "likely require further investments beyond the current fiscal year." (*Id.*)

The following day, during a conference call with analysts, Mr. Laparte emphasized the importance of an online platform and assured investors that PriceSmart was "developing a strategy plan and investing in technology to better satisfy [its] business and retail members." (*Id.* ¶¶ 16, 85.) Mr. Laparte added that the "goal" was "to integrate the best of our traditional brick-and-mortar warehouse clubs with the new trends of online shopping and create the right omni-channel experience for our members." (*Id.* (emphasis omitted).) He disclosed that PriceSmart had discontinued its prior efforts on the "electronic international catalog" and that the $3 to $5 million investment was so that PriceSmart could "make it the right way." (*Id.* ¶¶ 13 (emphasis omitted), 16, 88.) Mr. Heffner emphasized / / /

that developing "technologies and capabilities" was "essential to [PriceSmart's] future" and that the company had "some very exciting plans." (*Id.* ¶¶ 16 (emphasis omitted), 87.)

Although analysts responded positively to PriceSmart's announcement, (*see id.* ¶¶ 88–89), in-house development of PriceSmart's OCE was not on track to meet the hoped-for Summer 2018 launch date. (*See id.* ¶ 17.) As a matter of fact, PriceSmart had not yet figured out how to connect digital with brick-and-mortar in a way that adhered to its business model. (*Id.*)

### 3. *PriceSmart's First Quarter 2018 Form 10-Q and Earnings Call*

On January 4, 2018, PriceSmart issued its Form 10-Q for the First Quarter Fiscal Year 2018, ending November 30, 2018 (the "First Quarter 2018 Form 10-Q"), which included the same misrepresentations as to the effectiveness and adequacy of the company's internal controls over financial reporting and false SOX certifications executed by Mr. Laparte and Heffner. (CCAC ¶¶ 20, 96, 105–06.) The 10-Q also reiterated that PriceSmart's "longer range strategic objective" of establishing an OCE, (*see id.*), and again touted its new Innovation Committee. (*See id.* ¶ 97.) The 10-Q again noted that the Board had "designated an incremental $3.0 to $5.0 million of technology-related spending for fiscal year 2018 for evaluation and selection of the [enterprise resource planning ("ERP")] vendor and to fund a newly established team to direct [PriceSmart's] technology investment and preopening spending to develop a new online business that [they] hope[d] to launch during the Summer 2018." (*Id.*) Finally, PriceSmart announced that it had spent $735,000 of the designated funds in the first quarter of Fiscal Year 2018 to evaluate and develop technologies for the anticipated OCE. (*See id.* ¶¶ 97–98.)

During the earnings conference call on January 5, 2018, Mr. Laparte indicated that he believed that PriceSmart was "doing the right investments in different areas," (*id.* ¶ 99), but added that the plan was for the company to launch something towards the end of the year instead of that summer. (*See id.* ¶¶ 18, 99.) He also noted that the designated $3 to $5 million was for Fiscal Year 2018, (*see id.* ¶ 100), and that PriceSmart would keep investing "until [it] figure[d] out how to get on that space and create that omni-channel

experience." (*Id.* ¶¶ 18, 100, 196 (emphasis omitted).)  Disclosure of this set-back caused PriceSmart's stock price to fall from a closing price of $87.85 on January 4, 2018, to a close of $81.25 per share on January 5, 2018.  (*Id.* ¶ 19.)  Meanwhile, Mr. Laparte and Mr. Heffner felt increasing pressure to find an OCE solution consistent with PriceSmart's business model.  (*See id.* ¶ 19, 101.)

### C.   The Alleged Misrepresentations and Omissions

#### 1.   PriceSmart's March 19, 2018 Form 8-K

On March 19, 2018, PriceSmart issued a press release on Form 8-K announcing the acquisition of Aeropost, Inc., one of "the largest and most visible crossborder logistics and e-commerce providers in Latin American and the Caribbean," offering "convenient local pick-up points, and an innovative local payments platform that allows buyers to purchase US-sourced merchandise online."  (CCAC ¶¶ 21 (emphasis omitted), 108.)  Aeropost's CEO commented that he could not "think of a better match" and that the acquisition would take the companies "to the forefront of retail innovation."  (*Id.* ¶¶ 21 (emphasis omitted), 108–09 (emphasis omitted).)   The press release added that "the technology behind Aeropost.com[,] coupled with its strong team, w[ould] allow PriceSmart to offer new online shopping options for its members, strengthening its commitment to provide an exceptional member experience with high quality merchandise at low prices."  (*Id.* ¶¶ 21 (emphasis omitted), 108–09.)  Mr. Laparte concluded that "the acquisition of Aeropost provides an opportunity to accelerate the development of an omni-channel shopping experience for our members."  (*Id.* ¶¶ 21 (emphasis omitted), 108–09.)  According to Lead Plaintiff, this press release "represented to the market that Aeropost's operational business model fit with PriceSmart's well-known, cost-efficient, and competitive low price business model, which was the foundation of its success[,]" and that "Aeropost possessed the digital platform technology piece that PriceSmart needed to figure out and build a robust Omni-Channel experience consistent with its business model," thereby "favorably position[ing] the Company to achieve an Omni-Channel Experience through the acquisition of Aeropost[]."  (*See id.* ¶ 109.)

Although the terms of the deal remained undisclosed, (*see id.* ¶ 110), investors and analysts viewed news of the Aeropost acquisition favorably, believing it to be an effective strategic solution to PriceSmart achieving an OCE consistent with its business model without the costs and delays associated with building such a system from scratch. (*See id.* ¶¶ 23, 111.) PriceSmart's trading price therefore rose from a close of $81.15 per share on March 19, 2018, to $83.55 per share by March 29, 2018, and to $83.85 per share at the close of trading on April 4, 2018. (*Id.*)

### 2. *PriceSmart's Second Quarter 2018 Form 10-Q and Earnings Call*

On April 5, 2018, PriceSmart issued its Report on Form 10-Q for the Second Quarter of Fiscal Year 2018, ending February 28, 2018 ("Second Quarter 2018 Form 10-Q"), in which it announced that it was "in the process of expanding [its] strategy to include online shopping and the strategic placement of regional distribution centers to support both [its] traditional warehouse club business and [its] new online shopping initiatives." (CCAC ¶¶ 24, 112.) The company added that it "believe[d its] business strategy need[ed] to be broadened to respond to changes in shopping habits so [its] members w[ould] have the shopping experience they desire[d]." (*Id.*) According to PriceSmart, the $30 million acquisition of Aeropost "br[ought] to PriceSmart a technology and development team, which the Company c[ould] leverage to offer new online shopping options for [its] members." (*Id.* (emphasis omitted).) Benefits of the acquisition included "efficient and low cost border delivery services" and a "more user friendly operating system and delivery service for PriceSmart members." (*Id.* ¶¶ 24 (emphasis omitted), 113.)

PriceSmart also disclosed an impairment charge of approximately $1.9 million for the three and six months ended February 28, 2018, "related to the write-off of internally developed software for e-commerce due to the Company's acquisition of Aeropost . . . and its digital e-commerce platform." (*Id.* ¶¶ 25, 114.) Elsewhere, the filing disclosed a "$2.6 million charge for the write-off of costs for an e-commerce platform and $525,000 in deal costs." (*Id.* ¶ 114.)

/ / /

During the earnings conference call on April 6, 2018, Mr. Laparte reiterated that PriceSmart had taken "$2.6 million in charges for e-commerce development activities that [we]re no longer needed because of that technology purchase as part of the acquisition of Aeropost, Inc." (*Id.* ¶¶ 25 (emphasis omitted), 115.)  According to Lead Plaintiff, "[t]his representation sent a message to investors that Aeropost's digital e-commerce platform was mature enough to enable . . . PriceSmart to abandon what it had previously done internally." (*Id.* ¶ 115.)  Mr. Laparte added during the call that "the combination of [PriceSmart's and Aeropost's] two companies br[ought] together PriceSmart brick-and-mortar excellence, buying power and distribution and operation expertise, with Aeropost's exceptional cross-border logistics, delivery option and e-commerce know-how." (*Id.* ¶¶ 26 (emphasis omitted), 116.)  Mr. Laparte continued that the "Aeropost business [would] accelerate[] PriceSmart's ability to offer online shopping, test and measure new digital strategies and offer delivery options for [PriceSmart's] members, all while maintaining [its] commitment to excellent members experience with high quality merchandise at low prices." (*Id.* (emphasis omitted).)

Mr. Laparte also reassured investors that, "[b]eyond the charges [PriceSmart] took in the current quarter, [it did] not anticipate any further dilution to [its] earnings through the end of th[e 2018] fiscal year with th[e Aeropost] acquisition," and that "[s]ome of the activities and investments [PriceSmart was] planning to do as part of [its] innovation initiatives, which [it had] previously indicated would be up to $5 million in th[e 2018] fiscal year, [we]re now being addressed by Aeropost capability" and, consequently, "any incremental costs of integrating Aeropost w[ould] largely fall within that previously planning investment amount." (*Id.* ¶¶ 26 (emphasis omitted), 117–19.)  Mr. Heffner reinforced Mr. Laparte's comments, stating that "the acquisition of Aeropost w[ould] allow [PriceSmart] to utilize Aeropost online technology, along with their in-house digital capability in place of an outsource solution," (*id.* ¶¶ 26 (emphasis omitted), 120), and that he thought PriceSmart could "operate within [$5 million] with the integration of Aeropost." (*Id.* ¶ 122.)  He also elaborated that the $525,000 in deal costs consisted of "due diligence,

legal, tax, accounting and technical advice." (*Id.* ¶ 120; *see also id.* ¶ 182.)  Mr. Laparte closed by noting that PriceSmart was "looking at building a platform, that w[ould] take a little longer, but as [the company had] d[one] the write-off of [its] current platform, now [it] ha[d] to replace it with a new platform," and that "Aeropost br[ought] to the table" "a lot of good things, obviously," including "technology on one hand, a good team, obviously, that w[ould] help [PriceSmart] get there." (*Id.* ¶ 123.)  He "guess[ed]" that "time to market" could "be a little more faster on what [the company was] trying to accomplish on this omni-channel opportunity." (*Id.*)

The announcement regarding the acquisition of Aeropost was met with considerable market enthusiasm, causing the closing price of PriceSmart's stock to rise from $84.65 on April 5, 2018, to $88.23 on April 6, 2018, on a trading volume of 711,600 shares, which was significantly higher than the average daily trading volume of its stock. (*Id.* ¶¶ 28, 124.) The trading price of PriceSmart's common stock continued to rise, reaching $93.40 per share on July 5, 2018. (*Id.*)

But contrary to PriceSmart's representations, Aeropost's online platform and technology were immature, requiring far more investment than the $3 to $5 million previously allocated, and the acquisition of Aeropost would further dilute PriceSmart's earnings beyond the charges taken that quarter. (*See id.* ¶¶ 29, 126, 135.)  Aeropost also could not provide an OCE consistent with PriceSmart's business model because the two entities possessed very different business models. (*See id.* ¶¶ 29, 128, 130–31.) Specifically, Aeropost did not provide adequate logistics and distribution efficiencies, nor did it focus on efficiency. (*See id.*)  Consequently, Aeropost's shipping templates, which impacted pricing, were not consistent with PriceSmart's efficient, low expense business format. (*See id.* ¶¶ 29, 132–34.)  According to Lead Plaintiff, these issues should have been readily apparent through reasonable due diligence. (*See id.* ¶¶ 133, 137–38; *see also id.* ¶¶ 179–88.)

/ / /

/ / /

### 3.     *PriceSmart's Third Quarter 2018 Form 10-Q and Earnings Call*

The acquisition of Aeropost saddled PriceSmart with expenses that resulted in a significant drag on its earnings, (*see* CCAC ¶¶ 136, 138), as reported in PriceSmart's July 5, 2018 Report on Form 10-Q for the Third Quarter of 2018, ending May 31, 2018 ("Third Quarter 2018 Form 10-Q"). (*See id.* ¶ 144.) Specifically, PriceSmart disclosed $8.0 million in "[c]osts associated with the acquisition of Aeropost," (*id.* ¶ 144), which translated to a negative impact of $0.08 per share on its earnings per share ("EPS") for that quarter. (*Id.* ¶¶ 30, 140, 144.) The Aeropost acquisition would continue negatively to impact PriceSmart's earnings, impacting its Fiscal Year 2018 EPS by $0.31 per share in the span of six months and its Fiscal Year 2019 EPS by $0.47 per share. (*Id.* ¶ 30; *see also id.* ¶ 193.) The Third Quarter 2018 Form 10-Q also continued to misclassify PriceSmart's assets and the effectiveness of its internal controls over financial reporting. (*See id.* ¶ 141.) Finally, the filing emphasized the importance of "expanding" or "broaden[ing]" PriceSmart's business strategy "to include online shopping," (*id.* ¶ 143), and that "Aeropost w[ould] allow [PriceSmart] to offer new online shopping options and provide an opportunity to accelerate the development of an omni-channel shopping experience for [its] members providing them with efficient and low-cost cross-border delivery services." (*Id.* ¶ 142.)

On July 6, 2018, Mr. Laparte and Mr. Jager conducted an earnings conference call. (*Id.* ¶ 145.) Mr. Laparte represented that the "e-commerce platform now in development" "would be able to offer [PriceSmart's] members most of the selection of items available in the other warehouse clubs" and that "[t]he Aeropost service [wa]s an exciting high value addition to the product[s] and services [PriceSmart] offer[s] to [its] members." (*Id.*) He added that "Aeropost's business accelerate[d] PriceSmart['s] ability to offer online shopping, test and measure new digital strategies, and offer delivery options for [PriceSmart's] members, all while maintaining [the company's] commitment to an excellent members' experience with high quality merchandise at low prices." (*Id.*) Specifically, "one of the tasks already initiated by the Aeropost tech team [wa]s the

development of [PriceSmart's] new e-commerce platform, which w[ould] be launched in some countries, at some point, during [PriceSmart's] next fiscal year 2019 [ending August 31, 2019]."  (*Id.* ¶ 146.)   Mr. Laparte further disclosed that constructing PriceSmart's OCE "w[ould] require some [additional] investment, there[ wa]s no question" but that PriceSmart "d[id] have the plans and then [it] started already investing in different initiatives to create – to improve the marketplace, to improve the whole Aeropost for – just to build [the] platform there, different initiatives that w[ould] not happen just without the investing," adding that "it m[ight] be short term, it m[ight] have some impact, but obviously, long-term, [the company] d[id] believe that it[ wa]s the right thing to do."  (*Id.* ¶ 148.)  Mr. Laparte was unable, however, to provide an estimate as to the scale of future investment required.  (*See id.* ¶ 149.)

The announcement of the adverse impact the Aeropost acquisition was having on PriceSmart's EPS and the other disclosures made on July 5 and 6, 2018, led to the closing price of PriceSmart's shares to drop from $93.40 on July 5, 2018, to $83.40 on July 6, 2018, representing a one-day drop of more than ten percent, on unusually high trading volume of 1,209,000 shares.  (*Id.* ¶¶ 31, 139, 151.)  PriceSmart's stock price continued to fall, reaching as low as $77.90 on July 10, 2018.  (*Id.* ¶¶ 31, 151.)

### D. *The Corrective Disclosures*

#### 1. *PriceSmart's 2018 Form 10-K and Earnings Call*

On October 25, 2018, after the close of the markets, PriceSmart announced its fourth quarter Fiscal Year 2018 and Fiscal Year 2018 results.  (*See* CCAC ¶ 153.)  In its Annual Report on Form 10-K for the Fourth Quarter and Fiscal Year ending August 31, 2018 ("2018 Form 10-K"), PriceSmart reported total revenue of $777.9 million and operating income of $27.2 million, compared with operating income of $30.8 million from the prior year.  (*Id.*)  PriceSmart also revealed that the company had experienced an increase of approximately $16.1 million in total selling, general, and administrative ("SG&A") expenses "due to the additional costs of [its] Aeropost subsidiary."  (*Id.* ¶ 155 (emphasis omitted).)   Total net losses from Aeropost and acquisition related expenses after tax

benefits came to $2.4 million in the second quarter of Fiscal Year 2018, $2.29 million for the third quarter, and $4.611 million for the fourth quarter, totaling $9.321 for Fiscal Year 2018.  (*Id.*)  This translated to negative impacts on EPS of $0.08, $0.08, $0.15, and $0.31, respectively. (*Id.*)

PriceSmart also disclosed for the first time that it had been misclassifying its short-term assets on its unaudited first, second, and third quarter Fiscal Year 2018 reported financial results, necessitating a restatement.  (*Id.* ¶¶ 35, 153; *see also id.* ¶ 107, 208.) Although this balance sheet classification had "no impact on earnings per share, revenue, operating income, net income, cash flow from operations, total assets or total current assets," (*id.* ¶ 153), it did result in the company overstating its total cash and cash equivalents.  (*See id.* ¶ 209.)  Further, PriceSmart revealed that its internal controls over financial reporting, specifically those relating to asset classifications, were materially weak and deficient, despite the prior representations and SOX certifications signed by Messrs. Laparte, Heffner, or Jager.  (*Id.* ¶¶ 35, 153.)

Finally, PriceSmart announced that its CEO, Mr. Laparte, had submitted his resignation effective November 16, 2018, which the Board of Directors had accepted the same day without a permanent replacement in place. (*See id.* ¶¶ 33, 156.)  During a follow-on conference call with market analysts, both Mr. Laparte and PriceSmart's interim CEO, Sherry Bahrambeygui, acknowledged the need for a "fresh perspective."  (*Id.* ¶¶ 33, 157.) Ms. Bahrambeygui added that the company needed a CEO that would "bring a different set of skills . . . to help expedite [the company's] growth."  (*Id.*)

PriceSmart's co-founder and Chairman of the Board, Robert Price, also participated in the earnings call.  (*See id.* ¶ 158.)  Mr. Price and Mr. Jager acknowledged the reduction in earnings caused by the acquisition of Aeropost.  (*See id.*)  Mr. Price also disclosed that the company was still "struggling with the issue of how to connect brick-and-mortar to online in a way that really works[,]" while further acknowledging that nobody had "figured it out."  (*Id.* ¶¶ 34 (emphasis omitted), 159, 195.)  He added that the company was still looking for "that sweet spot . . . how do you make sure that you can integrate properly the

technology, the benefits of technology with the traditional ways in which people have been shopping." (*Id.* ¶¶ 34, 159 (emphasis omitted).)

Cumulatively, the October 25, 2018 disclosures prompted a fifteen percent decrease in PriceSmart's share price, from $81.57 at the close of trading on October 25, 2018, to close at $69.16 per share on October 26, 2018, on unusually high trading volume of 901,300. (*Id.* ¶¶ 36, 162.)

### 2.   *PriceSmart's First Quarter 2019 Form 10-Q and Earnings Call*

On January 9, 2019, PriceSmart issued a Report on Form 10-Q for the First Quarter of Fiscal Year 2019, ending November 30, 2018 ("First Quarter 2019 Form 10-Q"), in which it announced a new loss from Aeropost operations and OCE development of $3.9 million, including $700,000 in acquisition costs, resulting in an adverse impact of $0.13 on the company's EPS that quarter. (CCAC ¶¶ 39, 164.) The company also acknowledged that it still did not maintain adequate internal controls respecting the classification of financial instruments as cash or short-term investments and that it had not yet remediated those existing material weaknesses. (*Id.* ¶ 164.)

During the quarterly earnings call on January 20, 2019, when one analyst asked whether PriceSmart had "seen any traction yet . . . in terms of [its] online activities," Ms. Bahrambeygui responded that the company was still "trying to understand where the greatest value is to be unlocked from th[e] acquisition" of Aeropost and "how to best apply it and integrate those technological capabilities and the talent into the very core of . . . business at PriceSmart." (*Id.* ¶ 40; *see also id.* ¶ 166.) She further admitted that Aeropost was not "just a plug-and-play that was going to be the answer to all [PriceSmart's] e-commerce and omni-channel needs" and that there would have to be additional investments that "at this point [would be] difficult for [her] to quantify." (*Id.* ¶¶ 41, 166 (emphasis omitted).)

### 3.   *PriceSmart's Second Quarter 2019 Form 10-Q and Earnings Call*

On April 9, 2019, PriceSmart issued a Report on Form 10-Q for the Second Quarter of 2019, ending February 28, 2019 ("Second Quarter 2019 Form 10-Q"), disclosing that

its quarterly EPS had been adversely impacted by $0.14 per share by the Aeropost acquisition, operational, and OCE costs.  (*See id.* ¶ 167.)  On the April 10, 2019 earnings call, PriceSmart noted that it had incurred $4.2 million in Aeropost costs, $1.7 million of which represented losses due to Aeropost's operations or "legacy" business and $1.3 million of which was due to the costs of developing the OCE.  (*Id.* ¶¶ 42, 167.) Ms. Bahrambeygui stressed the importance of leveraging "the technology and the talent" from the Aeropost acquisition, as well as the "need to accelerate [PriceSmart's] digital and omnichannel transformation to . . . drive growth."  (*Id.* ¶ 168.)

### 4.    *PriceSmart's Third Quarter 2019 Form 10-Q and Earnings Call*

PriceSmart issued its Report on Form 10-Q for the Third Quarter of 2019, ending May 31, 2019 ("Third Quarter 2019 Form 10-Q") on July 10, 2019, disclosing an Aeropost-related net loss for the quarter of $2.879 million, translating to a loss of an additional $0.09 per share.  (*Id.* ¶¶ 42, 170.)  In the follow-on call with analysts on July 11, 2019, Mr. Jager elaborated that "the legacy Aeropost business" and the "investments into [PriceSmart's] digital platform" costs $1.0 million and $1.8 million, respectively.  (*Id.* ¶ 170.)

### 5.    *PriceSmart's 2019 Form 10-K and Earnings Call*

On October 29, 2019, PriceSmart issued its Annual Report on Form 10-K for the Fourth Quarter and Fiscal Year ending August 31, 2019 ("2019 Form 10-K"), reporting an increase of $28.9 million in SG&A expenses, $9.9 million of which was attributable to Aeropost and $9.8 million of which was attributable to the OCE and expansion of Aeropost's legacy business.  (CCAC ¶¶ 43, 171.)  The 2019 Form 10-K acknowledged that the Aeropost acquisition constituted a significant cause of PriceSmart's year-over-year decline in operating income, from $126.1 million (4.0% of total revenue) for the prior year to $115.2 million (3.6% of total revenue) for Fiscal Year 2019.  (*Id.* ¶¶ 43, 172.)  The company reported a negative impact of Aeropost-related activities of $0.47 per share for the entire year.  (*Id.* ¶¶ 43, 173; *see also id.* ¶ 193.)

PriceSmart also announced that it was only testing its OCE in the Dominican Republic, representing far less progress than previously anticipated.  (*See id.* ¶¶ 43, 174.)

According to Lead Plaintiff, the changes between the 2013 and 2019 versions of the company's Dominican Republic websites were minimal and largely cosmetic.  (*See id.* ¶¶ 175–77.)

During the earnings conference call on October 30, 2019, PriceSmart assured investors that it was operating with a renewed focus on "expedit[ing its] growth strategies in a manner consistent with [its] core values."  (*See id.* ¶¶ 44, 174.)  In short, PriceSmart was never poised to launch an OCE for PriceSmart customers in 2018, and the Aeropost acquisition did not accelerate the OCE launch date.  (*See id.* ¶ 44.)

## II.    Procedural Background

On May 22, 2019, Plaintiff Max Morris Harari instituted this putative class action on behalf of all persons or entities who had purchased or acquired PriceSmart securities between October 26, 2017, and October 25, 2018 (the "Class Period").  (*See generally* ECF No. 1.)  He alleged causes of action for (1) violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a *et seq.*, and Rule 10b-5 promulgated thereunder; and (2) violation of Section 20(a) of the Exchange Act against Individual Defendants Laparte, Heffner, and Jager.  (*See generally id.*)

On July 22, 2019, PERA sought appointment as Lead Plaintiff and approval of its selected Lead Counsel, Barrack, Rodos & Bacine.  (*See generally* ECF No. 4.)  PERA, which manages thirty-one retirement plans for New Mexico's state, county, and municipal employees, had purchased 104,740 shares of PriceSmart common stock during the Class Period. (CCAC ¶¶ 1, 51.)  Judge Sammartino granted PERA's motion on October 7, 2019, (*see* ECF No. 23), following which the Parties' requested leave to file the instant Consolidated Class Action Complaint.  (*See* ECF No. 24.)

After receiving leave of Court, Lead Plaintiff filed the operative Consolidated Class Action Complaint on January 3, 2020, naming the same Defendants and alleging the same causes of action as pled in Mr. Harari's original Complaint.  (*See generally* ECF No. 26.)  The instant Motion followed on March 3, 2020.  (*See* ECF No. 29).

/ / /

# REQUEST FOR JUDICIAL NOTICE

## I.  Legal Standards

### A.  Judicial Notice

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.'" *Id.* (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). "But a court cannot take judicial notice of disputed facts contained in such public records." *Id.* (citing *Lee*, 250 F.3d at 689).

### B.  Incorporation by Reference

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006)). Consequently, "a defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

"However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id.* "Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* at 1002–03 (citing *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156–57 (2d Cir. 2006); *In re Immune*

*Response Sec. Litig.*, 375 F. Supp. 2d 983, 995–96 (S.D. Cal. 2005)).  "For this same reason, what inferences a court may draw from an incorporated document should also be approached with caution."  *Id.* at 1003.  Although "a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6),'" *id.* (alteration in original) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)), "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."  *Id.*

## II.   Analysis

Defendants ask the Court to take judicial notice of thirteen documents and to incorporate by reference the first twelve:

1.     Exhibit 1: PriceSmart's Form 10-K for the year ended August 31, 2017, filed with the SEC on October 26, 2017, referenced in the Consolidated Class Action Complaint at ¶¶ 14–15 and 81–84, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

2.     Exhibit 2: Transcript from PriceSmart's conference call on October 27, 2017, discussing its Fiscal Year 2017 financial results; referenced in the Consolidated Class Action Complaint at ¶¶ 16, 19, 25, 33, 38, 85–88, 103, 115, 126, 136, 186, and 196; and publicly available at https://seekingalpha.com/article/4117808-pricesmarts-psmt-ceojose-luis-laparte-on-q4-2017-results-earnings-calltranscript?part=single;

3.     Exhibit 3: PriceSmart's Form 10-Q for the quarter ended November 30, 2017, filed with the SEC on January 4, 2018, referenced in the Consolidated Class Action Complaint at ¶¶ 96–98, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

4.     Exhibit 4: Transcript from PriceSmart's conference call on January 5, 2018, discussing its first quarter 2018 financial results, referenced in the Consolidated Class Action Complaint at ¶¶ 99–100, and publicly available at https://seekingalpha.com/article/4135631-pricesmarts-psmt-ceo-jose-luis-laparte-on-q1-2018-resultsearnings-call-transcript?part=single;

5.      Exhibit 5: PriceSmart's Form 10-Q for the quarter ended February 28, 2018, filed with the SEC on April 5, 2018, referenced in the Consolidated Class Action Complaint at ¶¶ 24–25 and 112–14, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

6.      Exhibit 6: Transcript from PriceSmart's conference call on April 6, 2018, discussing its second quarter 2018 financial results, referenced in the Consolidated Class Action Complaint at ¶¶ 26–27 and 115–23, and publicly available at https://seekingalpha.com/article/4161538-pricesmarts-psmt-ceo-jose-luis-laparte-on-q2-2018-resultsearnings-call-transcript?part=single;

7.      Exhibit 7: PriceSmart's Form 10-Q for the quarter ended May 31, 2018, filed with the SEC on July 5, 2018, referenced in the Consolidated Class Action Complaint at ¶¶ 30 and 140–44, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

8.      Exhibit 8: transcript from PriceSmart's conference call on July 6, 2018, discussing its third quarter 2018 financial results, referenced in the Consolidated Class Action Complaint at ¶¶ 30 and 140–44, and publicly available at https://seekingalpha.com/article/4185822-pricesmart-inc-psmt-ceo-jose-luis-laparte-on-q3-2018-resultsearnings-call-transcript?part=single;

9.      Exhibit 9: PriceSmart's Form 8-K, which is a copy of PriceSmart's Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review, referenced in the Consolidated Class Action Complaint at ¶¶ 35 and 153, filed with the SEC before the opening of the market on October 25, 2018, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

10.     Exhibit 10: PriceSmart's Form 8-K, which is a copy of PriceSmart's press release announcing its fourth quarter and Fiscal Year 2018 financial results, referenced in the Consolidated Class Action Complaint at ¶¶ 33 and 156, filed with the SEC on October 25, 2018, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

/ / /

19-CV-958 TWR (LL)

11.      Exhibit 11: PriceSmart's Form 10-K for the year ended August 31, 2018, filed with the SEC on October 25, 2018, referenced in the Consolidated Class Action Complaint at ¶¶ 154–55, and publicly available at www.sec.gov/edgar/searchedgar/companysearch/html;

12.      Exhibit 12: Transcript from PriceSmart's conference call on October 26, 2018, discussing its Fiscal Year 2018 financial results, referenced in the Consolidated Class Action Complaint at ¶¶ 34 and 157–60, and publicly available at https://seekingalpha.com/article/4215060-pricesmart-inc-psmt-ceo-jose-luis-laparte-on-q4-2018-resultsearnings-call-transcript?part=single; and

13.      Exhibit 13: PriceSmart's stock price during the alleged Class Period; referenced in the Consolidated Class Action Complaint at ¶¶ 111, 124, 139, 151, and 162; and available as a matter of general public record at https://finance.yahoo.com/quote/PSMT/history?p=PSMT.

(*See* RJN at 2–3.)  Defendants contend that it is appropriate for the Court to consider these documents to gain a complete picture of the statements made during the Class Period.  (*See id.* at 6–10.)  Lead Plaintiff "does not object to judicial notice of these documents for the limited purpose of establishing the existence of their contents[,] *i.e.*, what was stated to the market and when," (RJN Obj. at 1), but object to the extent that "Defendants use the documents . . . to establish an alternative universe of facts contrasting those of the well-pleaded complaint."  (*Id.* at 4.)

Because the Court does not refer to Exhibits 2 through 5, 7, 9, 10, and 13, the Court **DENIES IN PART AS MOOT** Defendant's Request for Judicial Notice as to those exhibits; however, the Court agrees that incorporation by reference and judicial notice of Exhibits 1, 6, 8, 11, and 12 is proper.  *See, e.g.*, *In re Aqua Metals, Inc. Se. Litig.*, No. 17-CV-07142-HSG, 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14, 2019) (taking judicial notice of and incorporating by reference "SEC filings, press releases, and conference call transcripts that [the p]laintiff allege[d] contain[ed] false and/or misleading statements for the purpose of determining what was disclosed to the market"); *see also Khoja*, 899 F.3d

at 999 ("An investor call transcript submitted to the SEC generally qualifies as a 'source[] whose accuracy cannot reasonable by questioned." (quoting Fed. R. Evid. 201(b))); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (taking judicial notice of SEC filings). The Court therefore **GRANTS IN PART** Defendants' Request for Judicial Notice (ECF No. 29-2) as to Exhibits 1, 6, 8, 11, and 12 for the limited purpose of determining what was disclosed to the market in the context of Lead Plaintiff's alleged misrepresentations and omissions.

## MOTION TO DISMISS

### I.   Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"[C]laims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734–35 (9th Cir. 1985)). "Rule 9(b) requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (alteration in original) (internal quotation mark omitted) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* (internal quotation marks omitted) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

"Further, the enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint 'plead with particularity both falsity and scienter.'" *In re Daou*, 411 F.3d at 1014 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)) (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)). Under the PSLRA, "[a] securities fraud complaint must . . . 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed.'" *Id.* (quoting *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u-4(b)(1))). "The complaint must also 'state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *Id.* at 1014–15 (emphasis in original) (quoting *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u-4(b)(2))) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *superseded by statute on other grounds as recognized by In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017)). "The stricter pleading standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *Id.* at 1015 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002), *abrogated on other grounds as recognized by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (2008)). "Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Id.* (citing *In re Silicon Graphics*, 183 F.3d at 974).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

## II.    Analysis

Defendants seek dismissal of both Lead Plaintiff's causes of action for (1) violation of Section 10(b) and Rule 10b-5 against all Defendants, and (2) for violation of Section 20(a) against the Individual Defendants.  (*See generally* Mot.)

/ / /

/ / /

### A.    Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails[,] . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  One of those rules is Rule 10b-5, which, among other things, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

To plead a violation of either Section 10(b) or Rule 10b-5, a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 522 U.S. 148, 1157 (2008)).  Through the instant Motion, Defendants challenge the adequacy of Lead Plaintiff's pleading only as to the first two elements.  (*See* ECF No. 29-1 ("Mot. Mem.") at 14–36.)  The Court analyzes these elements with respect to the two categories of misstatements Lead Plaintiff alleges:  (1) those related to PriceSmart's misclassification of assets, and (2) those related to the acquisition of Aeropost and development of PriceSmart's OCE.

### 1.    Misclassification of Assets

Lead Plaintiff alleges that PriceSmart's unaudited "reports on form 10-Q for its first, second, and third quarters of 2018 falsely stated the Company's classification of assets, and liquidity position, by reporting CDs with terms exceeding 3 months as 'cash

equivalents,' in violation of GAAP." (Opp'n at 14.) Consequently, PriceSmart's "2017 Form 10-K falsely represented and certified that PriceSmart's disclosure controls and controls over financial reporting were adequate and 'effective at the reasonable assurance' level," (*id.* at 13 (quoting CCAC ¶ 92)), and Messrs. "Laparte, Heffner, and Jager['s] . . . SOX certifications supporting their portrayal of adequate and effective internal controls over financial reporting, and the accuracy and reliability of the Company's financial statements, were . . . also deceptive and misleading." (*Id.* at 14 (citing CCAC ¶¶ 203–06, 213).)

Defendants do not contest falsity—indeed, PriceSmart issued a Form 8-K disclosing the misclassification and subsequently restated the relevant financials in its 2018 Form 10-K. (*See, e.g.*, CCAC ¶¶ 35, 38, 153, 157, 213.) Instead, Defendants contend that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." (*See* Mot. Mem. at 17 (quoting *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002)) (citing *Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2016 WL 3971400, at *8 (S.D. Cal. July 25, 2016); *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *18 (N.D. Cal. July 29, 2010); *Karpov v. Insight Enters., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 2105448, at *10 (D. Ariz. Apr. 30, 2010).) According to Defendants, Lead Plaintiff fails to allege the something "more" required to plead scienter. (*See id.* at 16–17.) Lead Plaintiff counters that the obviousness and magnitude of the error leads to a strong inference of scienter. (*See* Opp'n at 28.) Defendants respond that Lead Plaintiff fails to allege any "*reason that PriceSmart would have intentionally misclassified CDs*," (*see* Reply at 6 (emphasis in original)): the restatement did not reveal any shortage of liquidity, (*see id.* at 8), and had no impact on PriceSmart's earnings per share, revenue, operating income, net income, cash flow from operation, total assets, or total current assets. (*See id.* at 8.)

The Court agrees that Lead Plaintiff has failed to allege a strong inference of scienter regarding the misstatements prompting the restatement. The Ninth Circuit has cautioned that, "[t]o allege a 'strong inference of deliberate recklessness,' [plaintiffs] 'must state facts

that come closer to demonstrating intent, as opposed to mere motive and opportunity.'" *DSAM Global Value Fund*, 288 F.3d at 385 (quoting *In re Silicon Graphics*, 183 F.3d at 974). Such allegations are missing here. According to Lead Plaintiff, the improper classification of four-to-twelve-month CDs as "cash and cash equivalents" as opposed to short-term investments allowed Defendants to distort PriceSmart's liquidity profile, making it appear more liquid than it really was. (*See, e.g.*, CCAC ¶¶ 14, 20, 32, 38, 95, 104–07, 141, 153, 178, 207–13.) But Lead Plaintiff's allegations fail to answer the question—to what end? Lead Plaintiff claims that there was an "issue of liquidity associated with PriceSmart's ability to convert foreign currency into U.S. dollars," (*see id.* ¶ 95), and that the restatement "reduced the previously reported cash and cash equivalents balance as of May 31, 2018 by 37% and increased the previously reported net decrease in cash, cash equivalents, and restricted cash by 258% ." (*See id.* ¶ 211.) But Lead Plaintiff does not allege that PriceSmart faced any shortage of liquidity that misclassification of these assets served to conceal. (*see* Reply at 8.) In fact, PriceSmart reported $144,813,000 in cash and cash equivalents prior to the restatement, and $90,923,000 after. (*See* CCAC ¶ 211.) Lead Plaintiff fails to allege that this was insufficient to meet PriceSmart's needs, and it appears that—aside from the reclassification of the four-to-twelve-month CDs itself—PriceSmart's net decrease in "cash, cash equivalents, and restricted cash" was only $20,899,000 for the nine months ending May 31, 2018. (*See id.*)

In short, Lead Plaintiff's allegations fail to raise a strong inference that Defendants stood to gain anything from affirmatively misrepresenting PriceSmart's liquidity profile or, relatedly, the misrepresentation of the adequacy of PriceSmart's internal controls and the Individual Defendants' false SOX certifications. Consequently, the inference of scienter is not at least as compelling as the opposing inference to be drawn from these facts, *i.e.*, that PriceSmart made an unfortunate—but innocent—accounting error. *See, e.g.*, *Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2018 WL 1258108, at *8 (S.D. Cal. Mar. 12, 2018) (dismissing securities fraud claims where the "[p]laintiffs demonstrate that [the defendant]'s collectability analysis violated GAAP, but . . . the more

compelling inference from [the p]laintiffs' allegations is that [the d]efendants made a good faith but mistaken attempt to account for students with and without financial aid"); *Perrin v. Sw. Water Co.*, No. 2:08-cv-7844-JHN-AGRx, 2011 WL 10756419, at *13 (C.D. Cal. June 30, 2011) (dismissing securities fraud action based on restatement resulting in downward adjustments of revenue, operating income, net income, income from continuing operations, retained earnings, and net cash where the plaintiffs' "attempt to show nefarious intentions on the part of [the d]efendants . . . is no more compelling than the more innocent one—[the defendant] was a 'confederate of companies,' and its accounting practices were cumbersome, inefficient, and subject to error"); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZX), 2009 WL 2767670, at *12 (C.D. Cal. Aug. 21, 2009) (dismissing amended complaint where the "[p]laintiff has, once again, failed to provide a reasonable basis for the Court to conclude that any of the purported accounting mistakes were anything other than innocent and unintentional"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1163 (C.D. Cal. 2007) (dismissing securities fraud complaint based on alleged GAAP violations where the plaintiffs "attribute fraudulent motives to Defendants that are at best implausible"); *In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 1836181, at *10 (D. Ariz. July 5, 2006) (dismissing securities fraud claims based on misclassification of leases where the "[p]laintiffs have failed to allege facts establishing that these GAAP errors were more than technical errors based on the incorrect application of [the relevant Financial Accounting Standard]").   The Court therefore **GRANTS** Defendants' Motion and **DISMISSES** Lead Plaintiff's first cause of action to the extent it is predicated on misstatements relating to PriceSmart's misclassification of four-to-twelve-month CDs, the adequacy of PriceSmart's internal controls, and the Individual Defendants' SOX certifications.

### 2. Acquisition of Aeropost and OCE Development

The majority of Lead Plaintiff's allegations concern Defendants' statements regarding the acquisition of Aeropost and development of PriceSmart's OCE.  Defendants

/ / /

argue that Lead Plaintiff fails sufficiently to allege falsity or scienter as to these statements. (*See* Mot. Mem. at 17–36.)

### a.     Material Misrepresentations and Omissions

A statement or omission is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32 (quoting *TSC Indus.*, 426 U.S. at 449). But "it bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44. "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

Lead Plaintiff alleges that material misrepresentations and omissions were made on three separate occasions:  First, the March 19, 2018 announcement of the acquisition of Aeropost created the false impression that Aeropost's business model was consistent with PriceSmart's, whereas Defendants knew that the companies' business models were incompatible through due diligence.  (*See, e.g.*, CCAC ¶¶ 108–11.)  Second, Defendants representations concerning the acquisition of Aeropost and abandonment of PriceSmart's internal OCE efforts on April 5 and 6, 2018, created the misleading impression that Aeropost would provide the "solution" for PriceSmart's OCE.  (*See, e.g.*, *id.* ¶¶ 112–38.)  Finally, Lead Plaintiff claims that Defendants "doubled down" on the acquisition in their remarks on July 5 and 6, 2018, spinning the acquisition despite its continued negative impacts on PriceSmart's earnings and the delay of the OCE launch date.  (*See, e.g.*, *id.*

¶¶ 139–52.)   Defendants contend that dismissal is warranted because the alleged misrepresentations are nonactionable puffery and forward-looking statements and because Lead Plaintiff fails to allege actionable material omissions.  (*See generally* Mot. Mem. at 25–36.)

### i.   March 19, 2018 Statements

On March 19, 2018, PriceSmart issued a press release that reviewed and approved by Mr. Laparte announcing its acquisition of Aeropost.  (*See* CCAC ¶ 108.)  According to Lead Plaintiff, that announcement contained the following material misrepresentations:

1.   "Becoming part of the PriceSmart family gives us the opportunity to take Aeropost.com and PriceSmart to the forefront of retail innovation," (*id.* ¶¶ 108–09);

2.   "We can't think of a better match," (*id.* ¶¶ 108–09, 127);

3.   "The technology behind Aeropost.com coupled with its strong team, will allow PriceSmart to offer new online shopping options for its members, strengthening its commitment to provide an exceptional member experience with high quality merchandise at low prices," (*id.* ¶¶ 108–09); and

4.   "Expanding on the strength of our brick and mortar clubs, the acquisition of Aeropost provides an opportunity to accelerate the development of an omni-channel shopping experience for our members."

(*Id.*)  According to Defendants, each of these statements is nonactionable puffery.  (*See* Mot. Mem. at 26–28; *see also* Mot. Mem. App. at 1.)  Lead Plaintiff counters that these statements "are all false present tense impressions" that are "capable of being objectively verified" and that "[r]easonable investors would and did rely upon."  (*See* Opp'n at 20.)

"'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  "When valuing corporations,[ ] investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers.  This mildly optimistic, subjective assessment hardly amounts to a securities violation."  *Id.* (alteration in original) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).  On the other hand,

"[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Id.* (citing *SEC v. Todd*, 642 F.3d 1207, 1216–17 (9th Cir. 2011)).

The Court agrees that the alleged misrepresentations from March 19, 2018, are nonactionable puffery. "When one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light." *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *3 (N.D. Cal. May 26, 2000), *aff'd*, 32 F. App'x 905 (9th Cir. 2002). "Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination." *Id.* "Reasonable investors know better than to rely on these statements, which are all too familiar to market observers." *Id.*

In *Kane*, for example, the district court concluded that claims that, among other things, the merger was "fabulous," that the defendant company had "made great strides toward our long-term goal of becoming the number one leader in end-to-end switched networking," and that the merger would "enhance" sales were nonactionable puffery. *See id.* at *2–3. *Kane* relied on *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997), *see Kane*, 2000 WL 33208116, at *3, in which the Tenth Circuit found immaterial "statements of corporate optimism" concerning a merger, including that the integration of the two companies' sales forces was a "substantial success"; that the merger was moving "faster than we thought"; that the merger presented a "compelling set of opportunities;"; that, "[b]y moving rapidly to a fully integrated sales force, [the companies we]re leveraging [their] combined knowledge of the expanding scope of network solutions"; and that the defendant company "expect[ed] that network applications w[ould] quickly reshape customer expectations." *Grossman*, 120 F.3d at 1121.

The statements at issue here are similar to those found to be nonactionable "statements of corporate optimism" in *Kane* and *Grossman*. Despite Lead Plaintiff's assertion that the statements "are actionable because they were capable of being objectively verified," (*see* Opp'n at 20 (citing *Apollo Grp.*, 774 F.3d at 606)), the Court is hard-pressed

to identify the objectively verifiable facts in the challenged statements—there are no objective measurements for evaluating corporate "match" or the "opportunity to accelerate" a technological innovation.  The Court therefore concludes that the challenged statements from the March 19, 2018 press release are nonactionable puffery.

ii.   April 6, 2018 Statements

After PriceSmart issued its Second Quarter 2018 Form 10-Q, it held an earnings conference call on April 6, 2018.  (*See* CCAC ¶¶ 112–23.)  According to Plaintiff, Mr. Laparte and Mr. Heffner made the following material misrepresentations or omissions during the April 6, 2018 earnings call:

1.   Aeropost's "services" provide an "exciting, high value addition to the product[s] and services we offer to our members" and the "combination of our two companies brings together PriceSmart brick-and-mortar excellence, buying power and distribution and operation expertise, with Aeropost's exceptional cross-border logistics, delivery option and e-commerce know-how," (*id.* ¶ 116);

2.   "Beyond the charges we took in the current quarter, we do not anticipate any further dilution to our earnings through the end of this fiscal year with this acquisition," (*id.* ¶ 117);

3.   statements regarding financial investments in Aeropost and PriceSmart's OCE, including "some of the activities and investments we were planning to do as part of our innovation initiatives, which we have previously indicated could be up to $5 million in the fiscal year, are now being addressed via Aeropost capabilit[ies]," (*id.* ¶ 118); "any incremental costs of integrating Aeropost will largely fall within that previously planned investment amount," (*id.* ¶ 119); and "[i]n the near-term right now from an investment standpoint, there are investments, but as we mentioned, we have been planning investments to do things and what we consider innovation area, which are now very much wrapped up into the innovation activities of Aeropost.  So, we've indicated I think $3 million to $5 million for this year.  If you look at the upper end of that range of $5 million, we think we can operate within that with the integration of Aeropost," (*id.* ¶ 123);

31

4.      PriceSmart took "$2.6 million in charges for e-commerce development activities that are no longer needed because of the technology purchase as part of the acquisition of Aeropost, Inc.," (*id.* ¶ 118; *see also id.* ¶ 120), which "will allow us to utilize Aeropost online technology, along with their inhouse digital capability in place of an outsource solution," (*id.* ¶ 120), while failing to disclose that the acquisition of Aeropost was not the "solution" to PriceSmart's OCE;

5.      "we believe we have added exciting new capabilities with Aeropost," (*id.* ¶ 119);

6.      PriceSmart is "looking at selling merchandise from PriceSmart within the Aeropost platform" and "looking at building a platform, that will take a little longer, but as we did the write-off of our current platform, now we have to replace it with a new platform," and, regarding "time to market, . . . I guess [it may] be a little more faster on what we're trying to accomplish on this omnichannel opportunity," (*id.* ¶ 123); and

7.      Aeropost "brings to the table for" PriceSmart "a lot of good things, obviously," including "technology on one hand, a good team obviously, that will help us get there."

(*Id.*)  Defendants contend that the first, fifth, and seventh statements are nonactionable puffery; that the second, third, and sixth are nonactionable forward-looking statements; and that the fourth is both a forward-looking statement and nonactionable omission.  (*See* Mot. Mem. at 27, 28–29, 31, 32–33; *see also* Mot. Mem. App. at 2–8.)  For the reasons discussed above, *see supra* Section II.A.2.a.i, the Court agrees that the first, fifth, and seven statements are the sort of statements of corporate optimism that amount to nonactionable puffery.

As for the second, third, fourth, and sixth statements, Defendants contend that they are forward-looking statements falling within the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5.  (*See* Mot. Mem. at 28–29, 31.)  The first prong of the safe harbor exempts from liability "any forward-looking statement, whether written or oral, if and to the extent that . . . the forward-looking statement is . . . identified as a forward-looking statement, and

is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  The second prong applies where "the plaintiff fails to prove that the forward-looking statement[,] . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i).

For purposes of the safe harbor, a "forward-looking statement" is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" "a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC];" or "any statement of the assumptions underlying or relating to any [of the above] statement[s]." 15 U.S.C. § 78u-5(i)(1). "[T]o establish that a challenged statement contains non-forward-looking features that avoid this definition, a plaintiff must plead sufficient facts to show that the statement goes *beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact[].'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (second alteration in original) (quoting *Quality Sys.*, 865 F.3d at 1142, 1144).

Generally speaking, the statements that Defendants contend are forward-looking relate to PriceSmart's "anticipat[ion]" regarding further dilution to its earnings from the Aeropost acquisition, the amounts PriceSmart expected would be expended on the acquisition and innovation initiatives, PriceSmart's capacity to use Aeropost's technology, and PriceSmart's projection that building its OCE platform could be "a little . . . faster" given the acquisition of Aeropost.  (*See* CCAC ¶¶ 117–20, 123.)  These statements all articulate PriceSmart's "projection[s]," "plans," or "objectives."  *See, e.g., Wochos*, 985

33

F.3d at 1192 (concluding that statements that defendant had a goal to produce 5,000 vehicles per week, was "on track" to achieve its goal, and that "there [we]re no issues" that "would prevent" it from achieving its goal were forward-looking statements).

The question, therefore, is whether Lead Plaintiff has pleaded that any of these statements contains an express or implied concrete assertion concerning a specific current or past fact. *See id.* at 1192–93. Lead Plaintiff contends that the challenged statements "were predicated on representations of current or past events, and as such are not forward-looking." (*See* Opp'n at 22.) For example, Lead Plaintiff argues that "the statement '[t]he acquisition of Aeropost will allow [PriceSmart] to utilize Aeropost online technology, along with their in-house digital capability in place of an outsource solution' is an evaluation of the then-current capability of Aeropost's technology." (*See id.* (citing CCAC ¶ 120).) But "it is not enough to plead that a challenged statement rests on subsidiary premises about how various *future* events will play out over the timeframe defined by the forward-looking statement" because "such 'statement[s] of the assumptions underlying or related' to a declared objective are also deemed to be forward-looking statements." *See Wochos*, 985 F.3d at 1192 (quoting 15 U.S.C. § 78u-5(i)(1)(D)). The Court therefore concludes that the second, third, fourth, and sixth statements challenged from April 6, 2018, are forward-looking statements for purposes of the PSLRA.

The safe harbor therefore applies if the statements were accompanied by "meaningful cautionary statements," *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), or were not made with actual knowledge of their falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i). Because the Court concludes that Lead Plaintiff has failed to allege a strong inference of scienter, *see infra* Section II.A.2.b, Lead Plaintiff also fails to allege that the challenged statements were made with actual knowledge of their falsity. *See, e.g.*, *In re Twitter Sec. Litig.*, No. 19-cv-07149-YGR, 2020 WL 7260479, at *7 n.5 (N.D. Cal. Dec. 10, 2020); *In re Pac. Gateway Exchange, Inc. Sec. Litig.*, No. C-00-1211 PJH, 2002 WL 851066, at *12 n.8 (N.D. Cal. Apr. 30, 2002). Consequently, the second prong of the safe harbor applies.

/ / /

The Court also concludes that the first prong of the safe harbor applies because these statements were accompanied by meaningful cautionary language.  As Defendants note, (*see* Mot. Mem. at 29–30), Defendants indicated at the beginning of the April 6, 2018 earnings call that:

> statements made during this call may contain forward-looking statements concerning the Company's anticipated future plans, revenues and related matters.  These forward-looking statements include, but are not limited to, statements containing the words expect, believe, will, may, should, estimate and similar expressions.
>
> These statements are subject to risks and uncertainties that could cause actual results to differ materially, including the risks detailed in the Company's annual report on Form 10-K for the fiscal year ended August 31, 2017 filed with the Securities and Exchange Commission on October 26, 2017.

(RJN Ex. 6 at 2.)  In turn, the 2017 Form 10-K disclosed that:

> ***Failure to grow our e-commerce business through the integration of physical and digital retail or otherwise, and the cost of our increasing e-commerce investments, may materially adversely affect our market position, net sales and financial performance.***
>
> . . .
>
> In addition, the cost of certain e-commerce and technology investments will adversely impact our financial performance in the short-term and may adversely impact our financial performance over the longer term.

(RJN Ex. 1 at 7 (emphasis in original).)  These disclosures provide sufficient "meaningful cautionary language" to bring the challenged statements under the first prong of the PSLRA's safe harbor for forward-looking statements.  *See, e.g.*, *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1066–67 (C.D. Cal. 2012).  The Court therefore concludes that the second, third, fourth, and sixth statements from April 6, 2018, are

nonactionable forward-looking statements under the first and second prongs of the PSLRA's safe harbor.

Finally, Lead Plaintiff alleges that the fourth statement is also a material omission. "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006 (citing *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 890 (9th Cir. 1994)).  But, "[a]bsent a duty to disclose, an omission does not give rise to a cause of action under § 10(b) and Rule 10b-5."  *Retail Wholesale & Dept. Store Union Local 338 Ret. Fund v. Hewlett Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (citing *Basic Inc.*, 485 U.S. at 239 n.17).  Consequently, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."  *Id.* (alteration in original) (quoting *Matrixx Initiatives*, 563 U.S. at 44). Rather, "[a]n actionable omission claim arises only when disclosure is 'necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).  "In other words, a duty to provide information exists only where statements were made which were misleading in light of the context surrounding the statements."  *Id.*

Lead Plaintiff challenges Mr. Heffner's statement that "[t]he acquisition of Aeropost will allow [PriceSmart] to utilize Aeropost online technology, along with their in-house digital capability in place of an outsource solution."  (*See* CCAC ¶ 120.)  According to Lead Plaintiff, "the careful use of the word 'solution' . . . [w]as a representation that acquiring Aeropost solved the 'how' in terms of figuring out how to achieve the Omni-Channel Experience consistent with PriceSmart's business model – in the right way," (*see id.* ¶ 120), while, "[i]n truth, PriceSmart had not figured out how to adequately harmonize its core business model in order to offer low cost pricing through a focus on efficiencies in the handling and shipping of goods and merchandise, with the costs and dynamics of international or cross-border e-commerce" and, in fact, Aeropost had not "provided the solution."  (*See id.* ¶ 126; *see also id.* ¶ 142.)  Defendants argue that "Plaintiff's focus on

Mr. Heffner's use of the word 'solution' unreasonably singles out a reference to a separate issue (PriceSmart's pursuit of an 'outsource solution' to the development of its e-commerce platform . . . ) and imposes that term to characterize the Acquisition as a 'solution.'" (*See* Mot. Mem. at 33 (citing CCAC ¶ 120).)  Further, Defendants contend, PriceSmart never said that Aeropost provided an immediate solution to PriceSmart's OCE, and the broader context of the April 6, 2018 call makes clear that PriceSmart did not consider the acquisition to be an immediate solution.  (*See* Reply at 14–15.)

Lead Plaintiff attributes too much to Mr. Heffner's choice of the word "solution." Reading Mr. Heffner's statement in context, it does not give the impression that the Aeropost acquisition was "the solution" for PriceSmart's OCE.  In full, Mr. Heffner disclosed:

> [W]e had SG&A costs of $3.1 million related to our Aeropost acquisition that are not expected to reoccur.  Included in the $3.1 million or $525,000 in deal costs associated with the acquisition for due diligence, legal, tax, accounting, and technical advice. We also took a total of $2.6 million in charges to discontinued development efforts of our ecommerce solution.  The acquisition of Aeropost will allow us to utilize Aeropost online technology along with their in-house digital capability in place of an outsourced solution.

(RJN Ex. 6 at 7.)  Generally, Mr. Heffner was discussing PriceSmart's SG&A costs for the quarter, which included certain costs related to the Aeropost acquisition.  After explaining that PriceSmart had taken a $2.6 million charge for the discontinuance of its prior internal OCE platform, Mr. Heffner indicated that PriceSmart would be able to use the tools acquired from Aeropost, rather than looking to an outside company, in its efforts to develop an OCE platform.  Mr. Heffner made clear that the acquisition "w[ould] allow [PriceSmart] to utilize Aeropost online technology."  The future tense reference to the "utiliz[ation]" of Aeropost's "technology" stands in clear contrast to the present tense impression of a "solution" that Lead Plaintiff attempts to create.  Further, Lead Plaintiff ignores that

/ / /

Mr. Heffner is providing an explanation for the SG&A costs related to the acquisition, as opposed to extolling PriceSmart's OCE platform generally.

This becomes all the clearer when Mr. Heffner's statements are viewed in their entirety. When Mr. Laparte hands the line over to Mr. Heffner, Mr. Heffner makes clear that he will "cover few additional items including a further discussion of the impact of the U.S. tax reform legislation on [PriceSmart's] results in the quarter." (*Id.*) Mr. Heffner then discusses PriceSmart's SG&A, followed by "[n]et interest expense," "net foreign currency transaction gains," and changes to PriceSmart's "provision for income taxes" resulting from the U.S. Tax Cuts and Jobs Act. (*See id.*) In other words, Mr. Heffner—PriceSmart's CFO, (*see* CCAC ¶ 54)—is the "finance" guy. He is not offering some carefully crafted extolment of the Aeropost acquisition, (*cf. id.* ¶ 120); that was Mr. Laparte's role. (*See* RJN Ex. 6 at 1 ("Jose Luis Laparte[:] . . . I will also address our recent acquisition of Aeropost, Inc.").)

The broader discussion of the Aeropost acquisition on the April 6, 2018 call also makes clear that Defendants never created the impression that the Aeropost acquisition was "the solution" to PriceSmart's OCE. Mr. Laparte initially expressed that "Aeropost business accelerates PriceSmart's ability to offer online shopping, test and measure new digital strategies, and offer delivery options for our members, all while maintaining our commitment to an excellent members experience with high-quality merchandise at low prices." (RJN Ex. 6 at 6.) Mr. Laparte adds that "[s]ome"—but not all—"of the activities and investments [PriceSmart] w[as] planning to do as part of [its] innovation initiative, which [PriceSmart] ha[s] previously indicated could be up to $5 million in th[e 2018] fiscal year are now being addressed via Aeropost capabilities." (*Id.*) In short, although Mr. Laparte conveys optimism that Aeropost will accelerate PriceSmart's OCE platform, he does not represent that an OCE platform has been secured as part of the deal. Rather, he makes clear that "test[ing]" is still required and that additional work is needed through the innovation initiative.

/ / /

Further, in response to questions from analysts regarding the acquisition, Mr. Laparte explains that "eventually where [PriceSmart] want[s] to build a platform and getting to [its] goal is to offer multi-channel shopping experience opportunity for [its] members. . . . [PriceSmart is] looking at building a platform obviously through [Aeropost] so that [PriceSmart] can offer [its] own PriceSmart platform to [its] members." (*Id.* at 8–9.) PriceSmart would not need to "build a platform" if it had already acquired a fully functional one from Aeropost. That the OCE platform was a future goal that still needed to be built was further underscored by comments such as, "[PriceSmart's] ultimate goal is obviously create a better omni-channel experience for [its] members," (*see id.* at 9); "[PriceSmart is] looking at selling merchandise from PriceSmart within the Aeropost platform. And [PriceSmart is] looking at building a platform that will take a little longer, but as [PriceSmart] did the write off [its] current platform, now [PriceSmart] ha[s] to replace it with [PriceSmart's] new platform," (*see id.* at 13); and "eventually, [PriceSmart wi]ll have a pricesmart.com platform for all [its] members." (*See id.* at 15.)

In short, taking as true Lead Plaintiff's allegations that Aeropost was not "the solution" to PriceSmart's OCE and that PriceSmart had not yet figured out how to create an OCE consistent with its business model, Lead Plaintiff has failed to plead any facts showing that the statements made on April 6, 2018 were false and misleading in light of those facts because PriceSmart simply did not create the impression that the Aeropost acquisition was "the solution" to its OCE platform. *See, e.g.*, *In re Eventbrite, Inc. Sec. Litig.*, No. 5:18-cv-02019-EJD, 2020 WL 2042078, at *11 (N.D. Cal. Apr. 28, 2020) ("Plaintiffs' vague allegations that the . . . acquisition was 'delayed,' 'cost,' and that the integration missed 'key features' are insufficient to show that Defendants 'affirmatively' created an impression of a state of affairs that differs in a material way from reality."); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 836–37 (N.D. Cal. 2014) (concluding that the plaintiff had failed to plead a material omission where the defendants had listed out their duties pursuant to FDA regulations but failed to disclose that they had already violated FDA regulations because the statements concerning the regulations themselves

were "literally accurate" and the plaintiff had failed to plead facts showing how the violations rendered statements regarding the FDA requirements false or misleading).  The Court therefore concludes that Lead Plaintiff fails to allege a material omission from the April 6, 2018 earnings call.  Consequently, Lead Plaintiff fails to allege any actionable misrepresentations or omissions from April 6, 2018.

iii.      July 5, 2018 Statements:

PriceSmart released its Third Quarter 2018 Form 10-Q, signed by Mr. Laparte and Mr. Jager, on July 5, 2018.  (*See* CCAC ¶¶ 141–44.)  Lead Plaintiff alleges that the following material misrepresentations or omissions were made in the Form 10-Q:

1.      "Aeropost will allow us to offer new online shopping options and provide an opportunity to accelerate the development of an omni-channel shopping experience for our members providing them with efficient and low-cost cross-border delivery services, a wider assortment of products and services available to purchase online and a more user friendly ordering system and delivery service," without disclosing that PriceSmart had yet to figure out an OCE consistent with its business model, (*id.* ¶ 142);

2.      PriceSmart was in the process of "expanding our strategy to include online shopping and the strategic placement of regional distribution centers to support both our traditional warehouse club business and our new online shopping initiative[,]" and "broadening" its "business strategy" "to combine the traditional membership warehouse 'brick and mortar' business with online shopping to provide the best shopping experience possible for our members," (*id.* ¶ 143); and

3.      "Costs associated with the consolidation of Aeropost were recorded for approximately $4.2 million related to warehouse club and other operations costs and approximately $3.8 million related to a general and administrative costs for a combined total of $8.0 million," while failing to disclose that Aeropost's inconsistent business model would be a persistent drag on PriceSmart's earnings.

(*Id.* ¶ 144.)  Defendants argue that the first statement is puffery and a nonactionable omission, that the second is puffery, and that the third is a nonactionable omission.  (*See*

40

Mot. Mem. at 27, 32–33; *see also* Mot. Mem. App. at 8–10.)  For the reasons discussed above, *see supra* Sections II.A.2.a.i–ii, the Court agrees that the first and second statements are nonactionable puffery.

As for the alleged omissions, for the reasons discussed above, *see supra* Section II.A.2.a.ii, the Court concludes that Lead Plaintiff fails to allege that the first statement created a false impression that PriceSmart had "figured out how to achieve that Omni-Channel Experience consistent with its business model . . . in any expansive or broadened way" or that the Aeropost acquisition "provided the 'solution.'"  (*See* CCAC ¶ 142.) Rather, the statement indicates that the acquisition represented an "*opportunity* to accelerate the development" of its OCE.  Regarding the third statement, even assuming that Lead Plaintiff alleged that Defendants were aware that PriceSmart's business model was incompatible with Aeropost's and that the Aeropost acquisition would be a "persistent drag" on PriceSmart's earnings, Lead Plaintiff fails to allege any facts giving rise to a duty to disclose this information—PriceSmart represented only the present impact of Aeropost on earnings and did not make any projections about its future impact.  The Court therefore concludes that Lead Plaintiff has failed to allege any false or misleading statements or omissions from July 5, 2018.

### iv.    July 6, 2018 Statements:

Finally, PriceSmart held its earnings conference call for the third quarter of Fiscal Year 2018 on July 6, 2018.  (*See* CCAC ¶¶ 145–49.)  Lead Plaintiff alleges that the following material misrepresentations and omissions were made during the course of that call:

1.    "one of the tasks already initiated by the Aeropost tech team is the development of our new e-commerce platform, which will be launched in some countries, at some point, during our next fiscal year 2019 [ending August 31, 2019]," and "our platform will probably [not be] launched until next year, they are working, a portion of that may be launched with some membership component probably by September, October, but the facility for the members to actually access the PriceSmart.com platform will be in place

during the spring 2019," while failing to disclose that PriceSmart still had not figured out how to achieve an OCE consistent with its business model, (*id.* ¶ 146);

2.      "PriceSmart is well-positioned" with "a unique competitive position in our markets" and it is "also exciting to see Aeropost now an integral part of our team, energized to bring . . . more value to our existing members" and "several strategic benefits not the least of which is technology," (*id.* ¶ 147); and

3.      "it will require some investment, there's no question.  We definitely have a great team with the Aeropost . . . we do have the plans and then we started already investing in different initiatives to create — to improve the marketplace, to improve the whole Aeropost for — just to build our platform there, different initiatives that will not happen just without the investing . . . it may be short term, it may have some impact, but obviously, long-term, we do believe that it's the right thing to do," (*id.* ¶ 148), and that PriceSmart "wouldn't set any direct expectation . . . in terms of additional investment," (*id.* ¶ 149), despite knowing that the additional investment would vastly exceed the balance of the original $5 million allocation and continue to be a drag on PriceSmart's earnings.

(*See id.*)  Defendants contend that the first statement is a nonactionable omission, that the second is puffery, and that the third is both a forward-looking statement and a nonactionable omission.  (*See* Mot. Mem. at 27, 29, 32–33; *see also* Mot. Mem. App. at 2–8.)

For the reasons discussed above, *see supra* Sections II.A.2.a.i–iii, the Court concludes that the alleged omissions are nonactionable.  With regard to the third statement, Mr. Laparte made clear that "additional investment" would be required to develop PriceSmart's OCE, which might have an impact on PriceSmart's financials in the short-term.  (*See* RJN Ex. 8 at 16–17.)  He also declined to provide "any direct guidance or . . . any direct expectation" regarding the "level of investment."  (*See id.* at 17.)  In short, Defendants previously indicated that they believed the integration of Aeropost would cost approximately $5 million for Fiscal Year 2018.  Lead Plaintiff does not allege that Defendants knew that the costs would greatly exceed the original $5 million projected for

Fiscal Year 2018 and, in any event, Defendants disclosed that further investment would be required and that they were unable to provide an estimate as to how much.  Lead Plaintiff therefore fails to plead facts showing either that the July 6, 2018 statement was false or that Defendants had a duty to "correct" the prior statement concerning the anticipated investment in Aeropost for Fiscal Year 2018.

Turning to the second statement, it is nonactionable as puffery for the reasons discussed above.  *See supra* Section II.A.2.a.i–iii.

Finally, the third statement is a nonactionable forward-looking statement.  The statement is a projection of future costs associated with the development of PriceSmart's OCE and, like the statements made on April 6, 2018, *see supra* Section II.A.2.a.ii, Defendants opened the call with cautionary language concerning any forward-looking statements and incorporated by reference the risks disclosed in PriceSmart's 2017 Form 10-K.  (*See* RJN Ex. 8 at 2.)  The statement is therefore nonactionable under the first prong of the PSLRA safe harbor.  Further, because Lead Plaintiff fails to plead a compelling inference of scienter, *see infra* Section II.A.2.b, the statement is also nonactionable under the second prong of the PSLRA safe harbor.  Lead Plaintiff therefore fails to allege any false or misleading statements or omissions from the July 6, 2018 conference call.

\*   \*   \*

In light of the above, the Court concludes that Lead Plaintiff has failed to meet its burden under Rule 9(b) and the PSLRA to allege any actionable material misstatements or omissions.  While this alone merits dismissal of Lead Plaintiff's Consolidated Class Action Complaint, the Court analyzes Lead Plaintiff's scienter allegations for the benefit of future amendments to the pleadings.

### b.   Scienter

According to Lead Plaintiff, Defendants' scienter for the alleged misstatements and omissions concerning the acquisition or Aeropost and development of its OCE platform can be inferred from pre-acquisition due diligence, the importance of both the acquisition and OCE platform to PriceSmart's "core operations," and the abrupt resignation of

Mr. Laparte, the adverse impact of the acquisition on PriceSmart's EPS, alleged admissions that PriceSmart had not "figure[d] out" how to create a successful OCE, and false and misleading financial reporting.[3]  (*See, e.g.*, CCAC ¶¶ 179–216.)  Defendants contend that these rationales fail—either individually or collectively—to raise a strong inference of scienter.  (*See* Mot. Mem. at 17–25.)

### i.   Due Diligence

Lead Plaintiff alleges that the Individual Defendants "must have learned and known the adverse information contradicting their positive statements about the Aeropost acquisition and/or that those statements were untrue" based on information uncovered through pre-acquisition due diligence.  (*See* CCAC ¶¶ 179–88.)  Lead Plaintiff does not contest that Mr. Jager, who joined PriceSmart after the acquisition of Aeropost, (*see id.* ¶ 33), cannot be charged with knowing information uncovered through due diligence.  (*See* Mot. Mem. at 18; Opp'n at 29–37; Reply at 4 n.6.)

Defendants rely on *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017), which the Court finds persuasive.  In *City of Dearborn Heights*, the plaintiff alleged that the defendant dental company had paid an artificially inflated price to acquire a subsidiary that made intra-oral scanners.  *Id.* at 610.  Specifically, the plaintiff alleged that the subsidiary had offered unprecedented discounts to its customers prior to the acquisition, which resulted in an unsustainable increase in scanner sales, or "channel stuffing," to make itself appear more valuable to an acquiring company.  *Id.*  The plaintiff claimed that this channel stuffing "would have been 'readily apparent' from [the defendant]'s due diligence and direct access to [the subsidiary]'s financial reports and company documents through a data room that

---

[3] The Court addressed above Lead Plaintiff's allegations concerning PriceSmart's allegedly false and misleading financial reporting, lack of transparency, and material weakness of internal controls.  (*See supra* Section II.A.1; *see also* CCAC ¶¶ 197–216.)  To the extent those allegations are relevant to Defendants' scienter regarding the alleged misrepresentations and omissions concerning the Aeropost acquisition and development of PriceSmart's OCE, the Court addresses them as part of its holistic review. *See infra* Section II.A.2.b.vi.

[the subsidiary] made available during the acquisition process." *Id.*  The district court concluded that the plaintiff had failed to plead scienter with sufficient specificity, *see id.* at 612, and the Ninth Circuit affirmed.  *See id.* at 619.  The Ninth Circuit noted that, while "particularized allegations that defendants had 'actual access to the disputed information' may raise a strong inference of scienter," the plaintiff had "allege[d] insufficient facts to establish that [the individual defendants] had direct knowledge of [the subsidiary]'s channel stuffing" because the plaintiff did "not allege that [the individual defendants] personally accessed the data room, or that the confidential informants personally disclosed [the subsidiary]'s channel stuffing to [the individual defendants]." *Id.*

Lead Plaintiff attempts to distinguish *City of Dearborn Heights* based on the fact that this case does not involve "allegations of inflated and subjective goodwill." (*See* Opp'n at 36.)  But the "due diligence" allegations in *City of Dearborn Heights* did not pertain to subjective evaluations—rather, the plaintiff alleged that the target's financials and documents would have revealed the target company's channel stuffing.  *See* 856 F.3d at 620.  Here, by contrast, Lead Plaintiff alleges that due diligence would have revealed that Aeropost was not a good "match" based on its business model.  (*See* Opp'n at 30 (citing CCAC ¶¶ 132–37).)  Analysis of such subjective factors is problematic—as the Ninth Circuit noted of the defendant's goodwill valuation in *City of Dearborn Heights*, "the more compelling inference is that Defendants made a good faith but mistaken determination . . . that the positive factors outweighed the negative ones."  *See* 856 F.3d at 621.

The inference Lead Plaintiff asks the Court to draw is simply implausible.  Under the facts as alleged by Lead Plaintiff, Defendants conducted thorough pre-acquisition due diligence that revealed that Aeropost had a nascent OCE platform and a business model that was incompatible with PriceSmart's but, nonetheless, committed $30 million—the largest acquisition in the company's history—to acquire a "toxic" asset because the Individual Defendants were facing "pressure" to come up with a workable OCE.  Instead, as in *City of Dearborn Heights*, the more compelling inference is that the Individual Defendants made a "good faith but mistaken determination" regarding the acquisition of

Aeropost.  Lead Plaintiff's due diligence allegations therefore fail to give rise to a strong inference of scienter.

### ii.      "Core Operations" Inference

Lead Plaintiff also relies on the "core operations" inference, (*see, e.g.*, CCAC ¶ 189), pursuant to which knowledge of facts critical to a business's core operations or important transactions may be attributed to a company's key officers.  *See S. Ferry*, 542 F.3d at 782–86.  The Ninth Circuit has cautioned that "[p]roof under this theory is not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard" because, "[i]n such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware." *S. Ferry*, 542 F.3d at 784.  This is because, "[a]s a general matter, 'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information conveyed to management and related to the fraud.'"  *Id.* at 784–85 (quoting *Metzler*, 534 F.3d at 1087).

Consequently, "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances."  *Id.* at 785.  "First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations.'"  *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information."  *Id.* at 786.  "Finally, such allegations may conceivable satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would / / /

be 'absurd' to suggest that management was without knowledge of the matter." *Id.* (citing *Berson*, 527 F.3d at 988).

Lead Plaintiff relies on the third of these:  According to Lead Plaintiff, because "[d]eveloping an OCE consistent with PriceSmart's business model was repeatedly characterized as . . . essential to the Company's competitiveness and success . . . , it would be absurd for Defendants not to know that PriceSmart had not figured out how to achieve OCE consistent with its business model – 'in the right way' – or that PriceSmart did not secure such a 'solution' by acquiring Aeropost, it's most important transaction." (Opp'n at 31; *see also, e.g.*, CCAC ¶ 189.)  Defendants respond that this is not one of the "exceedingly 'rare' occasion[s]" contemplated by the Ninth Circuit, (*see* Reply at 5), and that "[a]ccepting Plaintiff's attempt to fit this case into the 'rare' circumstances of *Berson*[, 527 F.3d 982,] and [*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*] *American West* [*Holding Corp.*, 320 F.3d 920 (9th Cir. 2003),] essentially would convert *every* securities case arising out of optimism surrounding a merger into such 'rare' cases." (*Id.* at 6 (emphasis in original) (citing *Jui-Yang v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 WL 1508991, at *22 (N.D. Cal. Apr. 27, 2017); *Fadia v. FireEye, Inc.*, No. 5:14-cv-05204-EJD, 2016 WL 6679806, at *16–17 (N.D. Cal. Nov. 14, 2016)).)

The Court agrees that Lead Plaintiff has failed to plead facts establishing that this is the "rare" case in which scienter can be inferred from PriceSmart's core operations without particularized allegations.  Defendants are correct that Lead Plaintiff must allege that Defendants withheld specific *facts* of which they were aware by virtue of their position in the company.  (*See* Reply at 6.)  Lead Plaintiff here alleges that Defendant failed to disclose that the Aeropost acquisition was not a "good match." (*See, e.g.*, CCAC ¶ 189.)  But "[t]he Ninth Circuit cases relying on the 'absurd to suggest' doctrine are usually based on concrete numbers, not majestic generalities." *See Know v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 967 (C.D. Cal. 2017) (citing *Berson*, 527 F.3d at 988 n.5; *Am. W.*, 320 F.3d at 928, 943 n.21).

/ / /

In *Berson*, for example, the defendant company received "stop work" orders from government customers, including one halting between $10 and $15 million of work on the company's largest contract with one of its most important customers, but misleadingly classified the contracts as part of its "backlog." 527 F.3d at 984, 988 & n.5. The Ninth Circuit concluded that it was permissible to infer that high-level managers must have known about the stop work orders "because of their devastating effect on the corporation's revenue." *Id.* at 987–89. In *American West*, which the Ninth Circuit later recognized was the weaker of the two cases, *see Berson*, 527 F.3d at 988, the Ninth Circuit permitted an inference that board members of the defendant airline, who were also corporate officers of another airline that was the defendant airline's largest shareholder, knew about maintenance and operational problems and misstatements made by the defendant airline because the board members attended several board meetings and "[i]t is absurd to suggest that the Board of Directors would not discuss either the repurchasing authorization for millions of dollars worth of stock or the [Federal Aviation Administration ("FAA")] investigations or negotiations, especially considering the fact that the FAA had indicated that it was considering penalties of up to $11 million." *Am. W.*, 320 F.3d at 925, 941–43 & n.21. Unlike in *Berson* and *American West*, Lead Plaintiff does not allege that Defendants concealed objective facts that were likely materially to impact the company's revenue. Instead, Lead Plaintiff alleges that Defendants concealed PriceSmart's subjective evaluations concerning its development of its OCE platform and acquisition of Aeroport.

The only concrete metric Lead Plaintiff identifies is PriceSmart's post-acquisition earnings per share, which decreased by $0.31 per share for the two post-acquisition quarters in Fiscal Year 2018 and by $0.47 per share for Fiscal Year 2019. (*See, e.g.*, CCAC ¶ 193.) For Fiscal Year 2018, PriceSmart reported EPS of $2.44. (*See* RJN Ex. 11 at F-25, F-47.) The reported impact of the Aeropost acquisition on PriceSmart's EPS was smaller than that attributable to tax reforms. (*See* RJN Ex. 12 at 5.) Further, the fourth quarter Fiscal Year 2018 EPS of $0.62 missed projections by only $0.05, (*see id.* at 1), compared to the $0.15 "hit" from the Aeropost acquisition. (*See* CCAC ¶ 155.) Even if the impact of the Aeropost

48

acquisition on PriceSmart's EPS was "so dramatic that it would be absurd to think that [defendants] did not know that something was wrong," *Twitter*, 2020 WL 7260479, at *14 (alteration in original) (quoting *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018)), '[k]nowledge of the problem . . . is insufficient to infer that [defendants] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly.'" *Id.* (alterations in original) (quoting *In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-4270 (RS), 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011)).

The Court therefore concludes that Lead Plaintiff fails to allege a strong inference of scienter under the core operations theory. *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *20–21 (N.D. Cal. Dec. 17, 2019) (concluding that the plaintiffs alleging that the defendant software company concerned with moving to the cloud engaged in false sales failed to establish scienter based on core operations theory because the importance of moving to the cloud "does not make every piece of information within the Company related to its Cloud business critical to the business's core operations" and the allegations were "not sufficient to show that the revenue generated by Sales Practices were material"); *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-cv-04882-BLF, 2018 WL 1411129, at *29 (N.D. Cal. Mar. 21, 2018) ("Even if Defendants had knowledge of the [target company] *acquisition* and the importance of integrating the companies, that does not amount to knowledge of the minutia of all integration efforts thereafter."); *Fadia*, 2016 WL 6679806, at *16–17 (concluding that the plaintiffs had failed to allege scienter under core operations theory where the defendant company was accused of misrepresentations concerning merger where the plaintiffs had "fail[ed] to provide evidence that suggests the current circumstances are somehow rare, which justifies an inference of scienter without particularized allegations"); *see also In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-4270 (RS), 2010 WL 4117561, at *10 (N.D. Cal. Oct. 19, 2010) ("Without sufficiently alleging actual falsity . . . , plaintiffs cannot rely on the concept of core operations to infer scienter as to either of the individual defendants."). Nonetheless, the Court will take into account Lead Plaintiff's allegations when conducting

its holistic review.  *See Webb*, 884 F.3d at 858 (quoting *S. Ferry*, 542 F.3d at 786); *see also infra* Section II.A.2.b.vi.

### iii.    Departure of Mr. Laparte

Lead Plaintiff alleges that Mr. Laparte's abrupt resignation several months after the Aeropost acquisition, without having lined up a permanent replacement, supports a strong inference of scienter.  (*See, e.g.*, CCAC ¶¶ 190–91.)  Defendants argue that, because Lead Plaintiff fails to allege facts connecting the resignation to the Aeropost acquisition or restatement, the more compelling inference is that Mr. Laparte resigned for an innocent reason.    (*See* Mot. Mem. at 21–22; Reply at 4–5.)    Lead Plaintiff responds that Mr. Laparte's abrupt resignation without a replacement and in the midst of revelations of wrongdoing supports an inference of scienter.  (*See* Opp'n at 34–35.)

"Although resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter, . . . [w]here a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of [the] restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).  "Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*

Lead Plaintiff attempts to meet this hurdle by arguing that the departure of Mr. Laparte without a formal replacement was inconsistent with "PriceSmart's practice, as exemplified by the fact that Heffner awaited his actual replacement (Jager) before retiring and leaving the Company." (*See* Opp'n at 34 (citing CCAC ¶¶ 33, 190).)  But a single instance does not establish a "practice," and no such hiring practices are alleged in the

Consolidated Class Action Complaint.  This leaves only the fact that Mr. Laparte resigned in the midst of the restatement, delays in the launch of PriceSmart's OCE, and Aeropost's negative drag on PriceSmart's earnings.  Under the Ninth Circuit's guidance in *Zucco*, these allegations do not suffice:  the more compelling inference is that Mr. Laparte resigned for innocuous reasons such as retirement, a new opportunity, or poor performance.  *See* 552 F.3d at 1002 (concluding that allegations that CFO retired just before disclosure of improper accounting and financial controls "cannot support [the plaintiff]'s allegations of scienter" despite resignations of independent accounting firm and two controllers during the class period).  The Court therefore concludes that Mr. Laparte's resignation does not raise a strong inference of scienter.

### iv.    Adverse EPS Impact

According to Lead Plaintiff, the proximity, magnitude, and ongoing duration of the adverse impact on PriceSmart's EPS from the Aeropost acquisition supports an inference of scienter. (*See* CCAC ¶¶ 192–94.)  Defendants respond that the adverse EPS impact does not suffice to establish a strong inference of scienter because "[i]f *intentional* misconduct could be inferred solely from declines in share prices or business losses, the PSLRA's heightened pleading requirements for scienter would be rendered meaningless."  (Mot. Mem. at 20 (emphasis in original) (quoting *Gammell*, 905 F. Supp. 2d at 1077).)  According to Lead Plaintiff, there was no intervening, independent event causing Aeropost's operational losses, which means that those losses are attributable to the obvious mismatch between PriceSmart's and Aeropost's business models. (*See* Opp'n at 30–31 (citing CCAC ¶ 194).)

The Court must agree with Defendants—that Aeropost negatively affected PriceSmart's EPS, standing alone, is insufficient to establish scienter.  *See, e.g.*, *City of Dearborn Heights*, 856 F.3d at 622–23 (concluding that magnitude of goodwill write-downs following acquisition, without more, did not establish strong inference of scienter); *Gammel*, 905 F. Supp. 2d at 1077 (concluding that magnitude of write-downs, without more, were insufficient to establish scienter).  The Court therefore concludes that, while

Lead Plaintiff's allegations concerning the adverse impact of Aeropost on PriceSmart's EPS may be relevant to the Court's holistic review, *see infra* Section II.A.2.b.vi, they do not establish a strong inference of scienter on their own.

v.      Alleged Admissions

Finally, Lead Plaintiff alleges that Defendants made certain "admissions" that they had not "figure[d] out" how to construct an OCE that "really works," which supports a strong inference of scienter.  (*See, e.g.*, CCAC ¶¶ 195–96.)  Specifically, Lead Plaintiff points to Mr. Price's statements from October 26, 2018, that PriceSmart was "struggling with the issue of how do you connect brick-and-mortar to online in a way that really works" and that he "d[id]n't think anybody's totally figured it out."  (*See id.* ¶ 195 (emphasis omitted).)  Lead Plaintiff also cites Mr. Laparte's statements from January 2018, that PriceSmart would "continue investing until [it] figure[d] out how to get on that space and create that omni-channel experience."  (*See id.* ¶ 196 (emphasis omitted).)

Defendants argue that the statements of Mr. Price—who is not a defendant to this action—cannot be attributed to Defendants.  (*See* Mot. Mem. at 23 (citing *Jui-Yang*, 2017 WL 1508991, at *21*).)  In any event, Defendants contend, Lead Plaintiff fails to identify any prior statements that were contradicted by Mr. Price's and Mr. Laparte's alleged "admissions."  (*See id.* at 22–24; *see also* Reply at 5.)

As discussed above, *see supra* Section II.A.2.a.ii, the Court agrees that Defendants never represented that the acquisition of Aeropost was "the solution" to PriceSmart's OCE platform.  Further, the Ninth Circuit has recognized that a statement made after the class period can establish that a statement was false when it was made only when the later statement is "along the lines of 'I knew it all along.'"  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 n.9 (9th Cir. 1994), *superseded by statute on other grounds as recognized by Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001)).  Lead Plaintiff's allegations fail to meet this high bar.  *See, e.g.*, *Jui-Yang*, 2017 WL 1508991, at *21* (concluding that interim CEO's statements that integration following acquisition "had not been successful" and that

52

1    the acquisition "wasn't a very good deal" did not suffice to demonstrate falsity of a prior

2    statement); *Browning v. Amyris, Inc.*, No. 13-cv-02209-WHO, 2014 WL 1285175, at *20

3    (N.D. Cal. Mar. 24, 2014) (concluding that post-class period statement did not establish

4    scienter because "all [the defendant company's president and CEO]'s statement shows is

5    that he did not realize how difficult his projections were to achieve" and "[a]cknowledging

6    that [the defendant company] had more trouble scaling up its process than anticipated does

7    not show that the defendants always knew that the projections were unattainable of that

8    they acted with scienter because 'it is clearly insufficient for plaintiffs to say that a later,

9    sobering revelation makes an earlier, cheerier statement a falsehood'" (quoting *Yourish*,

10   191 F.3d at 997)).  The Court therefore concludes that the alleged "admissions" made by

11   Mr. Price and Mr. Laparte fail to establish a strong inference of scienter.

12                          vi.    Holistic Review

13        Having determined that none of Lead Plaintiff's individual allegations of scienter

14   are compelling enough to create a strong inference under the PSLRA, the Court must

15   consider the allegations holistically.  *See, e.g.*, *Zucco*, 552 F.3d 981 (citing *Tellabs*, 551

16   U.S. at 322–23).  "[E]ven '[v]ague or ambiguous allegations are . . . properly considered

17   as a part of a holistic review when considering whether the complaint raises a strong

18   inference of scienter,'" *id.* (second alteration in original) (quoting *S. Ferry*, 542 F.3d at

19   784), but the court "must also 'take into account plausible opposing inferences' that could

20   weigh against a finding of scienter." *Id.* (quoting *Tellabs*, 551 U.S. at 323).  The Ninth

21   Circuit has cautioned that, "[e]ven if a set of allegations may create an inference of scienter

22   greater than the sum of its parts, it must still be at least as compelling as an alternative

23   innocent explanation." *Id.*

24        Even viewing Lead Plaintiff's allegations together, they are not as cogent or

25   compelling as a plausible alternative inference—that PriceSmart made a simple accounting

26   error in classifying its four-to-twelve-month CDs and was overly optimistic about its

27   acquisition of Aeropost and development of an OCE platform.  As currently alleged, it

28   appears that PriceSmart only began investing in four-to-twelve-month CDs, and

erroneously classifying them as cash or cash equivalents, during the Class Period.  (*See* CCAC ¶ 207.)  Further, Lead Plaintiff does not allege that PriceSmart faced any liquidity crisis such that it would stand to benefit from the intentional misclassification of these assets or that the misclassification of short-term investments as cash or cash equivalents would in any way offset the earnings issues the company was facing following its acquisition of PriceSmart.  It is therefore more plausible that the misclassification of the four-to-twelve-month CDs as cash or cash equivalents was simply an accounting error.

Similarly, the allegations concerning PriceSmart's due diligence, "core operations," the departure of Mr. Laparte, Aeropost's negative impact on PriceSmart's earnings, and PriceSmart's comments that it still had to "figure out" its OCE platform do not raise a strong inference of scienter.  As discussed above, *see supra* Sections II.A.2.b.i–ii, it is implausible that the Individual Defendants knowingly entered into a "bad" deal because they felt pressure to develop a workable OCE.  The more plausible inference is that Defendants believed the acquisition of Aeropost to be advantageous but that they were overly optimistic about the merger and its contribution to the development of PriceSmart's OCE.  The departure of Mr. Laparte is more likely collateral damage from the restatement, acquisition, or both or simply an unrelated, personal decision.  The Court therefore concludes that Lead Plaintiff has failed sufficiently to allege scienter under Federal Rule of Civil Procedure 9(b) or the PSLRA.  *See, e.g.*, *Zucco*, 552 F.3d at 1007.

\*   \*   \*

Because the Court concludes that Lead Plaintiff has failed adequately to allege actionable material misrepresentations or omissions and scienter, the Court **GRANTS** Defendants' Motion and **DISMISSES** Lead Plaintiff's first cause of action for violations of Section 10(b) and Rule 10b-5.

### B.   Section 20(a)

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent

as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a prima facie case under Section 20(a), a plaintiff must allege "(1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)).

Because Lead Plaintiff has failed adequately to allege a primary violation of Section 10(b) or Rule 10b-5, *see supra* Section II.A, the Court **GRANTS** Defendants' Motion and **DISMISSES** Lead Plaintiff's second cause of action for control person liability against the Individual Defendants. *See, e.g.*, *City of Dearborn Heights*, 856 F.3d at 623 (affirming district court's dismissal of Section 20(a) claim where the plaintiff had failed sufficiently to allege violations of Section 10(b) and Rule 10b-5).

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART AS MOOT** Defendants' Request for Judicial Notice (ECF No. 29-2), **GRANTS** Defendants' Motion to Dismiss (ECF No. 29), and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiff's Consolidated Class Action Complaint (ECF No. 26). Lead Plaintiff **MAY FILE** an amended consolidated class action complaint addressing the deficiencies identified in this Order within twenty-one (21) days of the electronic docketing of this Order. *Should Lead Plaintiff fail timely to file an amended complaint, this action will remain dismissed without prejudice.*

**IT IS SO ORDERED.**

Dated: February 23, 2021

Honorable Todd W. Robinson
United States District Court

55